# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

STEPHEN C. BULLOCK, in his official
capacity as Governor of Montana;
MONTANA DEPARTMENT OF REVENUE;
STATE OF NEW JERSEY,

*Plaintiffs,*

v.

INTERNAL REVENUE SERVICE;
CHARLES RETTIG, in his official
capacity as Commissioner of the
Internal Revenue Service; UNITED
STATES DEPARTMENT OF THE
TREASURY,

*Defendants.*

Case No. 4:18-cv-00103-BMM

**COMBINED BRIEF IN
SUPPORT OF SUMMARY
JUDGMENT AND
RESPONSE TO MOTION
TO DISMISS**

Gurbir S. Grewal
ATTORNEY GENERAL OF NEW JERSEY

Glenn Moramarco
ASSISTANT ATTORNEY GENERAL
Katherine A. Gregory
DEPUTY ATTORNEY GENERAL
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625
(609) 376-3235
(609) 777-4015 (fax)
*glenn.moramarco@law.njoag.gov*
*katherine.gregory@law.njoag.gov*

*Attorneys for Plaintiff State of New Jersey*

Raphael Graybill
CHIEF LEGAL COUNSEL
OFFICE OF THE GOVERNOR
P.O. Box 200801
Helena, MT 59620-0801
(406) 444-3179
(406) 444-5529 (fax)
*raphael.graybill@mt.gov*

Deepak Gupta
Matthew W.H. Wessler
Daniel Wilf-Townsend
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
*deepak@guptawessler.com*

*Attorneys for Plaintiffs Stephen C. Bullock
and Montana Department of Revenue*

April 17, 2019

# TABLE OF CONTENTS

Table of authorities ................................................................. ii

Introduction ............................................................................ 1

Background ........................................................................... 3

Summary of argument ........................................................ 15

Argument ............................................................................ 19

    I.    Revenue Procedure 2018-38 impermissibly amends a legislative rule without notice and comment. ...................................................... 19

    II.    The plaintiffs have standing to bring this case. ................................... 24

        A.    The plaintiffs have established an informational injury sufficient for Article III standing. ............................................... 26

            1.    Informational injury is a well-established injury for constitutional purposes. ................................................... 26

            2.    The plaintiffs have demonstrated an informational injury .............................................................................. 28

            3.    The IRS's arguments regarding the plaintiffs' informational injury are unavailing. ............................... 31

        B.    The plaintiffs also have standing because they have diverted resources in response to the IRS's decision ............... 38

        C.    The plaintiffs have standing because Revenue Procedure 2018-38 unlawfully interferes with their ability to enforce their laws. ...................................................... 43

        D.    The plaintiffs are within the zone of interests of the Internal Revenue Code's information-sharing provisions. .............................................................................. 46

    III.    The "committed to agency discretion" exception does not apply here. ............................................................................ 49

Conclusion ............................................................................ 53

# TABLE OF AUTHORITIES

## Cases

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,*
    789 F.2d 931 (D.C. Cir. 1986) ............................................................27, 32

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
    458 U.S. 592 (1982)...................................................................................18, 44

*American Friends Service Committee v. Webster,*
    720 F.2d 29 (D.C. Cir. 1983) ............................................................... 32

*American Institute of Certified Public Accountants v. IRS,*
    746 Fed. App'x 1 (D.C. Cir. 2018).............................................................23

*Americans for Prosperity Foundation v. Becerra,*
    903 F.3d 1000 (9th Cir. 2018) .......................................................... 30

*Americans for Prosperity Foundation v. Harris,*
    809 F.3d 536 (9th Cir. 2015)....................................................................... 30

*Association of Public Agency Customers v. Bonneville Power Administration,*
    733 F.3d 939 (9th Cir. 2013) ..............................................................46, 47

*ASSE International., Inc. v. Kerry,*
    803 F.3d 1059 (9th Cir. 2015).............................................................18, 50

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...............................................................................48

*Bullock v. Fox,*
    2019 MT 50...........................................................................................45

*Buschmann v. Schweiker,*
    676 F.2d 352 (9th Cir. 1982)..............................................................18, 52

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018)....................................................................20

*Citizens for Responsibility and Ethics in Washington v. Executive Office of President,*
    587 F.Supp.2d 48 (D.D.C. 2008) ........................................ 27, 28, 30, 31

*Citizens United v. Schneiderman,*
  882 F.3d 374 (2d Cir. 2018) ................................................................. 30

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) ............................................................................. 33

*Cohen v. United States,*
  578 F.3d 1 (D.C. Cir. 2009) ................................................................... 51

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
  657 F.3d 936 (9th Cir. 2011) (en banc) ..................................... 40, 42, 43

*Center for Competitive Politics v. Harris,*
  784 F.3d 1307 (9th Cir. 2015) ............................................................... 30

*Czyzewski v. Jevic Holding Corp.,*
  137 S. Ct. 973 (2017) ........................................................................... 42

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) .................................................. 18, 50, 51, 53

*East Bay Sanctuary Covenant v. Trump,*
  909 F.3d 1219 (9th Cir. 2018) ...................................................... 17, 39, 49

*Erringer v. Thompson,*
  371 F.3d 625 (9th Cir. 2004) ........................................................ *passim*

*Fair Housing of Marin v. Combs,*
  285 F.3d 899 (9th Cir. 2002) ................................................................. 43

*FEC v. Akins,*
  524 U.S. 11 (1998) ................................................................................ 26

*Florida State Conference of NAACP v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) ............................................................. 43

*Gunderson v. Hood,*
  268 F.3d 1149 (9th Cir. 2001) ............................................................... 23

*Hajro v. U.S. Citizenship and Immigration Services,*
  811 F.3d 1086 (9th Cir. 2015) .......................................................... 28, 32

*Harris v. Olszewski,*
442 F.3d 456 (6th Cir. 2006)......................................................53

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ...................................................................39

*Hawaii v. Trump,*
859 F.3d 741 (9th Cir. 2017) ....................................................44

*Hemp Industries Association v. DEA,*
333 F.3d 1082 (9th Cir. 2003) .................................... 19, 20, 21

*International Brotherhood of Teamsters v. Pena,*
17 F.3d 1478 (D.C. Cir. 1994)..................................................48

*Lincoln v. Vigil,*
508 U.S. 182 (1993).....................................................................52

*Lively v. United States,*
870 F.2d 296 (5th Cir. 1989) ...................................................53

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ...................................................................25

*Massachusetts v. EPA,*
549 U.S. 497 (2007).............................................................. 25, 46

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012).............................................................. 46, 47

*Mendoza v. Perez,*
754 F.3d 1002 (D.C. Cir. 2014) ........................................ 23, 24

*National Council of La Raza v. Cegavske,*
800 F.3d 1032 (9th Cir. 2015) .................................................39

*Northwest Requirements Utilities v. F.E.R.C.,*
798 F.3d 796 (9th Cir. 2015) ............................................ 46, 49

*P.E.T.A. v. U.S. Department of Agriculture,*
797 F.3d 1087 (D.C. Cir. 2015)............................... 27, 28, 31, 39

iv

*Pacific Shores Properties, LLC v. City of Newport Beach,*
   730 F.3d 1142 (9th Cir. 2013) ................................................42

*Payne Enterprise, Inc. v. United States,*
   837 F.2d 486 (D.C. Cir. 1988) ...............................................28

*Perez-Guzman v. Lynch,*
   835 F.3d 1066 (9th Cir. 2016)...........................................37, 38

*Pinnacle Armor, Inc. v. United States,*
   648 F.3d 708 (9th Cir. 2011)...................................................51

*Public Citizen v. Carlin,*
   2 F.Supp.2d 1 (D.D.C. 1997) .....................................28, 30, 32

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015)...................................................44

*Virginia ex rel. Cuccinelli v. Sebelius,*
   656 F.3d 253 (4th Cir. 2011)...................................................44

*Washington Environmental Council v. Bellon,*
   732 F.3d 1131 (9th Cir. 2013) ................................................25

*West Virginia ex rel. Morrisey v. HHS,*
   827 F.3d 81 (D.C. Cir. 2016) ..................................................42

*Wilderness Society, Inc. v. Rey,*
   622 F.3d 1251 (9th Cir. 2010) ................................................26

*Woodahl v. State Highway Commissionn,*
   155 Mont. 32, 465 P.2d 818 (1970) ........................................45

*Wyoming ex rel. Crank v. United States,*
   539 F.3d 1236 (10th Cir. 2008)...............................................44

*Zivotofsky ex rel. Ari Z. v. Secretary of State,*
   444 F.3d 614 (D.C. Cir. 2006) ................................................27

## Statutes and Regulations

5 U.S.C. § 553(b)..................................................................*passim*

5 U.S.C. § 706(2)(D) ...........................................16, 19, 34, 48

26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) .................................................. 37

26 C.F.R. § 1.501(c)(5)-1(a)(1) ...................................................... 37

26 C.F.R. § 1.6033-2 .................................................................. 9, 16

26 C.F.R. § 1.6033-2(a)(2)(ii)*(f)* .......................................... 21, 22, 31

26 C.F.R. § 1.6033-2(g)(6) ............................................................ 52

26 U.S.C. §§ 1–3 ........................................................................ 6

26 U.S.C. § 162 ........................................................................ 36

26 U.S.C. § 501 ....................................................................... 6, 7

26 U.S.C. § 501(c)(4) ................................................................ 7, 8

26 U.S.C. § 6033(a)(1) .......................................................... 10, 52

26 U.S.C. § 6033(a)(3)(B) ........................................................... 50

26 U.S.C. § 6103(b) ........................................................... 6, 19, 36

26 U.S.C. § 6103(d) .............................................................. *passim*

26 U.S.C. § 6104(c)(3) .............................................................. 37

26 U.S.C. § 6652(c) .................................................................. 24

36 Fed. Reg. 11,025 (June 8, 1971) ................................................ 22

Internal Revenue Code of 1954, Pub. L. No. 83-591, § 6103(b), 68A Stat. 1, 754 (1954) ............................................................................. 5

Mont. Code Ann. § 15-31-102 (2017) ............................................ 7, 8

N.J. Admin. Code § 13:48-4.1(b)(7) .............................................. 12

N.J. Admin. Code § 13:48-5.1(b)(5) .............................................. 12

N.J. Stat. Ann. § 45:17A-20 (West 2018) ........................................ 11

N.J. Stat. Ann. § 54:32B-9 (West 2018) ......................................... 7, 8

N.J. Stat. Ann. § 54:10A-3(e) (West 2018).................................................................... 8

Revenue Act of 1913, Pub. L. No. 63-16, § II G. (d), 38 Stat. 114, 177 (1913) .................. 5

Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 1202, § 6103(d), 90 Stat. 1520, 1669 (1976) ........................................................................5

Treasury Decision 7122, 36 Fed. Reg. 11,025 (June 8, 1971) ........................................ 9

**Other Agency Materials**

Internal Revenue Service, *2011 Annual Report & 2012 Work Plan*, https://perma.cc/D2XF-DZTW ........................................................ 11

Internal Revenue Service, *Donations to Section 501(c)(4) Organizations* (Mar. 26, 2019), https://perma.cc/BS9V-95EK............................................................36

Revenue Ruling 81-95, 1981-1 C.B. 332 ...................................................................... 8

Revenue Procedure 2018-38 ...............................................................................*passim*

**Other Authorities**

50 Cong. Rec. 3869 (1913).............................................................................................5

Application for Writ of Prohibition, *McGrath v. Martz*, 2004 WL 2985143 ................45

Center for Responsive Politics, *Dark Money Basics* (July 23, 2018), http://perma.cc/GQR2-6GDT ..................................................................... 3, 10

Daniel C. Kirby, *The Legal Quagmire of IRC § 501(c)(4) Organizations and the Consequential Rise of Dark Money in Elections*, 90 Chi.-Kent L. Rev. 223 (2015) .............................................................................................................. 8

Anna Massoglia and Karl Evers-Hillstrom, *Senate votes to prevent 'dark money' from getting even darker,* Center for Responsive Politics (Dec. 12, 2018), https://perma.cc/53S2-X64S ..................................................................35

Victor Reklaitis, *Secret political spending on track to reach $1 billion milestone*, MarketWatch (Nov. 26, 2018), https://on.mktw.net/2QgjYZo ...................... 3, 10

Staff of Joint Committee on Taxation, 94th Cong., General Explanation of the Tax Reform Act of 1976 (Comm. Print 1976), 1976 WL 352412 ..............*passim*

# INTRODUCTION

In recent years, there has been a dramatic rise in political spending activity by "dark money" groups. These groups with unknown funding sources are often set up as social welfare organizations that seek tax-exempt status. But state and federal laws restrict how tax-exempt organizations spend their money, limiting political spending and requiring that their activities benefit the broader community. And state charities laws protect the public by prohibiting charitable organizations from misleading donors in the course of raising money, from self-dealing, and from other unlawful conduct.

Enforcing these laws can be difficult. Among other things, it requires state and federal regulators to consider where these groups' funding comes from and how money flows among and between different organizations. The ability to track who is giving money to what groups allows state officials to identify suspicious patterns of activity, determine whether organizations are complying with the law, and alert donors who may be the victims of fraud.

To assist state law-enforcement efforts, federal law has required for more than a century that the IRS disclose to state officials information that it gathers from federal tax returns. And more than forty years ago, the IRS issued a regulation that requires certain tax-exempt organizations to identify the names and addresses of their substantial contributors on the "Schedule B" form submitted with their annual

returns. Because of this regulation, state tax agencies like those in Montana and New Jersey have been able to rely on the IRS's determinations that tax-exempt entities adhere to legal requirements, and state tax and charities regulators have also been able to access substantial-contributor information via exempt organizations' Schedule B forms.

But last year, the IRS attempted to undo this key regulatory requirement. It did so by publishing a six-page document titled "Revenue Procedure 2018-38"— without following the notice-and-comment procedures required by the Administrative Procedure Act. Under foundational principles of administrative law, agencies may only alter or amend their regulations by promulgating new regulations via notice and comment—in other words, it takes a rule to change a rule. Revenue Procedure 2018-38 therefore cannot alter or amend the IRS's regulations. But it does just that: it provides that "tax-exempt organizations . . . will no longer be required to provide names and addresses of contributors . . . and thus will not be required to complete these portions of their Schedules B." These "revised reporting requirements"—to use the IRS's own description—alter the rights and obligations of regulated entities, and thus may lawfully be issued only via notice and comment.

The plaintiffs are responsible for enforcing the laws of Montana and New Jersey with respect to tax-exempt organizations. They ask this Court to resolve this straightforward legal issue via summary judgment and set aside the IRS's unlawful

action. The IRS, meanwhile, has filed a motion to dismiss, arguing primarily that the plaintiffs have no interest in this issue and therefore do not have standing. But federal tax law specifically gives state agencies a legal entitlement to information gathered by the IRS, and the IRS's actions have deprived the plaintiffs of key information. In addition, the plaintiffs now must divert their own resources to address the lack of information that is essential to enforcement of tax and consumer-protection laws. The plaintiffs thus have standing and this Court should enter summary judgment.

## BACKGROUND

States face numerous difficulties in enforcing the laws governing tax-exempt organizations. For one, campaign spending by "dark money" groups has spiked in recent years, increasing more than fifty-fold in the last fifteen years. *See* Center for Responsive Politics, *Dark Money Basics* (July 23, 2018), http://perma.cc/GQR2-6GDT. By some estimates, the total political spending by these groups since 2010 has reached close to one billion dollars. Victor Reklaitis, *Secret political spending on track to reach $1 billion milestone*, MarketWatch (Nov. 26, 2018), https://on.mktw.net/2QgjYZo. The opacity of these groups' operations can make it difficult for states to enforce their laws protecting the public from fraud and misrepresentation by charities, as enforcing those laws often requires knowing about the underlying funding sources of tax-exempt entities.

This case challenges a recent decision by the IRS—reached without the public input provided by the normal notice-and-comment procedures required by the Administrative Procedure Act—to stop gathering information on the funding sources of many tax-exempt organizations. *See* Revenue Procedure 2018-38. This background section introduces the statutory regime that has governed federal-state sharing of tax information sharing over the last century, and then describes how information regarding substantial contributors to tax-exempt organizations is necessary to effectively enforce the law governing those organizations. Finally, it describes how Revenue Procedure 2018-38 changed the IRS's existing regulatory regime that required tax-exempt organizations to report substantial-contributor information, leading to this lawsuit.

***1. Federal and state information sharing.*** For more than a century— and for the entire existence of the modern income tax—there has been a strong federal policy of sharing federal tax information with state governments. In 1913, several months after the constitutional amendment enabling a federal income tax was ratified, Senator Robert La Follette proposed amending a new tax bill to provide that "the proper officers of any State imposing a general income tax" would "have access to" tax returns "or an abstract thereof" from each "corporation, joint-stock company, association, or insurance company" filing tax returns under the bill. 50

Cong. Rec. 3869 (1913). A fellow Senator deemed the proposal "absolutely unobjectionable," and it was immediately accepted and enacted into law. *Id.*

That provision has endured through today, with periodic expansions by Congress, and is now codified at 26 U.S.C. § 6103(d). *See also* Revenue Act of 1913, Pub. L. No. 63-16, § II G. (d), 38 Stat. 114, 177 (1913); Internal Revenue Code of 1954, Pub. L. No. 83-591, § 6103(b), 68A Stat. 1, 754 (1954); Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 1202, § 6103(d), 90 Stat. 1520, 1669 (1976). Section 6103(d) mandates that "[r]eturns and return information with respect to taxes imposed by" a broad swath of the federal tax code "shall be open to inspection by, or disclosure to, any State agency, body, or commission" that is "charged under the laws of such State with responsibility for the administration of State tax laws," "for the purpose of . . . the administration of such laws." 26 U.S.C. § 6103(d).

As Congress's Joint Committee on Taxation explained when updating Section 6103(d) in 1976, this information-sharing requirement advances two important policies. *First*, sharing information helps ensure that tax laws are followed: "With Federal tax information, the States are able to determine if there are discrepancies between the State and Federal returns in, e.g., reported income." Staff of Joint Comm. on Taxation, 94th Cong., General Explanation of the Tax Reform Act of 1976 (Comm. Print 1976), 1976 WL 352412, at *32. *Second*, providing states with information from the federal government leverages the federal government's capacity and helps shore up

state resources: "many States have only a few, if any, of their own tax auditors and rely largely (or entirely) on Federal tax information in enforcing their own tax laws." *Id.* As a result, Section 6103(d) reflects Congress's stance that "it is important that the States continue to have access to Federal tax information for tax administration purposes." *Id.*

The goals described in Section 6103(d)'s legislative history are reflected in the broad scope of its text. "Returns and return information"—the items it requires the federal government to share with the states—encompasses a wide universe of material. *See* 26 U.S.C. § 6103(b). The term "[r]eturn" includes "any tax or information return . . . which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed." *Id.* "[R]eturn information," meanwhile, includes (among other things) all "data . . . collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense." *Id.* Section 6103(d) covers all of this material "with respect to taxes imposed by" over a dozen chapters of the Internal Revenue Code, including chapter 1—the chapter that, among other things, imposes the general income tax and governs tax-exempt organizations. *See, e.g.*, 26 U.S.C. §§ 1–3, 501.

The net effect of these terms is that the federal government "shall" disclose to state tax officials all information it collects that is relevant to determining the existence or amount of liability under many sections of the Internal Revenue Code. 26 U.S.C. § 6103(d).

**2. *Tax-exempt organizations*.** While the information-sharing provisions of the Internal Revenue Code apply to the information reported to the IRS by many entities, this case focuses on tax-exempt organizations in particular. The federal tax laws, as well as Montana and New Jersey state laws, recognize a set of organizations that are exempt from normal taxation requirements. *See, e.g.*, 26 U.S.C. § 501; Mont. Code Ann. § 15-31-102 (2017); N.J. Stat. Ann. § 54:32B-9 (West 2018). Exempt organizations are often referred to as "501(c)" organizations after the section of the federal Internal Revenue Code that provides for their tax-exempt status. *See* 26 U.S.C. § 501.

In exchange for the benefits of tax exemption, exempt organizations must meet a variety of requirements, many of which are designed to ensure that they provide benefits to the broader community. Section 501(c)(4) organizations, for instance, must be "operated exclusively for the promotion of social welfare" or have "net earnings . . . devoted exclusively to charitable, educational, or recreational purposes." *Id.* § 501(c)(4)(A). Additionally, "no part of the net earnings of" a 501(c)(4) entity may "inure[] to the benefit of any private shareholder or individual."

*Id.* § 501(c)(4)(B). Montana and New Jersey have similar requirements in their own tax laws. In both states, many organizations can be exempt from certain taxes only if "no part" of their net income "inures to the benefit of any private stockholder or individual." Mont. Code Ann. § 15-31-102 (2017); *see also* N.J. Stat. Ann. §§ 54:32B-9, 54:10A-3(e) (West 2018).

The restrictions on exempt organizations are also particularly important in the sphere of political activity. Under the Internal Revenue Code, for instance, a 501(c)(4) organization may participate in some political activities, provided that they do not constitute the organization's primary activity. *See* Rev. Rul. 81-95, 1981-1 C.B. 332. And in recent years, 501(c)(4) organizations have come under increased scrutiny because of the large (and growing) amount of money they have collectively spent on political activity around elections. *See, e.g.*, Daniel C. Kirby, *The Legal Quagmire of IRC § 501(c)(4) Organizations and the Consequential Rise of Dark Money in Elections*, 90 Chi.-Kent L. Rev. 223 (2015).

When it comes to determining whether exempt organizations are adhering to legal obligations such as the ban on private inurement, limitations on political activity, or the requirements of state charities laws, a key piece of information is the source of those organizations' income—and in particular, the identity of contributors to the organization. For example, if a plumber organized her business under the guise of a tax-exempt organization, she might receive income by means of "contributions." But

if a tax regulator has access to the names and addresses of the organization's "contributors," it may be possible to determine that these persons are in fact the clients who received the plumber's services, not simply charitable third parties, and thereby conclude that tax-exempt status is inappropriate.

Similarly, information about the identity of exempt organizations' contributors is foundationally important for enforcing limits on political activity. For instance, Organization A might spend 49% of its funding on political activities, and donate the remaining 51% of its funding to another organization focused on similar issues, Organization B. But if Organization B uses those funds for political activities, then essentially all of Organization A's funding would have been used for political activities—which could exceed the legal limits. Knowing that Organization A gave money to Organization B would be essential in determining this violation of the tax law. Tax authorities therefore need to know the identities of contributors to exempt entities to ensure that those entities are complying with the law.

***3. Contributor information before Revenue Procedure 2018-38.*** Due to the importance of this information, more than forty years ago the IRS issued a regulation requiring certain exempt organizations to report annually to the IRS the identities of persons who contributed a substantial amount of money to the organization during the year. *See* Treasury Decision 7122, 36 Fed. Reg. 11,025 (June 8, 1971). That regulation, currently codified at 26 C.F.R. § 1.6033-2, states that covered

exempt organizations shall file a return including "the names and addresses of all persons who contributed, bequeathed, or devised $5,000 or more (in money or other property) during the taxable year."

For many years, the IRS has implemented this regulation in part via a form known as "Schedule B," on which exempt organizations list the names and addresses of their significant contributors. *See* Rev. Proc. 2018-38 at 2–4. This regulatory system was created pursuant to the IRS's statutory authority under 26 U.S.C. § 6033, which requires exempt organizations to submit annual tax returns and allows the IRS to issue regulations defining what information must be included in those returns. *See* 26 U.S.C. § 6033(a)(1).

In the time since this regulatory regime was implemented, the importance of the information gathered via Schedule B has only grown. Political activity has increased dramatically by organizations claiming exemption under Sections 501(c)(4), (c)(5), and (c)(6) of the Internal Revenue Code. By one estimate, campaign spending by "dark money" groups—primarily organizations that are exempt under these sections—increased more than fifty-fold between 2004 and 2016. *See* Center for Responsive Politics, *Dark Money Basics*. The total political spending by these groups since 2010 has been estimated at close to one billion dollars. Victor Reklaitis, *Secret political spending on track to reach $1 billion milestone*. In 2011, the IRS's Tax Exempt and Government Entities Division itself noted that Form 990 (which includes Schedule

B) provided the IRS with "a wealth of information" on exempt organizations and touted the benefits of the information in "enforc[ing] the rules relating to political campaigns . . . ." Internal Revenue Service, *2011 Annual Report & 2012 Work Plan*, https://perma.cc/D2XF-DZTW. Information from Form 990 has helped the IRS respond to "serious allegations of impermissible political intervention" and ensure compliance with the tax laws. *Id.*

In addition to being important for state tax regulators, having access to contributor information also equips state charities regulators with a powerful tool to enforce consumer-protection laws. For example, a principal mission of New Jersey's Division of Consumer Affairs (DCA) is to protect the public from fraud, deceit, and misrepresentation by charitable organizations operating in or raising money in the State. Rodríguez Decl. ¶ 5. This includes the regulation of social welfare organizations (also known as Section 501(c)(4) organizations). *See* N.J. Stat. Ann. § 45:17A-20 (West 2018). The State's Director of Consumer Affairs has prioritized DCA's enforcement of New Jersey's Charitable Registration and Investigation Act to protect donors and root out fraud, and has allocated additional resources toward this goal. Rodríguez Decl. ¶ 9. The substantial-contributor information contained in Schedule B allows DCA to track contributions over time and identify suspicious patterns of activity, locate donors to aid in determining whether the entity is soliciting

from individuals within New Jersey, and otherwise supplement its investigations under the Charitable Registration and Investigation Act. *Id.* at ¶ 12.

Given the federal government's resources, the rigor of its exempt-entity determinations, and the longstanding policy of federal-state information sharing, state tax agencies have structured their own policies and practices with the IRS's regulations in mind. *See, e.g.*, Walborn Decl. ¶ 8. Montana's Department of Revenue, for instance, "regularly requests and receives information from the IRS" pursuant to Section 6103(d)'s information-sharing provision. *Id.* at ¶ 6. New Jersey's Division of Taxation likewise "regularly receives federal tax information from the IRS" and, to that end, "maintains information-sharing agreements" with the IRS "pursuant to 26 U.S.C. § 6103(d)." Dallett Declaration ¶¶ 2–4.

The plaintiffs have regularly relied in particular on the IRS regulations requiring the reporting of substantial-contributor information via Schedule B. New Jersey requires certain organizations claiming tax-exempt status to file registration statements with New Jersey's Division of Consumer Affairs. These registration statements must include a "complete copy of the charitable organization's most recent [IRS] filing(s)," including "[a]ll schedules." N.J. Admin. Code § 13:48-4.1(b)(7) (concerning short-form registrations or renewals); *see also* N.J. Admin. Code § 13:48-5.1(b)(5) (concerning long-form registrations or renewals). Before Revenue-Procedure

2018-38, New Jersey thus obtained substantial-contributor information via the IRS's Schedule B forms. Rodríguez Decl. ¶¶ 8, 13.

Montana, in turn, requires tax-exempt entities to report whether they have received a federal exemption. Because federal law contains similar standards to Montana law, and because the IRS's regulations require entities to submit the necessary information for exemption determinations, Montana relies on the IRS's exemption determinations when making its own exemption determinations under state law. Walborn Decl. ¶¶ 9–10. Additionally, the Montana Department of Revenue sometimes receives copies of organizations' Schedule B forms as a matter of course during the normal process of evaluating organizations for exemptions. *Id.* ¶ 10.

**4. Revenue Procedure 2018-38.** In July 2018, the IRS issued a document entitled Revenue Procedure 2018-38. It issued this document without providing public notice or soliciting comment under the Administrative Procedure Act. Revenue Procedure 2018-38 effectively repealed the requirement under existing IRS regulations that exempt organizations submit substantial-contributor information on their annual tax returns via Schedule B. The Revenue Procedure set an effective date of May 15, 2019, and said that as of that date, "tax-exempt organizations required to file the Form 990 or Form 990-EZ . . . will no longer be required to provide names

and addresses of contributors on their Forms 990 or Forms 990-EZ and thus will not be required to complete these portions of their Schedules B." Rev. Proc. at 5.

The Revenue Procedure further stated that "[o]rganizations relieved of the obligation to report contributors' names and addresses must continue to keep this information in their books and records in order to permit the IRS to efficiently administer the internal revenue laws through examinations of specific taxpayers." *Id.* at 6. But it did not state the legal authority for this information-preservation requirement, did not state the length of time such information must be kept, and did not provide any penalties for violating this requirement. *Id.* The Revenue Procedure noted that its "revised reporting requirements" would "apply to information returns for taxable years ending on or after December 31, 2018." *Id.*

Because Revenue Procedure 2018-38 decreases the amount of information collected by the IRS, it diminishes the information available to Montana, New Jersey, and other states through the information-sharing provisions of Section 6103(d) of the Internal Revenue Code. It also diminishes states' ability to rely on the IRS's own tax-exemption determinations. Walborn Decl. ¶ 13. In addition, as a result of Revenue Procedure 2018-38, New Jersey's collection of Schedule B forms from charitable organizations will no longer result in the Division of Consumer Affairs having access to substantial-contributor information. Rodríguez Decl. ¶ 13–14. Later in 2018, New Jersey therefore began the process of revising its tax regulations to

require certain entities to submit that information on a new, state-created form. *Id.* ¶¶ 15–21. This process required months of review by regulatory specialists and legal counsel, taking significant government resources. And if a rule ultimately gets finalized, it will be subject to enforcement challenges and will require education and outreach to affected entities, further burdening the State's budget. *Id.*

*5. **This case.*** Shortly after Revenue Procedure 2018-38 was issued, Governor Bullock and the Montana Department of Revenue filed the initial complaint in this case, alleging that the Revenue Procedure impermissibly amended a legislative rule without going through the required process of notice and comment. Dkt. No. 1. Earlier this year, after the IRS filed its first motion to dismiss, the plaintiffs amended the complaint to include the State of New Jersey as well. Dkt. No. 16. The IRS has moved to dismiss the amended complaint. Dkt. No. 31. In this combined brief, the plaintiffs respond to that motion to dismiss and argue in support of their motion for summary judgment, which has been filed concurrently.

## SUMMARY OF ARGUMENT

**I.** One of the hallmarks of federal administrative law is that agencies may only alter or amend their regulations by promulgating new regulations via notice and comment—in other words, it takes a rule to change a rule. *See, e.g.*, *Erringer v. Thompson*, 371 F.3d 625, 632 (9th Cir. 2004) ("Any rule that effectively amends a prior legislative rule is legislative and must be promulgated under notice and comment rulemaking.").

The Administrative Procedure Act (APA) requires courts to "hold unlawful and set aside" any agency action that does not adhere to this "procedure required by law." 5 U.S.C. § 706(2)(D).

The IRS's Revenue Procedure 2018-38 violates the APA's notice-and-comment requirements. It amends the IRS regulation codified at 26 C.F.R. § 1.6033-2 by eliminating the substantial-contributor reporting requirement for all covered entities. The Revenue Procedure states that the relevant exempt entities "will no longer be required to provide names and addresses of contributors." Rev. Proc. at 5. This statement is not simply an interpretation of a statute, regulation, or other source of authority—it is a change in the legal requirements that apply to tax-exempt entities.

The Revenue Procedure confirms this in numerous places, describing its purpose as "modifying the information to be reported to the IRS," *id.* at 1, referring to its terms as "revised reporting requirements" and describing the entities that it affects as "[o]rganizations relieved of the obligation to report contributors' names and addresses," *id.* at 6. The Revenue Procedure thus "effectively amends" an existing regulation, and should have been promulgated via notice-and-comment rulemaking. *Erringer*, 371 F.3d at 632; 5 U.S.C. § 553(b).

**II.** The IRS's arguments to the contrary do not succeed. Its main argument is that the plaintiffs lack standing to pursue this case because they have not asserted an

injury to a legally protected interest. But federal tax law specifically protects states' interests in the information gathered by the IRS, requiring the IRS to disclose tax information to state tax officials for the purposes of enforcing state tax law. *See* 26 U.S.C. § 6103(d). And standing doctrine has long recognized that a plaintiff is injured for Article III purposes when it has a statutory right to information but federal agency action hinders its ability to exercise that right. Montana and New Jersey regularly exercise their rights under Section 6103(d), and the IRS cites no authority for the proposition that a plaintiff seeking to preserve its rights under an information-sharing provision must have previously sought the same specific documents in the past that it is trying to preserve access to in the future.

The plaintiffs also have standing on two other, independent grounds. First, they have diverted resources in an effort to adjust to Revenue Procedure 2018-38's effects on the information available to them and their ability to rely on the IRS's own tax-exemption determinations. *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1241 (9th Cir. 2018). New Jersey has gone to considerable lengths, including proposing to amend its regulations regarding the registration of charitable organizations, while Montana's Department of Revenue continues to expend staff time in an effort to develop a resource plan to make up for the IRS's decision. And second, for purposes of Article III standing, states have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this includes the power

to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 601 (1982). The IRS's unlawful repeal of its reporting requirements hinders the plaintiffs' ability to enforce their legal codes by depriving them of relevant information to which they are statutorily entitled.

**III.** The IRS's only remaining defense is that the decision to issue Revenue Procedure 2018-38 is committed to agency discretion, and therefore not reviewable under the Administrative Procedure Act. But this argument unreasonably stretches a "narrow exception to the presumption of judicial review of agency action." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1082 (9th Cir. 2014). Actions are committed to agency discretion only when "there is no law to apply." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015). The exception does not apply where, as in this case, there are clear procedural requirements imposed by law: the requirements of notice and comment. In such situations, even if the ultimate substance of a decision is committed to agency discretion, "procedural safeguards that assure the public access to the decision-maker should be vigorously enforced." *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982). In other words, even if the IRS is right that it has discretion over the substance of the ultimate decision about what tax information to collect, that would not permit the IRS to make such a decision without respecting the procedural requirements of the APA.

## ARGUMENT

### I. Revenue Procedure 2018-38 impermissibly amends a legislative rule without notice and comment.

The Administrative Procedure Act requires federal agencies to go through a process of public notice and comment before amending legislative rules and regulations. *See generally Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003); 5 U.S.C. § 553(b). Revenue Procedure 2018-38 transparently amends the IRS's regulation 26 C.F.R. § 1.6033-2 by eliminating the substantial-contributor reporting requirement for all covered entities.[1] But Revenue Procedure 2018-38 was not issued via the notice-and-comment procedures required by the APA. This Court should therefore "hold unlawful and set aside" the Revenue Procedure as issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

The notice-and-comment requirements of the APA are a pillar of administrative law; where an agency improperly fails to follow them, courts must declare the agency's action "invalid and unenforceable." *Hemp Industries*, 333 F.3d at 1091. The IRS does not contend that notice-and-comment procedures were in fact

---

[1] Revenue Procedure 2018-38 at times refers to 501(c)(3) organizations, which are still required to report substantial-contributor information. But 501(c)(3)s are required by statute to report the names and addresses of substantial contributors. *See* 26 U.S.C. § 6033(b)(5). Because of this, the IRS's substantial-contributor regulation added a reporting requirement only for organizations that were not 501(c)(3)s.

followed. The only question, then, is whether they should have been. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).

As the IRS correctly notes, notice and comment are not required for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). But Revenue Procedure 2018-38 is a legislative rule—not an interpretive rule, statement of policy, or rule of agency organization, procedure, or practice. Courts can distinguish between legislative rules and these other agency issuances because legislative rules "create rights, impose obligations, or effect a change in existing law." *Hemp Industries*, 333 F.3d at 1087. Interpretive rules, in contrast, "merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Id.*

Importantly, interpretive rules and rules of agency organization or procedure cannot change existing legislative rules, whether explicitly or implicitly: "Any rule that effectively amends a prior legislative rule is legislative and must be promulgated under notice and comment rulemaking." *Erringer*, 371 F.3d at 632. And this Court should not "accept the agency characterization" of its own rule "at face value." *Hemp Industries*, 333 F.3d at 1087. The requirements of the APA mean that "an agency is not allowed to change a legislative rule retroactively through the process of disingenuous interpretation of the rule to mean something other than its original meaning." *Id.* at 1091 (citation omitted).

There is no way to read Revenue Procedure 2018-38 as anything but a legislative rule. Before the Revenue Procedure was issued, nearly all exempt organizations were required by law to file a Schedule B form with the IRS containing, among other things, "the names and addresses of all persons who contributed, bequeathed, or devised $5,000 or more (in money or other property) during the taxable year." 26 C.F.R. § 1.6033-2(a)(2)(ii)(f). The Revenue Procedure changed that, stating straightforwardly that "tax-exempt organizations . . . will no longer be required to provide names and addresses of contributors . . . and thus will not be required to complete these portions of their Schedules B." Rev. Proc. at 5. Without a doubt, the Revenue Procedure "effect[ed] a change in existing law." *Hemp Industries*, 333 F.3d at 1087. It is therefore a legislative rule. *Id.*

If this were not enough, the Revenue Procedure itself is full of language indicating that it has changed the law. It refers to its own purpose as "modifying the information to be reported to the IRS." Rev. Proc. at 1. It describes itself as containing "revised reporting requirements," giving an effective date on which "the revised reporting requirements generally will apply." *Id.* at 6. It describes the entities affected by the Revenue Procedure as "[o]rganizations relieved of the obligation to report contributors' names and addresses." *Id.* Such language—"revised . . . requirements," and "modif[ied]" "obligations"—reflect the reality that the Revenue Procedure "effectively amends" an existing regulation, *Erringer*, 371 F.3d at 632. Even

by its own characterization, then, the Revenue Procedure "is legislative and must be promulgated under notice and comment rulemaking." *Id.*

The IRS's arguments to the contrary are unavailing. Tellingly, the IRS's discussion of this issue does not even mention 26 C.F.R. § 1.6033-2, the regulation that Revenue Procedure 2018-38 "effectively amends." *Id.*; *see* Br. 26–29. Instead, the IRS refers to the broad statutory requirements of § 6033(a)(1), saying that the Revenue Procedure "clarifies the 'other information' that § 6033(a)(1) allows the IRS to require." Br. 27.

The problem with this argument is that the IRS already promulgated a regulation that implemented Section 6033 by requiring specific "other information." *See* 36 Fed. Reg. 11,025 (June 8, 1971). That regulation has been on the books for more than forty years. *Id.* So, rather than simply clarifying the broad term "other information" that exists in the governing statute, Revenue Procedure 2018-38 "revise[s] reporting requirements" under that statute's implementing regulations, "modif[ies] the information to be reported to the IRS" under those regulations, and provides that "[o]rganizations [are] relieved of the obligation to report contributors' names and addresses" (one of the specific kinds of "other information" that the statute's implementing regulations had required). Rev. Proc. at 1–6; *see also* 26 C.F.R. § 1.6033-2(a)(2)(ii)(f). It changes the regulations that were used to implement Section

6033. It cannot, therefore, be considered merely "a clarification or explanation . . . of the regulation" or the statute. *Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir. 2001).

The IRS argues that its stance is supported by *Am. Inst. of Certified Public Accountants v. IRS*, an unpublished D.C. Circuit opinion. Br. 27 (citing 746 Fed. App'x 1, 8 (D.C. Cir. 2018)). But that case involved a Revenue Procedure that created a completely voluntary program for tax preparers, not a Revenue Procedure that created or altered existing reporting obligations. *Am. Inst. of Certified Public Accountants*, 746 Fed. App'x at 4, 7. As the D.C. Circuit noted, the Revenue Procedure and the program it created "do not bind unenrolled preparers at all," and do not "impose any new or different requirement[s]." *Id.* at 10. The court noted further that the same requirements that "bound" affected parties before the Revenue Procedure "continue[d] to bind them" after. *Id.* at 10. That is a far cry from Revenue Procedure 2018-38, which by its own terms changes the obligations that "bind" affected entities.

Nor is the IRS right that Revenue Procedure 2018-38 is exempt from notice-and-comment requirements because it is a "procedural rule." Br. 27. As the IRS acknowledges, procedural rules are rules that "do not themselves alter the rights or interests of parties." Br. 28 (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014)). But, as discussed above, Revenue Procedure 2018-38 alters one of the basic obligations that IRS regulations impose: what information must be reported to the IRS on tax returns. The IRS offers no authority for the counterintuitive proposition

that "[c]hanging the information that" organizations "must report . . . does not alter the rights or interests of those organizations." Br. 28. Tax reporting requirements are serious legal obligations; exempt organizations, like everyone else, may be held liable and assessed penalties if they fail to file information that is required of them under the tax laws. *See, e.g.*, 26 U.S.C. § 6652(c). "The exception for procedural rules is narrowly construed." *Mendoza*, 754 F.3d at 1023. This Court should not broaden it by adopting the IRS's stance that changes to reporting requirements do not affect the rights or interests of regulated entities.

## II.  The plaintiffs have standing to bring this case.

The IRS asserts that the plaintiffs may not come in the courthouse door because they do not have standing under Article III of the Constitution. The IRS gives two main reasons: first, it contends that the plaintiffs cannot be injured by Revenue Procedure 2018-38 in the present or the future because they have not sought substantial-contributor information directly from the IRS in the past. Second, it says that the plaintiffs cannot have been injured by the Revenue Procedure because they can rely on their own authority to obtain that information "directly from exempt organizations." Br. 9. Additionally, the IRS argues that even if the plaintiffs have been injured, they still cannot proceed because they do not fall within the zone of interests of a federal statute.

None of these arguments succeeds. The plaintiffs had no need to seek this information from the IRS when their own residents would provide that information to state agencies along with their Schedule B forms. *See* Walborn Decl. ¶ 10; Rodríguez Decl. ¶ 8. And the fact that they now must spend their own resources to get this information directly is itself a basis for standing—an ongoing economic "injury in fact" that is caused by the IRS's Revenue Procedure 2018-38 and would be redressed by injunctive relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And that is just the beginning—the plaintiffs have several independent grounds for standing in this case, and the IRS has not rebutted any of them. Nor is the IRS right to argue that the plaintiffs are not within the zone of interests of the Internal Revenue Code's information-sharing provisions. The plaintiffs do not need to allege a violation of those provisions to invoke them in their procedural challenge under the Administrative Procedure Act, and there is no real dispute that the plaintiffs—a state, state agency, and state official responsible for enforcing state tax laws—fall within the zone of interests of a statute specifically designed to give them a right to information from the IRS.

Additionally, because this case involves the assertion of procedural rights by state government entities, the plaintiffs are "entitled to special solicitude" in the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *see also Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1145 (9th Cir. 2013) (identifying the assertion of a

procedural right by a sovereign state as the relevant "two factors warranting 'special solicitude'"). The plaintiffs would have standing in this case even without such special solicitude; with it, it is even clearer that standing should be no impediment to this Court reaching the merits of the plaintiffs' case.

**A.** **The plaintiffs have established an informational injury sufficient for Article III standing.**

**1. Informational injury is a well-established injury for constitutional purposes.**

To begin with, the plaintiffs have suffered an injury to their statutory right to obtain information from the IRS. The Supreme Court has repeatedly made clear that the "inability to obtain information" constitutes injury in fact where a plaintiff has a statutory right to obtain that information. *See FEC v. Akins*, 524 U.S. 11, 21 (1998). For instance, the Supreme Court held in *Akins* that the plaintiff was injured by its inability to obtain "lists of . . . donors . . . and campaign-related contributions and expenditures" that were required, on the plaintiff's own "view of the law," to be disclosed. 524 U.S. at 21.

This doctrine of "informational injury" or "informational standing" is well established, and arises under numerous statutes. *See, e.g.*, *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1258–59 (9th Cir. 2010) (describing the history of "informational injury serving as an injury-in-fact sufficient for standing," and noting that courts have found informational standing under the Freedom of Information Act (FOIA), the Federal

Advisory Committee Act, the Fair Housing Act, and the Clean Water Act). Informational standing is why, for instance, *any* citizen who makes a request under FOIA for *any* government record has Article III standing to sue if the request is denied. *See, e.g.*, *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617–18 (D.C. Cir. 2006) ("Anyone whose request for specific information has been denied has standing to bring an action. . . . The requester is injured-in-fact for standing purposes because he did not get what the statute entitled him to receive.").

In addition to providing standing where individual requests for information have been denied, informational injury may also serve as a basis for standing where a plaintiff challenges actions that affect its ability to access information in the future. *See, e.g.*, *Citizens for Responsibility and Ethics in Washington v. Exec. Office of President*, 587 F.Supp.2d 48, 59–61 (D.D.C. 2008). Plaintiffs thus can bring suits under the Administrative Procedure Act where the consequence of the agency action that they challenge is to deprive them of access to information that the government should be collecting. *See, e.g.*, *P.E.T.A. v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093–97 (D.C. Cir. 2015); *Action Alliance of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937–43 & nn. 9, 14 (D.C. Cir. 1986).

Similarly, plaintiffs who seek information to which they have a legal right of access may bring a "pattern or practice claim," in which they allege "that an agency policy or practice will impair the party's lawful access to information in the future."

*Hajro v. U.S. Citizenship and Immigration Services*, 811 F.3d 1086, 1103 (9th Cir. 2015) (emphasis omitted) (quoting *Payne Enter., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988)). A plaintiff who regularly requests information from a government entity via the Freedom of Information Act, for instance, has standing to challenge actions that allegedly violate other statutes if those actions would "shrink[] the pool of records" to which the plaintiff has access. *Citizens for Responsibility and Ethics in Washington*, 587 F.Supp.2d at 61; *see also Public Citizen v. Carlin*, 2 F.Supp.2d 1, 6 (D.D.C. 1997) (holding that plaintiffs who regularly make FOIA requests have standing to challenge regulatory actions that create "a real risk that records will not be available" in the future), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999). Informational injury is thus a basis for standing not only where a specific request has been denied, but also where a plaintiff has alleged that an agency's action or policy harms the plaintiff's ongoing and future interests in obtaining information. *See P.E.T.A.*, 797 F.3d at 109 (explaining that plaintiffs may successfully allege informational injury where an agency's action "significantly restrict[s]" the future "flow of information" to which those plaintiffs have a statutory right).

### 2. The plaintiffs have demonstrated an informational injury.

The Internal Revenue Code specifically gives state tax agencies a statutory right to the relevant "[r]eturns and return information," by providing that they "*shall be open to inspection by, or disclosure to, any State agency, body, or commission,*

or its legal representative, which is charged under the laws of such State with responsibility for the administration of State tax laws." 26 U.S.C. § 6103(d) (emphasis added).

The text of Section 6103(d) clearly provides the plaintiffs with a right to information: it is captioned "Disclosure to State tax officials and State and local law enforcement agencies," and uses mandatory language, saying that the IRS "shall" make the relevant information open to inspection or disclosure. *Id.* And the legislative history of Section 6103(d) supports this view, stating that "Congress feels that it is important that the States continue to have access to Federal tax information," both so that "the States are able to determine if there are discrepancies" between state and federal returns, and because "many States have only a few, if any, of their own tax auditors and rely largely (or entirely) on Federal tax information in enforcing their own tax laws." General Explanation of the Tax Reform Act of 1976, 1976 WL 352412, at *32.

Section 6103(d) thus represents a federal policy requiring the IRS to share tax information with the states, both to provide states with information that they would not otherwise have and to shore up limited state resources. And the plaintiffs regularly exercise their rights under this statute, obtaining a wide variety of information during the normal course of enforcing their tax laws. Walborn Decl. ¶¶ 5–8; Dallett Decl. ¶ 4.

This information is critically important. As the Ninth Circuit has recognized on multiple occasions, States have a "compelling interest" in gathering substantial-contributor information. *Americans for Prosperity Found. v. Becerra*, 903 F.3d 1000, 1006 (9th Cir. 2018); *see also Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1317 (9th Cir. 2015); *Americans for Prosperity Found. v. Harris*, 809 F.3d 536, 538–39 (9th Cir. 2015). Such information "facilitates investigative efficiency, and can help . . . flag suspicious activity." *Americans for Prosperity Found.*, 903 F.3d at 1009 (quoting *Citizens United v. Schneiderman*, 882 F.3d 374, 382 (2d Cir. 2018)). "Because fraud is often revealed not by a single smoking gun but by a pattern of suspicious behavior, disclosure of the Schedule B can be essential . . . in detecting fraud." *Id.* (same). Substantial-contributor information thus helps States achieve two important goals: "ensuring organizations that receive special tax treatment do not abuse that privilege," and "preventing those organizations from using donations for purposes other than those they represent to their donors and the public." *Id.* (same).

But Revenue Procedure 2018-38 unlawfully "shrink[s] the pool" of substantial-contributor information available under Section 6103(d), *Citizens for Responsibility and Ethics in Washington*, 587 F.Supp.2d at 61, and creates "a real risk that records will not be available" in the future, *Public Citizen*, 2 F.Supp.2d at 6. Under existing regulations, the IRS is supposed to collect Schedule B information that includes "the names and addresses of all persons who contributed, bequeathed, or devised $5,000 or more" to

exempt organizations. 26 C.F.R. § 1.6033-2(a)(2)(ii)(*f*). That information would then be available to the states under Section 6103(d)'s mandatory information-sharing provision. But Revenue Procedure 2018-38 effectively repealed this reporting regulation without the required notice and comment. As a result, the IRS is not collecting information that it is supposed to collect under its own regulations, meaning that the plaintiffs "will not be able to obtain these federal records." *Citizens for Responsibility and Ethics in Washington*, 587 F.Supp.2d at 61. Such an action, which "significantly restrict[s]" the "flow of information," causes an informational injury sufficient for Article III standing. *P.E.T.A.*, 797 F.3d at 109.

### 3. The IRS's arguments regarding the plaintiffs' informational injury are unavailing.

The IRS argues that the plaintiffs have suffered no informational injury because they have not previously sought to collect substantial-contributor information from the IRS. But the IRS cites no case in support of its stance that a plaintiff cannot assert an informational injury unless the plaintiff has previously sought the same information requested. And such a stance is contrary to existing case law regarding informational injury. In *P.E.T.A. v. U.S. Department of Agriculture*, for instance, the D.C. Circuit held that a plaintiff organization had standing to challenge agency inaction because if the agency did act in the way the plaintiff wanted, it would generate information to which the plaintiff was entitled. 797 F.3d at 1094–95; *see also Action Alliance of Senior Citizens of Greater Phila*, 789 F.2d at 939 n.9 (upholding standing

where plaintiffs were "injured by a loss of information" because challenged regulations did not provide for certain information to be collected). In such cases, the plaintiffs have not previously sought the information that serves the basis for their underlying injury—the whole point of their lawsuit is that the government has unlawfully failed to collect that information in the first place. *Id.*

Here, the plaintiffs routinely request and obtain a wide variety of information from the IRS—information to which state officials are uniquely entitled by statute—giving them at least as strong an interest in this information as the interests of historians, journalists, and civil society groups that regularly have standing under theories of informational injury. *See, e.g.*, *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 46, 57 (D.C. Cir. 1983). In such cases, it is enough for plaintiffs to demonstrate that they regularly seek broad categories of documents—for instance, that they "have made FOIA requests for electronic documents in the past and intend to request records in electronic form in the future." *Public Citizen*, 2 F.Supp.2d at 6. Montanas and New Jersey have exercised their rights under Section 6103(d) often; that they have not previously requested specific documents does not prohibit them from challenging a policy that "will impair [their] lawful access to information in the future." *Hajro*, 811 F.3d at 1103.

It would be particularly strange to create a narrower document-specific standing requirement in a case such as this one, where the IRS itself made requests

for specific-contributor information unnecessary in the past by collecting this information on the Schedule B and incorporating it into its exemption determinations. Montana relied on the IRS's own exemption determinations, but the IRS's determinations are now less reliable because of the Revenue Procedure. Walborn Decl. ¶¶ 10–13. And New Jersey obtained this information as a matter of course by receiving the Schedule B forms of charitable organizations that complied with their state reporting obligations. Rodríguez Decl. ¶¶ 13–14. To deny standing now because the plaintiffs did not previously seek information they already had would be a bizarre reading of standing doctrine. The fact that New Jersey has suddenly become deprived of that information is the very injury that New Jersey now seeks to remedy. The IRS supports this stance only by reference to the general proposition that standing cannot be grounded in "pure speculation." Br. 15 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). But no speculation is necessary. New Jersey used to have the information that it seeks, and which it is entitled to obtain under Section 6103(d), and it no longer has that information because of the IRS's very actions that are challenged in this case.

As a final effort to avoid this conclusion, the IRS challenges the premise that the plaintiffs are even entitled to the information they seek under Section 6103(d). The IRS argues (1) that the plaintiffs cannot "dictate to the IRS" what information it collects, Br. 13; (2) that substantial-contributor information is "typically" not

information "with respect to taxes imposed by any listed chapter" in 6103(d), Br. 9; and (3) that a separate provision, Section 6104(c), "controls over the more general provisions of § 6103(d)" because it is more specific. Br. 12. None of these arguments succeeds.

*First*, the IRS argues that the plaintiffs do not have "a statutory right to dictate to the IRS *what* information it must collect from exempt organizations." Br. 12–13. That is correct; it is also not at all what the plaintiffs are claiming in this lawsuit. The IRS's *own regulations* require exempt organizations to submit substantial-contributor information. The plaintiffs, who benefit from those regulations, seek to enforce the legal requirement that the IRS cannot change those regulations without going through notice and comment and must abide by the APA's limits on arbitrary and capricious decision-making. *See* 5 U.S.C. §§ 553, 706. The plaintiffs do not claim a "legal right to dictate to the IRS" what it must collect, Br. 13, but only the ability to enforce the APA's procedural requirements.

This is not mere formalism. Had the IRS followed the procedural requirements of the APA and engaged in notice-and-comment rulemaking, Montana and New Jersey would have been able to bring to the agency's attention the importance of this information in administering their state tax and consumer-protection regimes. Montana, for example, lost the opportunity to inform the agency of the degree to which it relies on the IRS's tax-exemption and private-inurement

determinations to enforce its own similar requirements. *See, e.g.*, Walborn Decl. ¶¶ 9–10. New Jersey lost the opportunity to inform the agency of the substantial costs it will incur as a result of the new rule, as well as its very real concern that, in the absence of the federal reporting requirement, many charitable organizations operating in New Jersey will fail—through inadvertence or through design—to supply substantial-contributor information to the State. *See* Rodríguez Decl. ¶¶15–20. Likewise, the IRS lost the opportunity to consider, before enacting the new rule, the views of Congress, many of whose members strongly opposed this regulatory change after it came to light. *See* Anna Massoglia and Karl Evers-Hillstrom, *Senate votes to prevent 'dark money' from getting even darker,* Center for Responsive Politics (Dec. 12, 2018), https://perma.cc/53S2-X64S. The agency was unable to take these and other views into account when deciding whether to change its regulations because, contrary to the APA, it never asked for them.

*Second*, regardless of whether the IRS believes it is "typical" to include substantial-contributor information in Section 6103(d)'s reporting requirements, that information is readily encompassed within the provision's plain language. Section 6103(d) requires the IRS to disclose "[r]eturns and return information with respect to taxes imposed by" a long list of chapters. That list includes chapter 1, which imposes the normal taxes on individual and corporate income from which tax-exempt entities are exempt under 26 U.S.C. § 501. And Section 6103(b) defines "return information"

to include, among other things, "any . . . data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax." 26 U.S.C. § 6103(b).

Substantial-contributor information fits within this definition because it is "data" that is "received by" the IRS "with respect to the determination of the existence, or possible existence, of liability (or the amount thereof)." *Id.* Substantial-contributor information is relevant to numerous determinations of the existence or amount of potential tax liabilities. Just for one routine example, corporate or individual taxpayers may deduct contributions to exempt entities—for instance, deducting a contribution to a 501(c)(4) as an ordinary and necessary expense of a trade or business. *See* 26 U.S.C. § 162; Internal Revenue Service, *Donations to Section 501(c)(4) Organizations* (Mar. 26, 2019), https://perma.cc/BS9V-95EK. Substantial-contributor information provides evidence that these deductions were in fact received by the exempt entity, corroborating or refuting the tax liability claimed by the taxpayer.

More broadly, substantial-contributor information is relevant to the determination whether tax-exempt organizations in fact meet the qualifications for tax exemption. Organizations claiming exemption under 501(c)(5), for instance, may not have "net earnings inuring to the benefit of any member," and organizations

claiming exemption under 501(c)(4) may not operate primarily as "a social club for the benefit, pleasure, or recreation of [their] members" or "carry[] on a business with the general public in a manner similar to organizations which are operated for profit." 26 C.F.R. §§ 1.501(c)(5)-1(a)(1), 1.501(c)(4)-1(a)(2)(ii). Substantial-contributor information, which includes the names and contributions of major donors to these organizations, is directly relevant to these inquiries. The IRS has been collecting this information for almost 50 years for a reason—when it comes to determining "the existence, or possible existence, of liability (or the amount thereof)," 26 U.S.C. § 6103(d), it is very useful to have a record of who is giving money to which organizations that claim a tax exemption. This information therefore falls squarely within the terms of 26 U.S.C. § 6103(d).

*Third*, the IRS is also wrong to argue that Section 6103(d)'s plain terms should be ignored because the Internal Revenue Code provides an additional mechanism for federal-state information sharing via Section 6104(c). *See* 26 U.S.C. § 6104(c)(3). The IRS frames this (at 12) as an application of the oft-invoked canon of statutory interpretation that a specific provision "is not overridden by another provision 'covering a more generalized spectrum' of issues." *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016) (citation omitted).

But the rule that "the specific governs the general" applies only "[w]hen two statutes come into conflict," forcing courts to choose *between* the specific provision

and the general one. *Id.* There is no such conflict here. Section 6103(d) is a broad requirement that the IRS to disclose a variety of return information, and Section 6104(c) permits the IRS to create an additional mechanism for disclosing information for charitable organizations in particular. These two distinct provisions both exist because there may be information covered by 6104(c) that does not fall within the scope of 6103(d)—so 6104(c) provides an additional potential mechanism for information-sharing. Here, where information falls within the *mandatory* sharing provisions of 6103(d), it would make no sense to say that the IRS need not disclose it because it might also fall within the extra *permissive* authorization provided in 6104(c).

The IRS is therefore wrong to argue that the plaintiffs have no legally protected interest under Section 6103(d). The plain text of that provision requires the IRS to disclose substantial-contributor information to the plaintiffs, and it was intended by Congress specifically to aid state law enforcement and bolster states' resources—the very concerns that form the basis for this lawsuit. *See* General Explanation of the Tax Reform Act of 1976, 1976 WL 352412, at *32. The plaintiffs have standing to protect their interests under this law from the IRS's unlawful acts.

## B. The plaintiffs also have standing because they have diverted resources in response to the IRS's decision

In addition to their informational injury, the plaintiffs have standing because of the costs they have incurred as a result of Revenue Procedure 2018-38. It is well established that "a diversion-of-resources injury is sufficient to establish" standing. *E.*

38

*Bay Sanctuary Covenant*, 909 F.3d at 1241 (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015)). Where an allegedly unlawful action causes a "drain on [an] organization's resources," decades of precedent dating back to *Havens Realty Corp. v. Coleman* establish that this injury is "concrete and particular for purposes of Article III" and serves as an adequate basis for standing. *Nat'l Council of La Raza*, 800 F.3d at 1040 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). This is true where a plaintiff spends its own resources to make up for a defendant's failure to comply with the law, as, for instance, where an organization spends money to register voters who they allege "would likely have been registered by the State, had it complied with" its legal obligations. *Id.* That includes resources that are spent "to counteract" a deprivation of "access to information." *P.E.T.A.*, 797 F.3d at 1094. As long as the organization can demonstrate that its resources "would have [been] spent on some other aspect of [its] organizational purpose," the loss of resources is an Article III injury. *Nat'l Council of La Raza*, 800 F.3d at 1040.

The plaintiffs have standing in this case because the IRS's unlawful decision to stop collecting substantial-contributor information has caused the plaintiffs to divert scarce resources. The plaintiffs have "offered uncontradicted evidence that enforcement of [Revenue Procedure 2018-38] has forced [them] to divert resources, independent of expenses for this litigation, that [they] would have spent in other ways." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943

(9th Cir. 2011) (en banc). Because Montana's existing forms "do not contain the level of specificity" that used to be required on Schedule B, for instance, the Montana Department of Revenue must "assume the burden of developing unique processes to solicit" this information independently. Walborn Decl. ¶¶ 12–13. That burden includes spending staff time to develop a resource plan for how best to respond to the IRS's decision, including the outlays required to implement whatever long-term solution the Department is able to devise. *Id.* ¶¶ 16–18. Montana is thus already expending resources to adjust to the changes wrought by the Revenue Procedure and expects to continue doing so in the future. *Id.*

New Jersey, meanwhile, has spent and will continue to spend significant resources as a result of Revenue Procedure 2018-38. Before Revenue Procedure 2018-38, New Jersey received substantial-contributor information as a matter of course when charitable organizations filed with New Jersey the same Schedule B forms that they submitted to the IRS. Rodríguez Decl. ¶ 8. But because of Revenue Procedure 2018-38, to continue receiving this information New Jersey has had to create a new regulatory process for the relevant entities to report this information via an alternative mechanism. Rodríguez Decl. ¶ 16. The New Jersey Division of Consumer Affairs (DCA) has had to propose new rules to require that charitable organizations continue reporting substantial-contributor information, to make up for the lack of this information on their Schedule B forms. Drafting this rule required months of

research and review by regulatory specialists and legal counsel, and completing the promulgation of the rule will require further staff time. *Id.* If the proposed rules are finalized and published, New Jersey may have to spend further resources on educating charitable organizations about the requirement, responding to inquiries from charitable organizations, modifying forms and processes, and responding to inquiries regarding the new rules. *Id.* ¶¶ 16–18. DCA also anticipates that the absence of an analogous federal reporting requirement will reduce compliance rates at the state level, which may require it to expend additional resources on enforcement. *Id.* ¶¶ 9, 19–21. And, while it is true that DCA may affirmatively request that an entity produce a list of its substantial contributors (by subpoena or other means) such action requires state investigative resources and may require alerting the target of an investigation to the fact of the investigation.[2]

---

[2] The IRS is also wrong to argue that New Jersey has suffered no diversion of resources because the economic impact statement filed with its proposed rule "does not list a single expected cost to the state." Br. 19. The New Jersey Division of Consumer Affairs' general practice in its economic impact statements is to focus on the projected impact of the proposed rule change on members of the relevant regulated community and members of the general public, not on effects on the agency's operating costs or allocation of resources. *See* Rodríguez Decl. ¶ 18. The absence of such costs in the economic impact statement therefore does not constitute evidence that there were in fact no such costs; New Jersey has provided evidence of the actual costs associated with the rulemaking via declaration. *See* Rodríguez Decl. ¶¶ 15–21.

And, in any event, the Ninth Circuit has recognized that the expenditure of "staff time . . . is an injury sufficient to confer standing" for constitutional purposes. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1165 (9th Cir. 2013).

These past, present, and future costs are more than adequate to demonstrate standing. The threshold necessary for standing here is low—"[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017). Both states have limited resources, and "would have spent" the time and money necessary to develop and implement these processes "in other ways." *Comite de Jornaleros*, 657 F.3d at 943; *see also* Walborn Decl. ¶¶ 14–17; Rodríguez Decl. ¶¶ 15–17, 20. That alone is enough for standing. *Comite de Jornaleros*, 657 F.3d at 943.

The IRS's arguments to the contrary are not persuasive. The IRS argues (at 16) that the plaintiffs' diversion of resources is analogous to *West Virginia ex rel. Morrisey v. HHS*, in which the D.C. Circuit held that West Virginia did not have standing to challenge a federal law that effectively gave it "authority to enforce [a] federal mandate." 827 F.3d 81, 83 (D.C. Cir. 2016). According to the IRS, because the plaintiffs have "the discretion to decide" whether to compensate for the effects of Revenue Procedure 2018-38, the resources they spend as a result of that decision cannot form a basis for standing. Br. 16; *see also* Br. 18 ("The fact that New Jersey decided it needed to update its rules . . . does not give rise to an Article III injury.").

---

There can be no genuine dispute that the process of proposing and promulgating a rule consumes staff time within a government agency.

This argument, which has been made in other diversion-of-resource cases, "finds no support in the law, and it misses the point." *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008). It is often the case that where standing is based on an entity's diversion of resources, the entity had some discretion over whether and how to deploy those resources. Organizations have standing, for instance, where they decide to spend resources on monitoring and investigation of unlawful activity, *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 903–05 (9th Cir. 2002) (collecting cases), or mitigating the consequences of an unlawful action. *Comite de Jornaleros*, 657 F.3d at 943 (upholding standing where an organization spent resources "assisting day laborers during their arrests" under a challenged ordinance and "meeting with workers about the status of the ordinance"). The existence of some discretion in these decisions does not defeat standing, so long as those resources are spent "independent of the lawsuit" itself, and "would have [been] spent in other ways" but for the challenged action. *Id.* That is the case here. Walborn Decl. ¶¶ 14-17; Rodríguez Decl. ¶¶ 15-17, 20.

## C. The plaintiffs have standing because Revenue Procedure 2018-38 unlawfully interferes with their ability to enforce their laws.

Finally, the plaintiffs have standing by virtue of the injury to their sovereign interest in effective law enforcement. For purposes of Article III, states have an interest in "the exercise of sovereign power over individuals and entities within the

relevant jurisdiction—this includes the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son*, 458 U.S. at 601. Thus, where state statutes "regulate[] behavior or provide[] for the administration of a state program," states have standing to challenge federal actions that "interfere[]" with the enforcement of those statutes. *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) (collecting cases). That is true both where a federal agency's interpretation of a law "interferes with [a state's] ability to enforce its legal code," *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008), where federal actions would "prevent [a state] from effectuating its policies." *Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017), *vacated as moot*, 138 S. Ct. 377 (2017), and where federal regulatory changes "impos[e] substantial pressure on [states] to change their laws." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

Here, the IRS's unlawful repeal of its reporting requirements hinders the plaintiffs' ability to enforce their legal codes by depriving them of relevant information to which they are statutorily entitled. Montana, for instance, structured the administration of its tax laws based in part on the assumptions that this information would be available and that the IRS would continue to collect it as part of its own reliable exemption-determination process. Walborn Decl. ¶ 9–10. New Jersey, in turn, regularly relied on information from Schedule B forms as "vital" to the success of its regulation of charitable organizations, and felt pressured to change

its laws as a result of Revenue Procedure 2018-38. Rodríguez Decl. ¶ 12. As Congress recognized when discussing the need for Section 6103(d), "many States have only a few, if any, of their own tax auditors and rely largely (or entirely) on Federal tax information in enforcing their own tax laws." General Explanation of the Tax Reform Act of 1976, 1976 WL 352412, at *32.[3]

The plaintiffs thus have three independent bases for standing—the diminished amount of information available to them, the diversion of their resources, and the interference with their ability to enforce their legal code. Particularly given the

---

[3] The IRS argues that the Governor of Montana and the Montana Department of Revenue "have not established" that they have sufficient "legal authority" to assert standing in federal court, citing an appellate brief and a recent Montana Supreme Court case. *See* Br. 19 (citing *Bullock v. Fox*, 2019 MT 50, ¶ 41). But the very case the IRS cites answers the issue the IRS raises: it holds that the Governor and a Montana state agency have standing to sue "to effectuate the duties of their official positions," based on their "interest in the effective discharge of [their] constitutional and legal obligations." *Bullock v. Fox*, 2019 MT 50, ¶ 41 (quotation mark and bracket omitted). The passage in the brief that the IRS cites, meanwhile, arose in a very different context—a challenge to the constitutionality of a Montana statute that permitted the Governor to direct Montana's Attorney General to provide assistance in defense of litigation. *See* Application for Writ of Prohibition, *McGrath v. Martz*, 2004 WL 2985143, at *16 (November 04, 2004). Defense of the constitutionality of state statutes is a core duty of the Attorney General in Montana. But in Montana, like many states, agencies employ their own legal counsel and routinely represent themselves in all courts as both plaintiffs and defendants without using counsel employed by the Attorney General. *See, e.g., Woodahl v. State Highway Comm'n*, 155 Mont. 32, 37, 465 P.2d 818, 820–21 (1970) (noting that it is "clear then that the governor with his constitutional supreme executive powers . . . has the power to . . . himself employ additional counsel."). Neither the brief cited nor *Bullock v. Fox* support the remarkable proposition that the Governor may not affirmatively assert his office's interests in federal court, or that the Montana Department of Revenue may not hire outside counsel to do so as well.

"special solicitude" states are entitled to when asserting procedural challenges, standing is no impediment to this case proceeding. *Massachusetts v. EPA.*, 549 U.S. at 520.

**D.    The plaintiffs are within the zone of interests of the Internal Revenue Code's information-sharing provisions.**

In addition to having standing under Article III, the plaintiffs also satisfy the zone-of-interests test. The zone-of-interests test "is not meant to be especially demanding," which reflects "Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Ass'n. of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 954 (9th Cir. 2013) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). It requires only that a plaintiff in a lawsuit show that "the interest sought to be protected . . . be *arguably* within the zone of interests to be protected or regulated by the statute in question." *Nw. Requirements Utilities v. F.E.R.C.*, 798 F.3d 796, 807 (9th Cir. 2015) (emphasis added) (quoting *Ass'n. of Pub. Agency Customers*, 733 F.3d at 954). The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 225. "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quotation marks and citation omitted).

That low bar is easily cleared here. The substantive statutory provision that protects the interests the plaintiffs seek to safeguard, 26 U.S.C. § 6103(d), specifically requires the IRS to make information available to State tax officials and agencies. As discussed above, this is demonstrated by the provision's plain text: "return information . . . shall be open to inspection by, or disclosure to, any State agency, body, or commission . . . which is charged under the laws of such State with responsibility for the administration of State tax laws for the purpose of, and only to the extent necessary in, the administration of such laws." *Id.* § 6103(d).

The plaintiffs here are exactly the persons and entities that this statute was designed to protect and benefit. *Ass'n. of Pub. Agency Customers*, 733 F.3d at 954. Section 6103(d) is the current embodiment of a century-long policy of information-sharing between the IRS and state tax officials, providing state tax officials with a mechanism to request information from the IRS and requiring the IRS to share tax-return information with the states. And the plaintiffs in this case are a state, state official, and state tax agency, all of whom are seeking information from the IRS for the purposes of enforcing their own state laws. The plaintiffs therefore "fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

The IRS argues that the plaintiffs are not within the relevant zone of interests because "there are no plausible allegations that the IRS has violated" the Internal

Revenue Code's information-sharing provisions. Br. 21. But the plaintiffs do not need to argue that those provisions have been violated to be within their zone of interest. The plaintiffs' claim arises out of a violation of the Administrative Procedure Act: They argue not that Revenue Procedure 2018-38 violates 26 U.S.C. §§ 6103 or 6104, but that it *violates the APA* because it effectively repeals a regulation without the necessary notice-and-comment procedures. *See* Am. Compl. ¶¶ 81–89 (citing 5 U.S.C. §§ 553, 706).

Where a party challenges a government agency's failure to follow the notice-and-comment rules of the APA, the zone-of-interests inquiry is "derivative," meaning that "a party within the zone of interests of any substantive authority" will generally be within the zone of interests of a procedural requirement relating to that substantive authority. *Int'l Broth. of Teamsters v. Pena*, 17 F.3d 1478, 1484 (D.C. Cir. 1994). "This is particularly true for claims brought under the APA's notice-and-comment provisions." *E. Bay Sanctuary Covenant*, 909 F.3d 1219, 1245 (9th Cir. 2018). In such notice-and-comment suits, courts "look[] to the zone of interests of the underlying statute to determine ability to bring a notice-and-comment claim." *Id.* (citation and quotation marks omitted). Here, because the plaintiffs "are within the zone of interests protected by" Section 6103, they "may challenge the absence of notice-and-comment procedures" that affect the information available to them under that section without alleging a violation of the section itself. *Id.*

To show otherwise, the IRS would have to meet a demanding standard—that the plaintiffs' "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Nw. Requirements Utilities*, 798 F.3d at 808. But on that front, the IRS spends less than a sentence, saying only that "it is difficult to see how . . . these are the statutes that protect or regulate the interest sought to be protected by plaintiffs." Br. 21 (quotation marks and brackets omitted). It offers no reasoning or evidence in support. And, as just discussed, the IRS is wrong: Section 6103 was designed explicitly to provide state tax officials access to tax-return information held by the IRS, and so is directly relevant to this lawsuit in which state officials seek to protect their interest in obtaining important tax-return information.

## III. The "committed to agency discretion" exception does not apply here.

The IRS's only remaining defense is that the plaintiffs' claims are precluded because "Congress has committed decisions about what information to collect from exempt organizations to IRS discretion." Br. 22. The IRS contends that the Internal Revenue Code "leave[s] no meaningful standard that a court could apply in judging the IRS's exercise of discretion," pointing to language in the Code allowing the IRS to exempt organizations from filing information that the IRS determines "is not necessary to the efficient administration of the internal revenue laws." Br. 23 (quoting 26 U.S.C. § 6033(a)(3)(B)). This language, says the IRS, grants the IRS "broad

authority to determine what information it deems necessary from exempt organizations to fulfill its tax administration duties." Br. 25.

But this "narrow exception to the presumption of judicial review of agency action under the APA" does not apply here. *Drakes Bay Oyster Co.*, 747 F.3d at 1082. Actions are committed to agency discretion only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply, thereby leaving the court with no meaningful standard against which to judge the agency's exercise of discretion." *ASSE Int'l*, 803 F.3d at 1068 (citation omitted). The court must consider "whether the general purposes of the statute would be endangered by judicial review," and "the mere fact that a statute contains discretionary language does not make agency action unreviewable." *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011). Additionally, agencies may bind themselves with their own regulations, such that the existence of a "substantive rule" on a particular issue may be enough for a court to decide that an agency has "forfeited the discretion it retained prior to issuing" the rule. *Cohen v. United States*, 578 F.3d 1, 8 (D.C. Cir. 2009), *rehearing en banc granted on other grounds*, 650 F.3d 717, 723 (D.C. Cir. 2011) (explicitly affirming panel ruling on agency discretion).

Significantly, even where there is discretionary language in a statute, there is still a "meaningful standard" to apply where the agency's exercise of that discretion is subject to procedural safeguards: "[E]ven where the substance or result of a

decision is committed fully to an agency's discretion," federal courts still have jurisdiction to review whether the agency "followed whatever legal restrictions applied to [its] decision-making process." *Drakes Bay Oyster Co.*, 747 F.3d at 1082–83.

That is all that the plaintiffs are asking this Court to do. The plaintiffs seek summary judgment based not on the substance of the IRS's decision that Schedule B information was unnecessary, but on the faulty procedures by which the IRS made that decision—in particular, the IRS's use of a Revenue Procedure to effectively rescind a regulation without going through notice and comment. As the Ninth Circuit has held, "[w]hen substantive judgments are committed to the very broad discretion of an administrative agency, procedural safeguards that assure the public access to the decision-maker should be vigorously enforced." *Buschmann*, 676 F.2d at 357; *see also Lincoln v. Vigil*, 508 U.S. 182, 195–96 (1993) (holding that the substance of an agency's action was committed to the agency's discretion by law but conducting a separate analysis as to whether the agency complied with notice-and-comment requirements). In other words, even if the IRS is right that the substance of the ultimate decision is discretionary, that would not permit the IRS to evade the procedural requirements of the APA.

For the same reason, the IRS is wrong to argue that it has unbridled discretion here because it may "relieve any organization or class of organizations" from filing annual returns and is permitted to designate reporting requirements by regulations

or "by forms." Br. 22 (quoting 26 C.F.R. § 1.6033-2(g)(6) and 26 U.S.C. § 6033(a)(1)) (emphasis omitted). It is true that the IRS may use forms and other sub-regulatory documents to determine reporting requirements in certain situations. But the IRS offers no authority for the proposition that it can use these tools to undo reporting requirements that it has already set via regulation. And that is what Revenue Procedure 2018-38 does. Far from relieving only an "organization or class of organizations" from the obligation to report substantial-contributor information, Revenue Procedure 2018-38 undoes this regulatory requirement for *every* affected entity.

Even when statutory or regulatory exceptions are intended to be construed "broadly," they should not be allowed to "swallow[] the rule." *See, e.g.*, *Lively v. United States*, 870 F.2d 296, 299 (5th Cir. 1989); *cf. Harris v. Olszewski*, 442 F.3d 456, 469 (6th Cir. 2006) (upholding agency interpretation of an exception where it did not "swallow the rule"). The IRS is asking this Court to set a remarkable precedent by holding that where an agency gives itself discretion to carve out individuals or groups within a rule, it also may undo the rule as to all covered entities without heeding any procedural requirements—all in the name of the APA's exception for actions committed to agency discretion. This Court should reject such a broad reading of a "narrow exception," *Drakes Bay Oyster Co.*, 747 F.3d at 1082, particularly where the IRS has provided no authority for its reading of either the statute or regulation.

**CONCLUSION**

The motion to dismiss should be denied, and the motion for summary judgment should be granted.

*/s/Glenn Moramarco*                          */s/ Raphael Graybill*
Glenn Moramarco                               Raphael Graybill
ASSISTANT ATTORNEY GENERAL                    CHIEF LEGAL COUNSEL
Katherine A. Gregory                          OFFICE OF THE GOVERNOR
DEPUTY ATTORNEY GENERAL                       P.O. Box 200801
                                              Helena, MT 59620-0801
Gurbir S. Grewal                              (406) 444-3179
ATTORNEY GENERAL OF NEW JERSEY                (406) 444-5529 (fax)
Richard J. Hughes Justice Complex             *raphael.graybill@mt.gov*
25 Mark Street, 8th Floor, West Wing
Trenton, New Jersey 08625                     */s/ Deepak Gupta*
(609) 376-3235                                Deepak Gupta
(609) 777-4015 (fax)                          Matthew W.H. Wessler
*glenn.moramarco@law.njoag.gov*               Daniel Wilf-Townsend
*katherine.gregory@law.njoag.gov*             GUPTA WESSLER PLLC
                                              1900 L Street, NW, Suite 312
*Attorneys for Plaintiff State of New Jersey* Washington, DC 20036
                                              (202) 888-1741
                                              (202) 888-7792
                                              *deepak@guptawessler.com*

                                              *Attorneys for Plaintiffs Stephen C. Bullock*
                                              *and Montana Department of Revenue*

# CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7.1 of the Rules of Procedure of the United States District Court for the District of Montana, I certify the following concerning the foregoing brief:

1. the document is double spaced except for headings, footnotes, and quoted and indented material;

2. the document is proportionally spaced, using Baskerville, 14 point font; and

3. The document contains 12,983 words as calculated by Microsoft Word.

Dated: April 17, 2019

/s/ *Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2019, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta