# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| STEPHEN C. BULLOCK, in his official capacity as Governor of Montana; MONTANA DEPARTMENT OF REVENUE; STATE OF NEW JERSEY,<br><br>         Plaintiffs,<br><br>   vs.<br><br>INTERNAL REVENUE SERVICE; CHARLES RETTIG, in his official capacity as Commissioner of the Internal Revenue Service; UNITED STATE DEPARTMENT OF THE TREASURY,<br><br>         Defendants, | **CV-18-103-GF-BMM**<br><br><br><br>**ORDER** |

The Court addresses two motions.  Defendants Internal Revenue Service

("IRS"), Charles Rettig in his official capacity as Commissioner of the Internal

Revenue Service, and the United States Treasury (collectively "Defendants"),

move the Court to dismiss this action for lack of subject matter jurisdiction and for

failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and

(6).  (Doc. 31).  Plaintiffs Stephen C. Bullock in his official capacity as the

Governor of Montana, the Montana Department of Revenue, and the State of New

Jersey (collectively "Plaintiffs") move the Court for summary judgment as to

Count One of their Amended Complaint.  (Doc. 41).  Count One asks the Court to hold unlawful and set aside the IRS's promulgation of Revenue Procedure 2018-38, and order the IRS to follow the procedure for rulemaking as required by the Administrative Procedure Act ("APA").  (Doc. 16 at 26-27).

The Court held a hearing on these motions on June 5, 2019.  (Doc. 56).  The Court will address first the issue of whether the Plaintiffs possess standing sufficient for purposes of Article III to survive Defendants' motion to dismiss.  The Court next will address Plaintiffs' motion for summary judgment as to Count One of their Amended Complaint.

## BACKGROUND

The Internal Revenue Code imposes federal taxes on all entities on income from any source.  Certain organizations remain exempt from various taxes if the organization qualifies as one of twenty-eight types of nonprofit organizations.  26 U.S.C. § 501(c), (c)(3).  These exempt organizations include those organized and operated exclusively for charitable, educational, and similar purposes.  *Id.*  Federal law largely exempts those entities from federal income taxes, but the entities must meet certain substantive requirements to qualify for tax-exempt status.  For example, § 501(c)(4) groups generally must be "operated exclusively for the promotion of social welfare."  26 U.S.C. § 501(c)(4).

2

Section 6033 of the Internal Revenue Code requires exempt organizations to file annual information with the IRS.  26 U.S.C § 6033.  Each organization exempt from taxation must file an annual return "stating specifically the items of gross income, receipts, and disbursements, and such other information for the purpose of carrying out the internal revenue laws as the Secretary may by forms or regulations prescribe."  26 U.S.C § 6033(a)(1).  The statute also contains a discretionary exception that allows the Secretary to "relieve [most exempt organizations] . . . from filing such a return where he [or she] determines that such filing is not necessary to the efficient administration of the internal revenue laws."  26 U.S.C. § 6033(a)(3)(B).

The IRS by regulation had required most exempt organizations to report on Schedule B of Form 990 the "names and addresses of all persons who contributed . . . $5,000 or more" during the taxable year.  26 C.F.R. § 1.6033-2(a)(2)(ii)(*f*).  The IRS had required by regulation that the exempt organizations described in § 501(c)(7) (social clubs), § 501(c)(8) (fraternal beneficiary societies), or § 501(c)(10) (domestic fraternal societies), report on Schedule B the names of each donor who contributed more than $1,000 during the taxable year to be used exclusively for certain religious, charitable, or educational purposes.  26 C.F.R. § 1.6033-2(a)(2)(iii)(*d*).  Section 1.6033-2 serves the principle purpose of collecting

and centralizing annual information regarding money acquired by exempt
organizations.

Federal law permits states and their tax agencies to collect and use federal
return information gathered by the IRS.  26 U.S.C. §§ 6103, 6104.  Section
6103(d) provides for federal and state information sharing of "[r]eturns and return
information with respect to taxes imposed by" a broad swath of the federal tax
code.  This information "shall be open to inspection by, or disclosure to, any State
agency, body, or commission" that is "charged under the laws of such State with
responsibility for the administration of State tax laws, . . . for the purpose of . . . the
administration of such laws."  26 U.S.C. § 6103(d).  A state also may enter into a
disclosure agreement with the IRS pursuant to § 6104(c).  Neither Montana nor
New Jersey has entered into a disclosure agreement with the IRS.

Congress noted that federal and state information sharing serves two primary
purposes when it updated § 6103(d) in 1976.  Sharing information first helps
ensure that people and organizations follow the tax laws.  Congress reasoned "that
it is important that the States continue to have access to Federal tax information for
tax administration purposes.  With Federal tax information, the States are able to
determine if there are discrepancies between the State and Federal returns in, e.g.,
reported income."  Staff of Joint Comm. On Taxation, 94th Cong., General
Explanation of the Tax Reform Act of 1976 (Comm. Print 1976), 1976 WL

4

352412, at *32.  Sharing tax information also relieves state governments from the burden of expending resources to gather information already obtained by the IRS. Congress highlighted the fact that "many States have only a few, if any, of their own tax auditors and rely largely (or entirely) on Federal tax information in enforcing their own tax laws." *Id.*

New Jersey alleges that it has received the names and addresses of significant contributors through the Schedule B forms.  (Doc. 42 at 19).  New Jersey alleges that the substantial-contributor information previously contained in the Schedule B form has allowed its Division of Consumer Affairs to track contributions over time.  *Id.*  New Jersey further alleges that this tracking of contributions has allowed it to identify suspicious patterns of activity, locate donors to aid in determining whether the entity is soliciting from individuals within New Jersey, and otherwise supplement state investigations under its Charitable Registration and Investigation Act.  *Id.* at 20.  New Jersey also requires certain organizations claiming tax-exempt status to file registration statements that must include a "complete copy of the charitable organization's most recent [IRS] filing(s)," including "[a]ll schedules."  *Id.*; N.J. Admin. Code § 13:48-4.1(b)(7). New Jersey thus obtained substantial-contributor information through the IRS's Schedule B forms given to the state pursuant to state tax laws.  (Doc. 42 at 21).

Montana similarly requires entities claiming tax-exempt status to report whether they have received a federal exemption.  *See* Agreement on Coordination of Tax Administration between the MTDOR and the IRS (Doc. 45-1).   Federal law and Montana law contain similar standards.  The IRS's regulations require entities to submit the necessary information for exemption determinations. Montana alleges that it relies on the IRS's information regarding its exemption determinations when making its own exemption determinations under state law. Walborn Decl. (Doc. 45 at ¶¶ 9-10); (Doc. 42 at 21).

The collection of donor information changed when the IRS issued Revenue Procedure 2018-38.  Revenue Procedure 2018-38 eliminated the IRS's previous requirement contained at 26 C.F.R. § 1.6033-2 that exempt organizations report donor information.  Rev. Proc. 2018-38 at 1.  Revenue Procedure 2018-38 applies to all 501(c) groups except 501(c)(3) charitable organizations.  *Id.*  The instructions to the 2018 Schedule B to Form 990 incorporate these changes and inform exempt organizations of these changes.  (Doc. 32 at 10).  Revenue Procedure 2018-38 specifies that exempt organizations still must collect and maintain the donor information.  The exempt organizations now must make it available to the IRS only upon a specific request.  Rev. Proc. 2018-38 at 1.  The IRS maintains its ability to demand this donor information should the IRS determine that this information would be relevant.  (Doc. 32 at 10).

# I. MOTION TO DISMISS

A motion to dismiss tests the legal sufficiency of the claims asserted in the complaint.  Fed. R. Civ. P. 12(b)(6).  A court should not dismiss a complaint unless it appears beyond doubt that plaintiffs can prove no facts sufficient to support a claim that entitles plaintiffs to relief.  *Hicks v. Small*, 69 F.3d 967, 969 (9th Cir. 1995).  The Court must assume at this stage that all allegations in Plaintiffs' complaint are true and draw reasonable inferences in Plaintiffs' favor.  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

## A.  Standing

Defendants argue that Plaintiffs lack Article III standing.  Defendants contend that Plaintiffs possess no legally protected interest in receiving donor information from the IRS and thus have suffered no actual harm caused by Revenue Procedure 2018-38.  (Doc. 32 at 14-15).  The Court must consider whether New Jersey or Montana has suffered a "concrete and demonstrable injury to [its] activities," mindful that "a mere setback to [Montana's and New Jersey's] abstract social interests" remains insufficient.  *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).

An injury must be "concrete, particularized, and actual or imminent" in order to establish Article III standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  The injury must be "fairly traceable to the challenged action" and be

"redressable by a favorable ruling." *Id.* At the pleadings stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Court may presume that these "general allegations embrace those specific facts that are necessary to support the claim." *Oregon v. Legal Serv. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009).

The deprivation of information can rise to a level sufficient to establish an Article III injury for the purposes of standing. The D.C. District Court in *Public Citizen v. Carlin*, 2 F. Supp. 2d 1, 9 (D.D.C. 1997) (reversed on other grounds), determined that a group of researchers, historians, and journalists possessed standing to challenge the decision of the Acting Archivist of the United States to authorize the disposal of information contained in government documents and records. The plaintiffs argued that the information contained in the documents proved necessary for the dissemination of that information through plaintiffs' public record libraries, research projects, and journal articles. *Id.* at 6.

The district court acknowledged that this deprivation of information worked a "distinct and palpable injury." *Id.* Plaintiffs demonstrated that they previously had relied, and would continue to rely, on the withheld information for purposes of their work. *Id.* The injury remained true despite the fact that the plaintiffs could request the records in electronic form through a Freedom of Information Act ("FOIA") request. *Id.* The record cited by plaintiffs stood as "ample evidence that

8

the individual plaintiffs and members of plaintiff organizations have been or will be directly harmed" by the Archivist's action of authorizing the destruction of previously used and available information. *Id.* at 6.

Defendants suggest that Plaintiffs fail to meet an informational injury similar to *Public Citizen*. Defendants argue that an "informational injury can give rise to standing only when access to that information is statutorily guaranteed." (Doc. 32 at 16). The principle upheld in *Public Citizen* sweeps more broadly than the notion that an informational injury occurs only when a statute guarantees information to a specific plaintiff. The district court determined instead that an informational injury exists when the plaintiff can show that it has relied on, and will further seek, the information that must be collected and centralized by a government agency statutorily required to collect that information. *See Public Citizen*, 2 F. Supp. 2d at 5-7. No statute in *Public Citizen* granted plaintiffs a right to collect information. The plaintiffs simply collected information made publicly available to them pursuant to the Federal Records Act and FOIA. *Id.* at 3-6.

The D.C. Circuit reaffirmed this concept in *People for the Ethical Treatment of Animals* ("*PETA*") *v. U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015). The United States Department of Agriculture ("USDA") announced that it intended to extend the protections of the Animal Welfare Act ("AWA") to birds. *Id.* at 1089. Ten years had passed since the announcement and the USDA had failed to apply

the AWA to birds.  *Id.*  PETA sued the USDA under the APA on the basis that this

inaction amounted to action unlawfully withheld.  *Id.*  The USDA moved to

dismiss PETA's suit for lack of standing and for failure to state a claim.  *Id.* at

1091.  The district court determined that PETA possessed standing, but had failed

to state a claim.  *Id.*  The D.C. Circuit Court reviewed *de novo* the district court's

decision.  *Id.* at 1093.

The D.C. Circuit's standing analysis focused on whether PETA had suffered

an actual injury.  The D.C. Circuit recognized that a "concrete and demonstrable

injury to [an] organization's activities – with the consequent drain on the

organization's resources – constitutes far more than simply a setback to the

organization's abstract social interests" and will result in an injury sufficient to

provide standing.  *Id.* at 1093 (*citing Havens Realty Corp. v. Coleman*, 455 U.S.

363, 379 (1982)).  The D.C. Circuit outlined a two-part test to make this

determination.  A court first must ask "whether the agency's action or omission to

act injured the organization's interest."  *PETA*, 797 F.3d at 1093 (internal

quotations omitted).  The reviewing court then must determine whether the

organization expended resources to counteract that harm.  *Id.* at 1094.  PETA met

both prongs.

PETA accomplished its goal of preventing animal cruelty through "public

education" by providing "information about the condition of animals held by

particular exhibitors." *Id.*  The USDA's refusal to apply the AWA to birds effectively impaired PETA's ability to prevent cruelty to animals through its normal process of submitting USDA complaints.  *Id.*  The USDA's refusal further deprived PETA of the key information on which it relied to educate the public.  *Id.*  PETA, in turn, expended resources to counteract these injuries.  *Id.*

New Jersey similarly meets *PETA*'s two prong test.  New Jersey obtained substantial-contributor information through the IRS's Schedule B forms given to New Jersey pursuant to state tax laws.  (Doc. 42 at 21).  The IRS's Revenue Procedure 2018-38 removed the previous requirement that tax-exempt organizations report substantial-contributor information.  New Jersey alleges that it had relied on this information to "protect the public from fraud, deceit, and misrepresentation by charitable organizations operating in or raising money in the State."  (Doc. 42 at 19); Rodríguez Decl. ¶ 5.  Revenue Procedure 2018-38 effectively has deprived New Jersey of previously available information.

New Jersey also has diverted state resources to create new regulatory processes to obtain the previously available information collected by the IRS pursuant to 26 C.F.R. § 1.6033-2.  New Jersey alleges that the drafting of these new rules required "months of research and review by regulatory specialists and legal counsel."  (Doc. 42 at 48-49).  Like the plaintiff in *PETA*, New Jersey alleges that it has expended resources to counteract directly the actions of the IRS in

11

eliminating the substantial-contributor information. *PETA*, 797 F.3d at 1094.  New Jersey's alleged efforts to obtain the information now uncollected by the IRS rise to the level of an injury sufficient to meet the standard set by *PETA* for an informational injury. *Id.*

Defendants claim that Montana makes "only abstract and conclusory allegations about how [the Montana Department of Revenue] will expend 'staff time and resources' to determine how to proceed in light of Rev. Proc. 2018-38." (Doc. 51 at 18).  Montana presents a closer case.  Montana admittedly contends that in contrast to New Jersey's diversion of state resources, it will incur only future economic impacts as a consequence of Revenue Procedure 2018-38.  In this instance, however, Montana acts on behalf of its citizens.

The Court must give "considerable relevance that the party seeking review here is a sovereign State and not . . . a private individual." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007).  The Supreme Court has recognized that states do not come before the courts as "normal litigants for the purposes of invoking federal jurisdiction." *Id.*  Montana has alleged "an injury to it in its capacity of *quasi*-sovereign." *Id.* (*quoting Georgia v. Tennessee Copper Co.,* 206 U.S. 230, 237 (1907)).  When Montana acts in that capacity it "has an interest independent of and behind the titles of its citizens[.]" *Massachusetts*, 549 U.S. at 519 (*quoting Tennessee Copper Co.*, 206 U.S. at 237).

12

Montana alleges a sufficient basis for standing in the form of having to incur future expenses under these circumstances to obtain the information previously provided by the IRS.  Montana alleges that the IRS's action has harmed Montana's ongoing and future interests in obtaining information on which it has relied. Montana has alleged, and the Court must take as true, that in determining whether exempt organizations are adhering to legal obligations such as the ban on "private inurement, limitation on political activity, or the requirements of state charities laws" a key piece of information for Montana regulators "is the source of those organizations' income—and in particular, the identity of contributors to the organization."  (Doc. 42 at 16).  Montana contends that it relies on the IRS's information, assessment, and the agency's exemption determinations when making its own exemption determinations under state law.  *Id.* at 21.

The fact that Montana relies substantially on the IRS's own assessment of tax-exempt organizations "only reinforces the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power."  *Massachusetts*, 549 U.S. at 520.  Montana's reliance parallels also the intent of Congress that states should "have access to Federal tax information for tax administration purposes."  Staff of Joint Comm. On Taxation, 94th Cong., General Explanation of the Tax Reform Act of 1976 (Comm. Print 1976), 1976 WL 352412, at * 32.  This information allows states "to determine if

there are discrepancies between the State and Federal returns in, e.g., reported income . . . [because States] rely largely (or entirely) on Federal tax information in enforcing their own tax laws." *Id.* The IRS's promulgation of Revenue Procedure 2018-38 shrinks the pool of substantial-contributor information previously collected and centralized by the IRS. *Citizens for Responsibility & Ethics in Washington v. Exec. Office of President*, 587 F. Supp. 2d 48, 61 (D.D.C. 2008). Montana's alleged injury here arises from Defendants' action that restricted significantly the future flow of information on which Montana relies. *PETA*, 797 F.3d at 1094-95.

### B.  Zone of Interests

Defendants argue that Plaintiffs fall outside the zone of interests of any statute that may authorize their suit.  (Doc. 32 at 24).  Defendants contend that Plaintiffs' interests remain outside the relevant zone as § 6033 simply sets forth return filing obligations of exempt organizations.  *Id.* at 25.  Defendants contend further that Plaintiffs' interests stumble outside the relevant zone of interests as neither § 6103 nor §6104 "protect or regulate" an interest suitable for standing.  *Id.*

A plaintiff can remain in the zone of interests even "where the plaintiff is not itself the subject of the" regulation.  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  Prudential standing under the APA exists when "the interest[s] sought to be protected by the complainant [remain] *arguably* within the zone of interests

14

to be protected or regulated by the statute in question." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (emphasis added). "A rough correspondence of the plaintiff's interests" and the statute's purpose must exist to satisfy the zone of interests' test. *Bernhardt v. Cnty. of Los Angeles,* 279 F.3d 862, 870 (9th Cir. 2002). A plaintiff "within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority." *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1484 (D.C. Cir. 1994). This standard remains particularly true for claims brought under the APA's notice-and-comment provisions. *See Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014).

The D.C. Circuit in *Mendoza* examined whether former open-range agricultural workers' claims stood within the relevant zone of interests of the Immigration and Nationality Act ("INA"). *Id.* at 1007. The workers challenged the procedural validity of special procedures issued by the Department of Labor ("DOL"). *Id.* The DOL issued two Training and Employment Guidance Letters ("TEGLs") without following the notice-and-comment process pursuant to the APA. *Id.* at 1008. These TEGLs "updated" special procedures "that had long been in place for employers seeking" foreign worker permits. *Id.* The district court concluded that the workers stood outside the relevant zone of interests of the INA. *Id.* at 1009-10. The workers appealed. *Id.*

15

The D.C. Circuit determined that the workers fell within the INA's zone of interests. *Id.* at 1017-18.  The D.C. Circuit reasoned that the zone of interests' test "is not a demanding one" and there need be no "indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 1016-17 (*quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).  The D.C. Circuit explained that a plaintiff will fall outside the zone of interests only if its interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit suit." *Mendoza*, 754 F.3d at 1017.

The workers' interests remained "squarely within the zone of interests protected . . . by the statutory provision [of the INA] . . . invoked in the suit." *Id.* (internal quotations omitted).  The D.C. Circuit explained that the "clear intent of this [INA] provision is to protect American workers[.]" *Id.*  In making the provision, Congress expressed concern about American workers, their employment, their wages, and their working conditions that could be negatively impacted by foreign laborers. *Id.*  Plaintiffs appeared as American workers who alleged negative impacts from the DOL's lax foreign worker certification standards made pursuant to the challenged TEGLs. *Id.*

Plaintiffs' interests similarly stand more than related to the purposes of § 6103.  Defendants contend that Plaintiffs' interests cannot fall within this zone

16

because no statute regulates or protects Plaintiffs' interests.  (Doc. 32 at 25).

Plaintiffs will remain within the zone of interests, however, even "where the

plaintiff is not itself the subject of the" regulation.  *Clarke*, 479 U.S. at 399.  The

critical question involves whether the party holds a more than marginal interest

that remains close to any substantive authority of any procedural requirement

exercising that authority.  *Mendoza*, 754 F.3d at 1017.

Section 6103 facilitates a century-long policy of information sharing

between the IRS and state tax officials.  (Doc. 42 at 55).  Plaintiffs present here as

a state, a state official, and a state tax agency who seek "information from the IRS

for the purposes of enforcing their own tax laws." *Id.*  The IRS adopted Revenue

Procedure 2018-38 as a means of removing the requirement that "had long been in

place" in § 1.6033-2 that exempt organizations must submit substantial-contributor

information.  *Mendoza*, 754 F.3d at 1008.  Plaintiffs allege that they relied on the

acquisition of this information, the dissemination of this information, and the

federal government's exemption determinations to make their own exemption

determinations pursuant to state law.  (Doc. 42 at 19-21).

Like the workers in *Mendoza*, Plaintiffs' interests prove more than related to

the purposes of the information sharing policies contained in § 6103 and the

requirement in § 1.6033-2 of exempt organizations submitting substantial-

contributor information.  *Mendoza*, 754 F.3d at 1017.  Plaintiffs rest well within

17

the relevant zone of interests to challenge the absence of notice-and-comment

procedures.  *Id*.

### C.  Agency Discretion

Defendants claim that this Court cannot review the IRS's promulgation of

Revenue Procedure 2018-38.  (Doc. 32 at 26).  The IRS Commissioner possesses

broad discretion to "relieve any organization or class of organizations . . . from

filing, in whole or in part the annual return required . . . where he determines that

such returns are not necessary for the efficient administration of the internal

revenue laws."  26 U.S.C. § 1.6033-2(g)(6).  The IRS Commissioner exercised this

discretion and determined that tax-exempt organizations need not file substantial-

contributor information as previously required.  This discretion, according to

Defendants, evades any meaningful standard that a court could apply in judging the

IRS Commissioner's decision to relieve the exempt organizations of the reporting

requirement.  (Doc. 32 at 27).

A meaningful standard does exist.  "[T]he mere fact that a statute contains

discretionary language does not make agency action unreviewable."  *Pinnacle*

*Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011).  A court possesses

the ability to review agency action "even where the substance or result of a

decision is committed fully to an agency's discretion."  *Drakes Bay Oyster Co. v.*

*Jewell*, 747 F.3d 1073, 1082 (9th Cir. 2014).  The IRS stands correct that the

substance of its ultimate decision remains subject to the Commissioner's discretion.  A court may review, however, "whether the Secretary followed whatever legal restrictions applied to his decision-making process."  *Id.* at 1083.

The APA's rulemaking processes remain the legal restrictions at issue here. Plaintiffs do not ask this Court to review the substance of the IRS's decision or whether substantial-contributor information must be disclosed.  Plaintiffs challenge instead the IRS's alleged failure to follow the required notice-and-comment procedures before the promulgation of Revenue Procedure 2018-38.  Amend. Compl. ¶¶ 81-89.  Plaintiffs possess statutory standing to pursue this claim.

## II.  MOTION FOR SUMMARY JUDGMENT

Plaintiffs move the Court for summary judgment as to Count One of the Amended Complaint.  (Doc. 41).  Count One alleges that the IRS has failed to observe the APA's required rulemaking procedures when it promulgated Revenue Procedure 2018-38.  Amend. Compl. ¶¶ 81-89.

### A.  Legal Standards

A party moving for summary judgment must show that no genuine dispute exists "as to any material fact" and that the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  This standard provides that the "mere existence of an alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The Court here simply reviews the process by which the IRS promulgated Revenue Procedure 2018-38. No genuine issues of material fact exist as to this process, and, therefore, the Court deems appropriate resolution of Count I of Plaintiffs' Amended Complaint by summary judgment.

### B.  Facts

The tax code provides that all tax-exempt organizations must file a return "stating specifically the items of gross income, receipts, and disbursements, and such other information for the purposes of carrying out the internal revenue laws as the Secretary may by forms or regulations prescribe." 26 U.S.C. § 6033(a)(1). The IRS promulgated a regulation in the Federal Register in 1970, following a public notice-and-comment period, that requires exempt organizations to disclose "[t]he total of the contributions, gifts, grants and similar amounts received . . . and the names and addresses of all persons who contributed, bequeathed, or devised $5,000 or more" in money or property. 26 U.S.C. § 1.6033-2(2)(ii)(*f*).

The IRS issued Revenue Procedure 2018-38 on July 16, 2018. (Docs. 48 at 1; 52 at 2). Revenue Procedure 2018-38 "modif[ies] the information to be reported to the IRS by organizations exempt from tax under § 501(a) of the Internal Revenue Code . . ." *Id.* Revenue Procedure 2018-38 provides that tax-exempt organizations "will no longer be required to provide the names and addresses of

contributors" and "will not be required to complete these portions of their Schedules B" forms. *Id.* Revenue Procedure 2018-38 further states that these revised reporting requirements "will apply to information returns for taxable years ending on or after December 31, 2018." *Id.* Both parties agree that the IRS failed to follow any procedures that could qualify as a public notice-and-comment period pursuant to the APA before it issued Revenue Procedure 2018-38. *Id.*

Plaintiffs contend that Revenue Procedure 2018-38 represents a legislative rule that required the IRS to follow the APA's notice-and-comment procedures. (Doc. 42 at 27-30). Defendants argue that Plaintiffs misread Revenue Procedure 2018-38. (Doc. 51 at 38-40). Defendants claim that Revenue Procedure 2018-38 simply involves a rule of IRS procedure or practice. *Id.* at 39. The exempt organizations still must collect the substantial-contributor information previously required to be disclosed. (Doc. 32 at 10). And the exempt organizations still must make available this substantial-contributor information to the IRS upon request should the IRS determine that the information would be relevant. *Id.* Defendants suggest that Revenue Procedure 2018-38 addresses solely "the IRS's timing and process for collecting information that the IRS may use to determine compliance with substantive criteria that remains the same." (Doc. 51 at 39).

**C. Discussion**

21

The APA requires courts to "hold unlawful and set aside agency action" promulgated "without the observance of procedure required by law."  5 U.S.C. § 706(2)(D).  The APA requires that agencies advise the public through a notice in the Federal Register of the terms or substance of a proposed legislative rule and allow the public a period of time to comment.  *Erringer v. Thompson*, 371 F.3d 625, 629 (2004).  "This is termed the notice-and-comment requirement of the APA."  *Id.*; *see* 5 U.S.C. § 553(b), (c).  The APA's notice-and-comment requirement grants interested persons, organizations, and entities "an opportunity to participate in the rulemaking process" by submitting written data, opposing views, or arguments.  *Erringer*, 371 F.3d at 629 (*quoting Chief Prob. Officers of California v. Shalala*, 118 F.3d 1327, 1329 (9th Cir. 1997)); 5 U.S.C. § 553(c). This procedural gate holds government agencies accountable and ensures that these agencies issue reasoned decisions.  *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 758 (9th Cir. 1992).

The APA's rule-making procedures, including the notice-and-comment period, do not apply "to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice . . . or when the agency for good cause finds . . . that notice and public procedure are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 533(b)(3)(A).  An interpretive rule simply "advise[s] the public of the agency's construction of the statutes and rules

which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995). Interpretive rules "merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003) ("*Hemp Industries*").

"Interpretive rules instruct as to what an agency thinks a statute or regulation means." *Reno-Sparks Indian Colony v. U.S. E.P.A.*, 336 F.3d 899, 909 (9th Cir. 2003). The Ninth Circuit in *Reno-Sparks Indian Colony* considered whether a rule purporting to "clarify" certain determinations pursuant to the Clean Air Act ("CAA") stood as interpretive rather than legislative. *Id.* at 902. The Environmental Protection Agency ("EPA") issued a rule that it claimed simply clarified "that, in the table listing Nevada's Clean Air Act designations for various pollutants . . . the terms 'rest of state' and 'entire state' d[id] not refer to a single baseline area." *Id.* The EPA explained specifically that the terms "rest of state" and "entire state" actually referred "to more than 250 distinct hydrographic areas, each of which constitute[d] its own separate baseline area" for CAA determinations. *Id.*

The Reno-Sparks Indian Colony ("Reno-Sparks") filed suit. The more baseline areas a state possesses, the more areas pollution sources may colonize and operate in the state. *Id.* at 903. Reno-Sparks challenged the EPA's rule. Reno-Sparks argued that the EPA acted arbitrarily and capriciously when it adopted a

23

legislative rule without complying with the APA's notice-and-comment procedures.  *Id.* at 902.  The Ninth Circuit disagreed.  *Id.* at 909.

An agency must follow the requisite notice-and-comment procedures if the rule "effect[s] a change in existing law or policy" that "impos[es] general, extra-statutory obligations."  *Id.* (*quoting Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983); *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir. 1984)).  The Ninth Circuit determined, however, that the EPA's rule proved interpretive and not subject to the APA's notice-and-comment procedures because it failed to change existing law.  *Reno-Sparks Indian Colony*, 336 F.3d at 909.  The Ninth Circuit explained that "the terms 'rest of state' and 'entire state' carr[ied] the same meaning" with or without "the EPA's explanation of what the pre-existing substantive law mean[t]."  *Id.* at 910; *see also JEM Broadcasting Co., Inc. v. F.C.C.*, 22 F.3d 320, 327 (D.C. Cir. 1994) (upholding the FCC's adoption of "hard look" rules regarding review of broadcast license applications without public notice-and-comment as rules that "fall comfortably within the realm of the 'procedural'").

"Legislative rules, on the other hand, create rights, impose obligations, or effect change in existing law pursuant to authority delegated by Congress."  *Hemp Industries*, 333 F.3d at 1087.  The Ninth Circuit in *Hemp Industries* considered the validity of a rule issued by the Drug Enforcement Agency ("DEA").  *Id.* at 1082.

The DEA claimed that its rule simply interpreted both the Controlled Substances Act ("CSA") and DEA regulations in an effort to ban all naturally occurring Tetrahydrocannabinols ("THC"). *Id.* at 1085. THC constitutes the active chemical in marijuana. *Id.* The DEA's ban on THC, however, effectively banned hemp seed and hemp oil labeled THC-free. *Id.* at 1085. Both hemp seed and oil naturally contain miniscule trace amounts of THC. *Id.*

Companies that manufactured, purchased, or sold consumable products containing THC-free sterilized hemp seed and oil challenged the validity of the rule. *Id.* The companies argued that the DEA's alleged interpretive rule represented an invalid legislative rule "promulgated without observance of the procedures required by the APA." *Id.* at 1086. The Ninth Circuit adopted the D.C. Circuit's framework for distinguishing legislative rules from interpretive rules.

This framework acknowledges that legislative rules, unlike interpretive rules, possess the "force of law." *Id.* at 1087. Three circumstances exist in which a rule possesses the "force of law." *Id.* First, a rule possesses the force of law "when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action." *Id.* The second circumstance occurs when the agency "explicitly invoke[s] its general legislative authority." *Id.* The final circumstance arises "when the rule effectively amends a prior legislative rule." *Id.* The Ninth

Circuit determined that "the third criterion appears to be the primary source of contention" in evaluating the DEA's promulgation of its THC ban.  *Id.* at 1088.

The Ninth Circuit looked to the status of the law before the issuance of the DEA's new rule.  The CSA previously considered marijuana and THC separately from one another.  The CSA classifies marijuana to be "all parts of the plant Cannabis sativa L., whether growing or not," but excludes "mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant . . . or the sterilized seed of such plant[.]"  *Id.*; 21 U.S.C. § 802(16)(A), (B)(ii).  The CSA explicitly exempted the companies' products – hemp oil and sterilized seed – from marijuana's definition.  *Id.*  The DEA's new rule combined marijuana and THC by banning all products containing even trace amounts of THC.  The rule changed an existing law and effectively amended its previously understood terms.

The Ninth Circuit concluded that the DEA's revised approach rose to the level of a legislative rule subject to the public notice-and-comment period.  To interpret a regulation, a rule must remain consistent with the substance of the regulation.  *Id.* at 1090.  The DEA's new rule repealed existing classifications and rendered "superfluous the separate listing of marijuana."  *Id.*  Moreover, the DEA's new rule nullified "the explicit exemption of hemp seed and oil from the coverage of marijuana."  *Id.*  The Ninth Circuit declared that the DEA's promulgation of its

new rule represented a "disingenuous interpretation" in an attempt "to evade the time-consuming procedures of the APA" by changing an existing regulation retroactively.  *Id.* at 1091.

The IRS's promulgation of Revenue Procedure 2018-38 appears to represent a similar attempt to "evade the time-consuming procedures of the APA."  *Id.* Unlike the rule in *Reno-Sparks*, the IRS regulation would not retain the same meaning "with or without" the IRS's amendment.  *Reno-Sparks Indian Colony*, 336 F.3d at 910.  The IRS has required tax-exempt organizations for nearly five decades to "file an annual information return" that furnishes "[t]he total of the contributions, gifts, grants and similar amounts received . . . and the names and addresses of all persons who contributed, bequeathed, or devised $5,000 or more . . ."  26 C.F.R. § 1.6033-2(a)(ii)(*f*).  Revenue Procedure 2018-38 explicitly upends this fifty-year practice and "effectively amends" this existing rule.  *Hemp Industries*, 333 F.3d at 1087.  Revenue Procedure 2018-38 directs tax-exempt organizations to forego existing policy and informs these organizations that they "are no longer required to report the names and addresses of their contributors" as previously required.  Rev. Proc. 2018-38 at 1.

Defendants claim that Revenue Procedure 2018-38 remains an interpretive rule despite its clear conflict with existing law.  Defendants seek to classify Revenue Procedure 2018-38 as "an interpretive rule because it interprets and

27

clarifies the 'other information' that § 6033(a)(1) allows the IRS to require." (Doc. 32 at 30). Revenue Procedure 2018-38, according to Defendants, simply specifies the type of information that certain organizations need to provide. *Id.* at 31. It may be true that the IRS lawfully can determine what information that it requires from exempt organizations pursuant to § 6033. The IRS cannot escape, however, the procedural demands of the APA.

The APA requires federal agencies to follow the notice-and-comment rulemaking procedures before it creates or amends legislative rules and regulations. 5 U.S.C. § 533(b). An interpretive rule remains consistent with the regulation that it seeks to interpret. *Hemp Industries*, 333 F.3d at 1090. A legislative rule "effectively amends a prior legislative rule." *Id.* at 1087. Revenue Procedure 2018-38 effectively amends the previous rule that required tax-exempt organizations to file substantial-contributor information annually. *See* 26 C.F.R. § 1.6033-2(a)(ii)(*f*). Revenue Procedure 2018-38, as a legislative rule, requires the IRS to follow the notice-and-comment procedures pursuant to the APA. *Hemp Industries*, 333 F.3d at 1091. The IRS's admitted failure to follow the APA's public notice-and-comment procedure warrants summary judgment in favor of Plaintiffs on Count One of the Amended Complaint.

The IRS must enforce and administer the Internal Revenue Code "with integrity and fairness to all." THE IRS MISSIONS AND STATUTORY AUTHORITY,

https://www.irs.gov/about-irs/the-agency-its-mission-and-statutory-authority (last visited July 10, 2019).  The scope of this responsibility provides sufficient reason for the IRS to seek external information and opposing opinions before it promulgates an amendment to a legislative rule, such as Revenue Procedure 2018-38.  The Court recognizes that tax-exempt organizations may not receive tax-exempt status if any part of their earnings or income "inures to the benefit of any private shareholder or individual." *See* 26 U.S.C. § 501(c)(4)(B). Plaintiffs contend that a state-tax agency may need to rely on substantial-contributor information to determine whether that organization has violated this prohibition on private inurement.  (Doc. 42 at 17).  Plaintiffs further suggest that information concerning the identity of exempt organizations' contributors remains critical for enforcing limits on political activity.  *Id.*  The Court agrees that these purposes support the need for the IRS to comply with the APA's notice-and-comment provision when it amends a long-standing regulation that implicates the collection and sharing of this information.

## CONCLUSION

This case involves a challenge to the process by which the IRS attempted to amend a regulation.  Plaintiffs do not ask this Court to assess the merits of Revenue Procedure 2018-38.  Plaintiffs ask simply for the opportunity to submit written data and opposing views or arguments, as required by the APA's public

notice-and-comment process, before it changes the long-established reporting

requirements.  A proper notice-and-comment procedure will provide the IRS with

the opportunity to review and consider information submitted by the public and

interested parties.  Then, and only then, may the IRS act on a fully-informed basis

when making potentially significant changes to federal tax law.

## **ORDER**

IT IS ORDERED that Defendants' Motion to Dismiss (Doc. 13) and

Defendants' Motion to Dismiss (Doc. 31) are DENIED.

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 41)

as to Count I of the Amended Complaint is GRANTED.  This Court holds

unlawful and will set aside Revenue Procedure 2018-38 as adopted by the IRS.

The IRS must follow the proper notice-and-comment procedures pursuant to the

APA if it seeks to adopt a similar rule.

DATED this 30th day of July, 2019.

Brian Morris
United States District Court Judge