```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MONTANA
 2                       GREAT FALLS DIVISION

 3   STEPHEN C. BULLOCK, in his          )
     official capacity as Governor of    )
 4   Montana; MONTANA DEPARTMENT OF      )
     REVENUE; STATE OF NEW JERSEY,       )
 5                                       )   Civil Docket
                     Plaintiffs,         )   No. CV 18-103-GF-BMM
 6                                       )
                                         )
 7        vs.                            )
                                         )
 8   INTERNAL REVENUE SERVICE; CHARLES   )
     RETTIG, in his official capacity    )
 9   as Commissioner of the Internal     )
     Revenue Service; UNITED STATES      )
10   DEPARTMENT OF THE TREASURY,         )
                                         )
11                   Defendants.         )
     _____    )
12

13                 Transcript of Motion Hearing

14
                 Missouri River Federal Courthouse
15                    125 Central Avenue West
                       Great Falls, MT 59404
16                    Wednesday, June 5, 2019
                      1:30 p.m. to 3:55 p.m.
17

18             BEFORE THE HONORABLE BRIAN MORRIS

19             UNITED STATES DISTRICT COURT JUDGE

20
                    Yvette Heinze, RPR, CSR
21                 United States Court Reporter
                 Missouri River Federal Courthouse
22                    125 Central Avenue West
                       Great Falls, MT 59404
23               yvette_heinze@mtd.uscourts.gov
                        (406) 454-7805
24
               Proceedings recorded by machine shorthand
25        Transcript produced by computer-assisted transcription
```

2

| | |
|---|---|
| 1 | **APPEARANCES** |
| 2 | PRESENT ON BEHALF OF THE PLAINTIFFS, |
| | STEPHEN C. BULLOCK AND MONTANA |
| 3 | DEPARTMENT OF REVENUE: |
| 4 | Deepak Gupta |
| | Daniel Wilf-Townsend |
| 5 | GUPTA WESSLER, PLLC |
| | 1900 L Street, NW, Suite 312 |
| 6 | Washington, DC 20036 |
| 7 | |
| 8 | Raphael Graybill |
| | OFFICE OF GOVERNOR STEVE BULLOCK |
| 9 | PO Box 200801 |
| | Helena, MT 59620-0801 |
| 10 | |
| 11 | PRESENT ON BEHALF OF THE PLAINTIFF, |
| | STATE OF NEW JERSEY: |
| 12 | |
| 13 | Glenn J. Moramarco |
| | Office of the Attorney General of New Jersey |
| 14 | 25 Market Street, 8th Floor, West Wing |
| | Trenton, NJ 08625 |
| 15 | |
| 16 | PRESENT ON BEHALF OF THE FEDERAL DEFENDANTS: |
| 17 | Joseph A. Sergi |
| | Landon Monte Yost |
| 18 | Laura M. Conner |
| | UNITED STATES DEPARTMENT OF JUSTICE |
| 19 | 555 Fourth Street, NW |
| | Washington, DC 20001 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

PROCEEDINGS

1
2      (Open court.)

3           THE COURT:  Please be seated.

4           Madam Clerk, please call the next case on the Court's

5  calendar.

6           THE CLERK:  This Court will now conduct a motion

7  hearing in Cause Number CV 18-103-GF-BMM, Steven Bullock et al.

8  versus Internal Revenue Service, et al.

9           THE COURT:  Good afternoon, Counsel.  Would you

10  please make appearances for the record starting with the --

11  well, I guess this is the government's motion.  Go ahead.

12           MR. SERGI:  Joseph Sergi from the United States

13  Department of Justice on behalf of the United States.

14           THE COURT:  Have you been here before, Mr. Sergi?

15           MR. SERGI:  I have not.  And, actually, Your Honor,

16  this is my 50th state that I've stepped into working for the

17  Department of Justice.

18           THE COURT:  You saved the best for last.

19  Congratulations.

20           MR. SERGI:  There's a name for that.

21           THE COURT:  Thank you, Mr. Sergi.

22           MS. CONNER:  Laura Conner, also on behalf of the

23  United States.

24           THE COURT:  Welcome, Ms. Conner.

25           MR. YOST:  Landon Yost on behalf of the United

1  States.

2          THE COURT:  Now, you have been here before, Mr. Yost.

3          MR. YOST:  I've been to Montana several times, but

4  not in this courthouse, Your Honor.

5          THE COURT:  Not in this court?  Oh, all right.

6  Welcome.

7          And for the State of Montana, State of New Jersey.

8          MR. GRAYBILL:  Your Honor, my name is Raph Graybill

9  here on behalf of the Montana Department of Revenue and

10  Governor Bullock.

11          MR. GUPTA:  Your Honor, Deepak Gupta on behalf of

12  both plaintiffs, and this is my first time here.

13          MR. WILF-TOWNSEND:  Daniel Wilf-Townsend, also on

14  behalf of both plaintiffs.

15          THE COURT:  And where are you from Mr. Townsend?

16          MR. WILF-TOWNSEND:  From Washington D.C., from Gupta

17  Wessler.

18          MR. MORAMARCO:  And Glenn Moramarco, Your Honor, on

19  behalf of New Jersey.

20          THE COURT:  Where are you from, Mr. Moramarco?

21          MR. MORAMARCO:  Right now, Haddonfield, New Jersey.

22          THE COURT:  All right.  Welcome, everyone.

23          We have two motions to argue today, and they are

24  somewhat related.  First, we have a motion filed by the United

25  States to dismiss the complaint.  And then in response we have

1  a response to the motion to dismiss coupled with a motion for

2  summary judgment.  Why don't we take the motion to dismiss

3  first.

4          Who is going to argue for the government on that one?

5          MR. SERGI:  I am, Your Honor.

6          THE COURT:  Okay.  And then for the plaintiffs, who

7  will argue on the motion to dismiss?

8          MR. GRAYBILL:  Your Honor, we've elected to have

9  Mr. Gupta argue the standing portion of the argument, and then

10 I'll argue the merits as well as the government's defense on

11 reviewability.

12         THE COURT:  On the what?

13         MR. GRAYBILL:  On whether the agency action is

14 consigned to discretion.

15         THE COURT:  Well, I think that's reserved for the

16 summary judgment.

17         So Mr. Gupta will handle the standing question?

18         MR. GRAYBILL:  Yes, Your Honor.

19         THE COURT:  All right.  Mr. Sergi, why don't you go

20 first.  And I've blocked out about two hours for this hearing.

21 So keep your remarks in that ballpark.

22         MR. SERGI:  Yes, Your Honor.

23         Your Honor, plaintiffs filed a complaint seeking to

24 set aside an IRS revenue procedure under the Administrative

25 Procedure Act.  And in response, as you point out, we've moved

1  to dismiss this complaint for lack of subject matter

2  jurisdiction and failure to state a claim.  Specifically, we

3  argue plaintiffs have no Article III standing because they have

4  no legally protected rights and their injuries are, at best,

5  hypothetical.

6          In addition, plaintiffs lack statutory standing

7  because they do not fall within the zone of interest of any

8  statute that would allow them to sue.

9          And, finally, should the Court find that there is

10  standing, plaintiffs fail to state a claim under the APA

11  because Congress has committed the subject matter of the

12  revenue procedure and the regulation-to-agency discretion, and

13  the Revenue Procedure 2018-38 is an interpretative and

14  procedural rule for which notice and comment is not required.

15          On this last point, as you point out, the plaintiffs

16  have moved for summary judgment.  And while I will address each

17  point, it is the government's position that the Court needs to

18  resolve the standing issue first before we get to the summary

19  judgment.

20          THE COURT:  I agree.

21          MR. SERGI:  So -- well, that's good.  Then I've

22  convinced you, Your Honor.

23          THE COURT:  You've got one victory for the day.

24          MR. SERGI:  Yes.

25          So, first, a little bit of background.  As we've

1   discussed more in detail in our pleadings, for the most part,
2   tax exempt entities with assets -- well, I'm sorry -- with
3   gross receipts above $50,000 are required to file an
4   informational return called the 990.  And one of the
5   attachments to that form is what's referred to as a Schedule B,
6   and that lists the donor information that's at issue in this
7   suit.  It's the names and addresses of donors.

8           Now, 501(c)(3) organizations, which is what most
9   people think of when you talk about charities, and Montana has
10  a declaration saying they have over 10,000 charities, and the
11  majority of their charities are these (c)(3) organizations.
12  They're not at issue here because by statute they are required
13  to list the names of significant donors, and so that's not
14  going to change.

15          The same statute that requires them to list all of
16  that information also gives the treasury and then, by
17  designation and regulations, the IRS the ability to request
18  information that it needs, additional information that it needs
19  from other entities, and allows them to relieve entities
20  providing information that they don't need.

21          And so for years, with a few exceptions not relevant
22  here, the IRS required all tax exempt entities to file the 990s
23  and the Schedule Bs with the donor information, even -- and,
24  you know, in addition to the (c)(3)'s.

25          The IRS had good reasons for this.  They had tax

1    administration for reason for this.  At some reason, those

2    reasons went away, and the IRS realized that it was unnecessary

3    for the administration of tax to get donor names and addresses

4    from all 501(c) organizations.

5              Another thing I need to mention is that --

6              THE COURT:  Why did it become apparent 40 years after

7    the statute was enacted that we don't need these 501(c) donors

8    anymore?

9              MR. SERGI:  Well, Your Honor, for one thing, the law

10   changed.  One of the original reasons for these is, you know,

11   to track -- the reason for (c)(3)'s, for example, still, they

12   have donor names and addresses is because people take

13   deductions for their donations.  So there's a good way to

14   track.

15             At one point in the law -- and I'm just throwing this

16   out as an example -- there was a gift tax that was potentially

17   on it.  And so that was another way that the IRS could have

18   used these Schedule Bs to track it, and that gift tax was

19   repealed in 2015.  So it's not the 40 years that you are

20   speaking of, Your Honor, that that was repealed.  That's just

21   2015.  And so --

22             THE COURT:  But the gift tax only applied to

23   501(c)(4)'s?

24             MR. SERGI:  Well, no -- well, but that's one of the

25   entities, Your Honor, that would have been affected by this.

1  And they had other --

2         THE COURT:  But I don't think the regulation repealed

3  the reporting on 501(c)(3)'s.

4         MR. SERGI:  That's correct because the regulation and

5  the revenue procedure could not change (c)(3)'s because

6  (c)(3)'s are required by statute, Your Honor.

7         THE COURT:  Go ahead.

8         MR. SERGI:  So the flip side, however, is the

9  information on a 990 is public in accordance with Section 6104

10 of the Internal Revenue Code.  But 6104 also mandates that the

11 IRS redact out donor names and addresses.  Admittedly, the IRS

12 was not as -- I won't -- they weren't as successful as they

13 could have been, and it resulted in some high profile

14 litigation where certain names were not redacted and were

15 released, for example, to ProPublica.  And that caused

16 a coupled -- it caused bad press, Your Honor.

17        So then the IRS, faced with the fact that it really

18 didn't need this information anymore and the fact that there

19 was a down side to collecting it and having it redacted, the

20 IRS determined that it should -- it would issue Revenue

21 Procedure 2018-38, which relieves certain organizations of the

22 need to list donor names and addresses.

23        THE COURT:  The repeal regulation required disclosure

24 of those persons over $5,000?

25        MR. SERGI:  It was gross receipts -- oh, I'm sorry.

1  You mean donor amounts?

2              THE COURT:  Yes.

3              MR. SERGI:  Yes, Your Honor.  I believe it was $5,000

4  in donor amounts.

5              THE COURT:  So how many people are we talking about?

6              MR. SERGI:  I actually don't know the answer to that,

7  Your Honor.

8              THE COURT:  This is $5,000 to a single organization;

9  right?

10             MR. SERGI:  Right.  But there's a second half --

11 there's a second leg to that stick, Your Honor, which is it

12 also is the asset amounts because a lot of non-501(c)(3)

13 organizations are what as known as grassroots organizations,

14 and they would only have to file, like, postcard forms, and

15 they wouldn't have Schedule Bs at all.  So that's why I'm

16 saying that it's hard to tell what the number is.  But I don't

17 actually have that number.  I can get it, Your Honor.

18             THE COURT:  Well, you are talking about -- you said

19 the IRS occasionally would miss something, and something would

20 get disclosed that shouldn't have been disclosed under

21 redactions.

22             MR. SERGI:  Right.

23             THE COURT:  I was just trying to understand how large

24 a task it had been for the IRS to undertake these redactions.

25             MR. SERGI:  Well, interesting, Your Honor, I have

1  defended a lot of those cases, and so I do know the facts of

2  those cases.  And in those cases, what they have is they farmed

3  them out.  But they also have to redact out (c)(3)'s.  So there

4  is a large number of redactions that they have to do as well.

5         THE COURT:  Well, what's a large number?  50?  A

6  million?  10 million?

7         MR. SERGI:  Do we know the --

8         THE COURT:  I am just trying to -- we're talking

9  about American citizens who give more than $5,000 to a single

10  organization, and I'm trying to understand how large a task

11  that would be.

12         MR. SERGI:  Right.  Well, Your Honor, I do know that

13  there is an entire office that does it, and I think that office

14  is 15 to 20 employees that do this full time.

15         THE COURT:  Okay.  Go ahead.

16         MR. SERGI:  So I should point out that plaintiffs

17  take issue that this was done through a revenue procedure.  And

18  as we mention in our papers, the IRS has long revised reporting

19  requirements for tax exempts using revenue procedures, and

20  revenue procedures have even been used by the IRS to completely

21  exempt groups from filing Form 990s at all.

22         As plaintiffs point out, there are legitimate reasons

23  why donor information could be important such as the concept of

24  private inurement, and I believe Montana has a declaration

25  saying they rely on the IRS in their private inurement

1  determinations.  Private inurement is an example where an
2  organization exists only to benefit a single person and not the
3  public.  I believe there's an example in their complaint where
4  they talk about a plumber and private inurement.

5          THE COURT:  Yes.

6          MR. SERGI:  That's actually not private inurement.
7  What that is, is a noncharitable purpose.  Private inurement
8  would be somebody gets donations, but instead of using them for
9  the purpose of the organization, they spend them on themselves.

10          The IRS still requires organizations to keep this
11  information.  So, as a result, if there were a private
12  inurement concern, which you could probably see from how the
13  money is being spent without having forms, they could see --
14  based on the donations, the IRS could still get the information
15  in the audit.

16          THE COURT:  Well, what about the states?  Could they
17  get it?

18          MR. SERGI:  Well, which states, Your Honor?

19          THE COURT:  Well, you said the regulation requires
20  the organization to keep this information; right?

21          MR. SERGI:  Right.

22          THE COURT:  So the implication was that that
23  information potentially would be available to the IRS if there
24  were an issue.

25          MR. SERGI:  Right.

1          THE COURT:  Is that fair to say?

2          MR. SERGI:  That is fair to say.

3          THE COURT:  All right.  So would the states be able

4   to obtain that information if they requested it from the IRS?

5          MR. SERGI:  Yes.  And the reason I asked which states

6   is, yes, in general, states would have access to that

7   information under 6104(c) agreements, but neither Montana nor

8   New Jersey has 6104(c) agreements.

9          What's important here is that the information is

10  being retained.  So where as New Jersey says they're being

11  harmed because the IRS is no longer reporting this on

12  Schedule B, what New Jersey is saying is "Well, we need access

13  to this information."  So what's protecting New Jersey is

14  actually the fact that the IRS is having entities gather this

15  information, maintain this information, and keep the

16  information.

17         THE COURT:  So you said a 6104(c) agreement.  What

18  does that entail?

19         MR. SERGI:  So, Your Honor, in the briefing the

20  parties discuss ways information can be shared between the IRS

21  and the states, and there's two agreements.  There's a 6103(d)

22  agreement and a 6104(c) agreement.  The basic difference

23  between the two agreements is that a 6103(d) agreement allows

24  the IRS to share the information with state officials.  And the

25  6104(c) information -- I'm sorry, let me -- I missed the

1  important part of the difference.  A 6103 agreement allows the
2  IRS to share information with a state official regarding
3  taxable entities, and 6104(c) permits the IRS to share
4  information related to tax exempt groups.
5          And so what's equally true about that is if a state
6  doesn't have one of those agreements with the IRS, then they
7  don't share the agreement.  So in this case --
8          THE COURT:  So how many states have these agreements?
9          MR. SERGI:  I think three or four states have a
10 6104 agreement, and I can explain why, Your Honor.
11         THE COURT:  Please.
12         MR. SERGI:  It appears that -- it's the problem that
13 New Jersey has.  And that is, even if they get information
14 through a 6104 agreement, it doesn't serve the purposes that
15 New Jersey wants.  For example, in their brief, New Jersey
16 talks about their DCA, and what their DCA does is it talks
17 about consumer protection.  Well, information gathered in a
18 6104 agreement, you know, the Charitable Registration Act filed
19 by New Jersey says the purpose of the act is to gather
20 information to disseminate it to the public to protect its
21 citizens.  Well, it couldn't, under the terms of the 6104(c)
22 agreement that we've attached to our papers, do that.
23         So what we have here is a situation where states like
24 New Jersey go get it directly from the entities because they
25 have broader ways to use it than if they had just gotten it

1   from the IRS.

2          THE COURT:  When did the 6104(c) agreements come into

3   existence?

4          MR. SERGI:  Your Honor, I think 6104(c) and 6103(d)

5   agreements have been in existence --

6          THE COURT:  So this isn't something --

7          MR. SERGI:  Yeah, this isn't a new thing, Your Honor.

8          THE COURT:  It's not related to the change in the

9   regulation.

10          MR. SERGI:  Right.  And as a matter of fact -- and

11   this is beyond the scope of the record a bit, but the National

12   Association of Attorney Generals raised this issue and tried to

13   change 6104 so that they could use it for other purposes.  I

14   have the cite for that.  We kind of thought it was beyond the

15   scope of this argument.

16          But the problem is, is they can't use it for the

17   purposes they want, and they certainly can't use it for

18   election regulations, Your Honor.  That's the job of the FEC.

19   The job of the IRS is to regulate the tax code.

20          And so what we have here is they're making a decision

21   based on regulating the tax code, and you've got two states

22   coming in and arguing that "Well, that decision adversely

23   affects our consumer protection and our election rules."

24          So what we have here is, you know, New Jersey can get

25   the information.  The access to the information didn't change.

As a matter of fact, New Jersey recently changed its rules, and
it's very important because they put that in a footnote in
their reply.  So I'm really addressing it for the first time
here.  And they released a press release with that.  And the
press release specifically says, "With the IRS now abandoning
its requirement that many Section 501(c) organizations provide
a significant contributors list along with their annual
filings, the New Jersey rule announced today fills a void."

          Under the new rule, which was published in the
New Jersey Registrar on May 6, charitable organizations exempt
from taxes under 501 must continue to provide a list of
significant contributors to the Division of Consumer Affairs
regardless of whether the federal government's new policy
excuses them from doing so for the IRS.

          So the Division of Consumer Affairs' director, Paul
Rodriguez, who is the declarant in this case and talked about
all the harms they have promulgating the new rules and what
would happen if -- well, what if we had to go against everyone
individually and there wasn't a broad blanket rule?  He's
quoted in this press release as well saying, "This rule will
enhance our ability to effectively regulate charitable
fundraising and organizations and other tax exempt nonprofits
by ensuring that we continue to receive relevant information.
We take seriously our duty to make sure charitable
organizations are who they say they are and do what they say

1  they do in compliance with New Jersey laws."

2          And then --

3          THE COURT:  Mr. Sergi, let me just interrupt for a

4  second.  The regulation law you are citing in New Jersey, to

5  whom would it apply?  Is it only these organizations that are

6  based in New Jersey?

7          MR. SERGI:  It applies to New Jersey businesses doing

8  business in New Jersey, Your Honor.

9          THE COURT:  Doing business.  All right.  So what does

10  that entail?  If an organization wanted to paper New Jersey

11  with electioneering postcards, would that be doing business in

12  New Jersey that would be required to report?

13          MR. SERGI:  I think you would have to ask New Jersey

14  that, Your Honor.

15          THE COURT:  I'm just trying to understand.

16          MR. SERGI:  But I would guess --

17          THE COURT:  What you're suggesting is that the state

18  has the ability to fill the gap that this regulation created

19  through their own means.  Is that right?

20          MR. SERGI:  Well, that's not my position, Your Honor.

21          THE COURT:  What is that for?

22          MR. SERGI:  That's New Jersey's position that they

23  filled.

24          THE COURT:  I'm just wondering whether that

25  regulation could apply to a national -- or an organization

based in California, and that organization decides "We want to get involved in New Jersey elections, and so we're going to either fund other organizations that actually print the materials, or we're going to contribute to candidates for issue back groups in New Jersey." Does that mean they have to report it by that law? Or if it's only if they do business there, as long as they register a headquarters there or something like that?

MR. SERGI: I think the answer to that is not necessary to look at what New Jersey law covers and says, but rather look the what New Jersey law -- the New Jersey rules previously said they could get versus what they can get now. Previously, they could get Schedule Bs from whatever companies meet the criteria. Now they can get the information that was on the Schedule Bs from whatever companies meet the criteria.

So where Your Honor is pointing out to all of these examples of other companies that may or may not fit their rules, I think the important thing to see here is there is no harm because they're getting exactly what they got before merely by changing their rules from Schedule B to the information that was on a Schedule B.

THE COURT: Well, that goes more toward the merits of the issue. Let's stick here with the standing question. Why can't -- what if Montana doesn't want to follow New Jersey's lead and create a similar regulation? Why do they have to?

1    They've relied in the past for this information.  Why don't
2    they have standing to challenge this change in regulation?
3          MR. SERGI:  I'm sorry.  I didn't hear the end of the
4    question.
5          THE COURT:  Why don't they have standing to challenge
6    this regulation?  I'm trying to get you back to the standing
7    argument because it seems like that -- you're pointing out that
8    the change in New Jersey's regulation seems to relate more to
9    the merits, their ability to get this information in other
10   ways.
11         MR. SERGI:  No, Your Honor.  I'm saying the change in
12   New Jersey's regulation directly -- it's a standing issue.
13   Because it shows that they have no harm.  Because it shows that
14   they weren't harmed by the revenue procedure.  So, therefore,
15   there is no concrete harm; and, therefore, under *Spokeo*, they
16   have no standing.
17         So Montana -- I can take Montana too because Montana
18   is even more tenuous than New Jersey because Montana also
19   doesn't have a 6104(c) agreement.  Both states have a 6103(d)
20   agreement, but 6103(d) agreements don't cover tax exempt
21   entities.  They only cover entities that are subject to a tax.
22         THE COURT:  So let me understand more about these
23   agreements.  Why wouldn't 50 states have these agreements?
24   What's the holdup?
25         MR. SERGI:  You mean the 6103 or the --

1          THE COURT:   6104s.

2          MR. SERGI:   Because the states -- they just don't

3    have them, Your Honor.   They don't feel the need to get them.

4    Most of them, I guess, either rely on the IRS determinations.

5    And if they rely on the IRS determinations, they can still

6    continue to rely on IRS determinations.

7          For example, Montana says that they're harmed because

8    they -- it's in their brief.   It says they require tax exempt

9    entities to report whether they've received a federal

10   exemption, and now in essence -- I'll paraphrase -- because the

11   IRS is no longer asking for donor information, they can't be

12   comfortable in that decision.

13         Putting aside whether comfortable is enough to give

14   standing, I should point out that -- and this is in the

15   declaration of Mr. Walborn.   He says, "In response to Revenue

16   Procedure 2018-38, MTDOR will continue to spend staff time

17   determining how to redress the decreased reliability of the

18   IRS's tax exemption decisions and the decreased information

19   available via the information-sharing mechanisms."

20         THE COURT:   Let's be fair here, Mr. Sergi.   I mean,

21   the entire legal staff of the Montana Department of Revenue

22   could fit in the phone both out in the hallway here.   So to

23   suggest they can get it themselves, is that really a fair

24   criticism?

25         MR. SERGI:   That's not my argument for Montana, Your

1  Honor.  My argument for Montana is they don't get it now, and

2  they don't get it -- they don't get it under the new rule, and

3  they didn't get it under the old rule.  They never asked for

4  it.  What they say in their declaration is if they need it,

5  they can get it.

6          THE COURT:  Well, one of the arguments made, as I

7  read the state's briefs, is that the landscape is changing;

8  that the money in politics now travels through different

9  avenues than it historically had.  It doesn't go to candidates

10  anymore.  It may not even go directly from the donors to

11  political organizations.  Instead, it goes through the web of

12  these murky organizations.  It's hard to sort out who they are

13  and what they are.  That's their argument from what I read in

14  the briefs.

15          MR. SERGI:  Yes, Your Honor.  That is their argument.

16          THE COURT:  So you say they didn't need it in the

17  past.  Well, so what?  They think they need it now.

18          MR. SERGI:  But that's the point, Your Honor.  It's

19  not the IRS's job to monitor dark money.  The IRS's job is to

20  determine whether entities are entitled to tax exempt status.

21          THE COURT:  Right.  But the IRS had the statute that

22  requires the IRS to gather this information; right?

23          MR. SERGI:  The statute requires 501(c)(3)'s to

24  gather this information.  The regulation expanded that to

25  everyone, and it also carved out that the commissioner in his

1  discretion --

2          THE COURT:  And that was the state of the law until

3  two thousand -- was it '17 or '18?

4          MR. SERGI:  Right, because it was -- because it was

5  the discretion of the commissioner that the information was

6  necessary.  And, now, in the judgment of the commissioner, the

7  information is not necessary.

8          THE COURT:  All right.  That's getting us to the

9  notice-and-comment requirement.

10         MR. SERGI:  It does get us to the notice-and-comment

11 requirements.

12         But can I point something out, Your Honor?  Which is

13 Montana is concerned about the determinations of exempt status

14 made by the IRS.  None of that has anything to do with this

15 case because a determination of taxes and status isn't done on

16 a Form 990.  It's done on a Form 1023 or a Form 1024.

17         More importantly, a Form 1023 and a Form 1024 doesn't

18 ask for donor information.  The only time the IRS can ask for

19 donor information is if it's relevant, say, for example, for

20 private inurement.

21         There was a bunch of cases -- I know because I was

22 lead counsel on all of them -- where the IRS was taken to task

23 because of the Tea Party and the Tax Inspector General Report

24 that came out.  That report held that when the IRS asked for

25 donor information as a matter of course during the exemption

1   process, that those were unnecessary questions.

2          And so, Your Honor, I think the point is -- and I'm

3   not sure if this is what you are getting at -- is while it may

4   be relevant for dark money determinations, it may be relevant

5   for consumer protection purposes, names and addresses of donors

6   are not necessary for the determination of a tax exempt entity.

7   And that is what the IRS says.  And so now we have states

8   coming in to dictate to a federal agency what is required for

9   tax exempt status, and that is why we have a problem with this

10  case, Your Honor.

11          I'm not sure if that answers your question.

12          THE COURT:  I understand your position.  Go ahead.

13          MR. SERGI:  Okay.  So the point is, Your Honor, that

14  Montana's upset because now they are saying, "We can't rely on

15  the IRS."  The same thing that's in their declaration.  They

16  feel the same way about inurement.  "We can't rely on the IRS

17  for inurement determinations."

18          Well, Your Honor, nothing's changed with regard to

19  that.  If there's an inurement problem, the IRS will

20  investigate it, and the IRS will disallow it.  If an entity is

21  disallowed, there are other mechanisms that are beyond the

22  scope of this case that would allow the IRS to share with

23  states whether entities have been -- their status has been

24  revoked.

25          But that is not what we have here.  What we have here

1  is 6103 and 6104.  Plaintiffs in their reply tried to say and

2  argue that 6103(d) agreements would include Form 990s and

3  Schedule Bs.  And that position, Your Honor, we thought it was

4  black letter law, but I feel the need to address it.  So what

5  they say in their -- what they say in their rely is -- I'm

6  trying to find the quote -- basically, what they say is, on the

7  logic that we have, 6103(d) would not cover returns and return

8  information for entities including very large corporations in

9  America that pay no taxes because they declare a variety of

10 exemptions.  And they say, quote, "Cramped reading is at odds

11 with both the text and the purpose of the statute."

12      And so they argue that the statute maintains

13 disclosure of information rather than to determination of

14 possible existence of liability for taxes imposed by the

15 Internal Revenue Code even if it turns out that an entity

16 doesn't owe taxes.

17      Your Honor, this misstates much in the way that the

18 inurement example is not inurement.  That misstates a basic

19 principle of tax, and it's the difference between a taxable

20 entity that doesn't have taxable income and a tax exempt

21 entity.

22      So what happens is we can look at the forms to see

23 this.  If you have a corporation, a corporation files an 1120,

24 and an 1120 has income, deductions, and credits and you

25 calculate a tax.  A Form 990 doesn't have any of that.  What

they have is, you know, reasons that you spent, names of the
board, things like that, summary of contributions.  You can't
use it to figure out what the taxes are.  So if an entity
that's exempt does have a tax, they have to file something
called a 990T, which helps them calculate their unrelated
charitable taxable income.  That's just like an 1120.  It's got
income, deductions, and credits, and that is covered by a
6103(d) agreement.  And so the states would get that if it
related to tax.

          So I would also point out that plaintiffs also said
that passthrough entities our argument would preclude them.  It
really doesn't because, like a partnership return, what it does
is it figures out income, deductions, and credits, and then it
flows through to somebody that has to pay tax.  A 990 flows
through to no one.  So, therefore, the 990 is the subject of
the 6104 agreements.

          Okay.  So I want to make sure I didn't miss anything
with regards to standing.

          I should also add, Your Honor, that the IRS is still
collecting the names and -- I'm sorry -- the IRS is still
requiring entities to gather, maintain, and preserve the names
of donors and their addresses, which is why states like
New Jersey, when they do their economic impact, say there's no
additional cost to their new rule that says just give us this
information.  And they say there's no cost to the entities, but

1   they also say -- they don't list any costs that's required for

2   the state agency to change this rule.  And the declaration in

3   this case says, "Well, you know, the government doesn't

4   understand.  The federal government doesn't understand."  As a

5   matter of practice, we don't list that.

6          But what's more important is they don't list anything

7   in that declaration as to their increase in expenses.  The only

8   expenses they talk about as being incurred -- the only harms

9   incurred to them is implementing the new rule and what harms

10  would exist if there were no rule.  Well, now, Your Honor,

11  there is a rule.  So those costs are gone, and there is no harm

12  about people doing anything independent.

13         There is a reference to a compliance problem, but

14  it's rarely speculative because we're not sure how many people

15  complied with the law in the first place or didn't even submit

16  Schedule Bs.  We're not sure what the difference would be.  If

17  they're required to keep it, they're required to get it.

18         That declaration also says that not only does the IRS

19  not have a 6104(c) agreement with New Jersey, but even if an

20  entity under their rules gives them a Schedule B and they find

21  that that Schedule B is wanting, then they use their own

22  mechanisms.  They use an alternative means of getting the

23  additional information.

24         So that's our first standing argument, Your Honor, is

25  that there is no harm because they don't have -- they're not

 1 │ affected by it.

 2 │         I would go even further, Your Honor.  I would even

 3 │ give the flip side of that.  Let's assume that this was issued

 4 │ with notice and comment, and let's assume Montana and New

 5 │ Jersey submitted comments, and let's assume that the IRS

 6 │ decided to keep collecting names and addresses of donors.

 7 │ Well, that would still not affect either state because, one,

 8 │ New Jersey would still be getting it directly from a tax payer,

 9 │ albeit not on a separate sheet of paper but rather on a form

10 │ Schedule B.  And Montana would still not be getting it at all,

11 │ but I guess would still have the comfort of knowing that the

12 │ IRS collects it.

13 │         THE COURT:  So why change the regulation?

14 │         MR. SERGI:  I'm sorry?

15 │         THE COURT:  Why change the regulation?

16 │         MR. SERGI:  The IRS determined that they needed to do

17 │ it for tax administration.  They change regulations all of the

18 │ time, Your Honor.

19 │         THE COURT:  What does that mean, "tax

20 │ administration"?

21 │         MR. SERGI:  They -- in the commission -- well,

22 │ that's -- I think that's the point, and that goes into the APA.

23 │ That is, to administer the tax code, the commissioner made the

24 │ determination that this was necessary.  And it's not, you know,

25 │ under the APA.  It's something that's precluded from being --

1    THE COURT:  They had too much information before?
2    The IRS had too much information?

3    MR. SERGI:  Well, they had information they didn't
4    need.  And they also had information that was wrongfully
5    disclosed.  And so the less information they gathered, the less
6    chance of disclosure there would be.

7    THE COURT:  Okay.  Go ahead.

8    MR. SERGI:  I mean, I guess our point is we're not
9    really here to second-guess the commissioner, and that's why
10   the APA review is precluded, but I know that that's getting
11   more to the APA arguments.

12   Does Your Honor have any more questions about the
13   harm?

14   THE COURT:  No.  Why don't you move on.

15   MR. SERGI:  Okay.  So we have a second argument as to
16   why there's no standing, and that is plaintiffs lacks standing
17   because they don't fall within the zone of interest to sue.
18   And that is because plaintiffs' complaint only list a few
19   statutes.  A couple of them are the substantive statutes, and
20   then 6033 and maybe 6103 and 6104, which are the agreements.

21   We explain in our brief that 6033 is basically the
22   filing obligations.  Right?  So the plain purpose of it is to
23   help the IRS administer federal tax codes as it applies to
24   exempt works.  New Jersey and Montana are not in the zone of
25   interest of that, and states aren't even mentioned.

1               As for 6103 and 6104, the revenue --

2          THE COURT:  Hold on.  Hold on.  Before we get too far

3     down the road, I neglected to ask you.  On the informational

4     injury, which is what the plaintiffs rely, how do you

5     distinguish the *Akins* case and the *PETA* case?

6          MR. SERGI:  Your Honor, I think what we have here --

7     if I may have a moment to confer?

8          THE COURT:  Sure.

9       (Off-the-record discussion between Mr. Sergi and

10        cocounsel.)

11          THE COURT:  *Akins* is the Supreme Court case regarding

12     the FEC and the AIPAC.

13          MR. SERGI:  I need --

14          THE COURT:  And the *PETA* case is the DC Circuit

15     regarding -- the People for the Ethical Treatment of Animals

16     brought an action against the Department of Agriculture.

17          MR. SERGI:  Yes, Mr. Yost just -- it's the animal

18     case is what he told me, Your Honor.

19          THE COURT:  Yes.

20          MR. SERGI:  Yes.  The difference between that case

21     and this case is there was a statutory right to the information

22     in that case.

23          THE COURT:  In the PETA case?

24          MR. SERGI:  In both of those cases, Your Honor.

25          THE COURT:  Okay.  Statutory right -- did PETA have a

1   statutory right or any citizen?

2          MR. SERGI:  Well, any citizen would have had a

3   statutory right to that information.

4          Here, Montana and New Jersey have a right under 6104

5   if they were to, say in the future, get a 6104 agreement, they

6   have a right to what the service collects.  They don't have a

7   right to say what the service collects.  So that's what 6103(d)

8   and 6104(c) do.  They say, "We'll share with you the

9   information that we get."  It doesn't say, "Well, you have a

10  right to dictate what information we get."

11         THE COURT:  I'm still trying to understand.  How many

12  states have the 6103 agreements?

13         MR. SERGI:  I'm pretty sure all 50.

14         THE COURT:  Okay.  So why do 50 state have that

15  agreement and only three states have the 6104?

16         MR. SERGI:  Well, maybe --

17         THE COURT:  Is this new?

18         MR. SERGI:  It is not a new agreement, Your Honor.

19         THE COURT:  All right.

20         MR. SERGI:  It is an agreement that I know people are

21  constantly asking Congress -- well, I don't know if they are

22  constantly.  I know at one point people were asking Congress to

23  change 6104 to give a broader context to it.

24         It could be that most states, the 6103 agreement, is

25  what their tax departments do, and then charitable

1   organizations are reviewed by their consumer protection
2   agencies or their election regulation agencies, which wouldn't
3   be entitled to use the information under a 6104(c) agreement.
4           THE COURT:  So to distinguish the *Akins* case and the
5   animal case, your argument is that in those situations there
6   was a statutory right to gather information or to have access?
7           MR. SERGI:  For access to information.
8           THE COURT:  All right.  So in the *Akins* case, the
9   Federal Election Campaign Act required recordkeeping and
10  disclosure requirements for groups that fail to meet the
11  definition of political committee.  And at one point that
12  included AIPAC -- or apparently included AIPAC, and then the
13  FEC made a determination that they were out, not a political
14  committee.
15          MR. SERGI:  One second here, Your Honor.
16          I'm sorry.  Could you repeat the question.
17          THE COURT:  So in the *Akins* case, the Federal
18  Election Campaign Act, FECA, required recordkeeping and
19  required groups to disclose information if they were a
20  political committee.  Right?
21          MR. SERGI:  Yes, Your Honor.
22          THE COURT:  You agree?
23          MR. SERGI:  If that's what the case says.
24          THE COURT:  Okay.  Well --
25          MR. SERGI:  I don't have it at my fingertips.

1      THE COURT:  I'm not trying to put words in your

2  mouth.

3      MR. SERGI:  No, no.

4      THE COURT:  All right.  So the FEC determines that

5  AIPAC, the American Israel Public Affairs Committee, was not a

6  political committee, and a group challenged that decision.  And

7  the Supreme Court said they had standing to challenge that

8  determination that AIPAC was not a political committee.

9      MR. SERGI:  Because they would have -- it would have

10  affected them, Your Honor.  Here, it doesn't affect --

11      THE COURT:  How did it affect them?  I want to

12  have -- I mean, they are entitled to have AIPAC be a political

13  committee?  I mean, that seem like it's -- it's one thing that

14  you say, "They are a political committee, but I'm not giving

15  you access to their information."  But this is a determination

16  that they're a political committee in the first place.  It

17  seems like agency discretion -- all of those things that you

18  are arguing here that the IRS administrator has seem to be

19  called into question by the *Akins* decision.

20      MR. SERGI:  Well, but, Your Honor, our argument about

21  the discretion of the commissioner falls into the APA

22  arguments, not the standing arguments.  Here, we're saying that

23  neither New Jersey nor Montana are affected in any way by this

24  revenue procedure.  New Jersey has had the information and gets

25  the information, and Montana still doesn't have the information

1  and still doesn't get the information but can still rely on the

2  determinations of the IRS.

3          THE COURT:  Okay.

4          MR. SERGI:  The only thing they've lost here, at

5  best, I guess, is comfort from Montana.  And from New Jersey

6  they actually haven't lost anything.  By their own words,

7  they've completely filled the void with their new rule.

8          THE COURT:  And then the animal case, again, the

9  Department of Agriculture had gathered information before --

10 the Department of Agriculture made a decision not to apply

11 animal welfare regulations to birds or certain kinds of birds.

12 Right?  Do you know that case at all?

13         MR. SERGI:  I vaguely recall it, Your Honor.

14         THE COURT:  Okay.  So the Court said that impaired

15 PETA, the plaintiffs' ability to bring AWA violations to the

16 attention of the agency charter preventing avian cruelty and to

17 continue educating the public.

18         So your distinction is that here the statute required

19 the records to be --

20         MR. SERGI:  What I'm saying is there PETA has a

21 direct harm there, Your Honor, because they couldn't take an

22 action.  Here --

23         THE COURT:  The action is to educate the public.

24 That's one of the alleged harms.

25         MR. SERGI:  Well, and to challenge the regulation.

1          THE COURT:  And to educate the public.

2          MR. SERGI:  And to educate the public.

3          THE COURT:  That was one of the injuries is that
4     without this information, People for the Ethical Treatment of
5     Animals couldn't educate the public about conditions of birds
6     used for exhibitions.

7          MR. SERGI:  Right.  But, here, it's tax return
8     information.  So neither New Jersey nor Montana has the ability
9     to educate the public with -- all they -- that's why New Jersey
10    has to go and get the information directly.

11         So the reason there is no harm that they can't
12    educate the public, if that's what you are saying the harm is
13    by parallel in this case, here, there's information that
14    isn't -- they don't get it from the IRS.  They get it because
15    the IRS maintains people to -- require to maintain it.  New
16    Jersey can still get it.

17         Montana doesn't educate anyone because they don't get
18    the information.  Although they say in their declaration, if
19    they need the information, they sometimes can get it.  Well, if
20    they sometimes can get the Schedule Bs, they can sometimes get
21    the underlying information.

22         I think the difference here is we're talking about a
23    procedure of whether or not it's on a piece of paper that's
24    given to the IRS versus it's on a piece of paper that's given
25    to New Jersey or on a piece of paper that's given to Montana if

1   they request it.  So they are not impaired at all.

2          THE COURT:  All right.  Anything else you want to

3   talk about on the informational injury or lack thereof?

4          MR. SERGI:  If I may have a moment to confer to make

5   sure I didn't miss anything?

6          THE COURT:  Please.

7     (Off-the-record discussion between Mr. Sergi and

8       cocounsel.)

9          MR. SERGI:  No, Your Honor.

10         THE COURT:  All right.  Now address the zone of

11  interest.

12         MR. SERGI:  Oh, I'm sorry.

13         THE COURT:  The zone of interest standing.

14         MR. SERGI:  You're right.  I was beginning the zone

15  of interest standing, and we went backwards.  I forgot, Your

16  Honor.

17         Okay.  So with regards to the zone of interest, I

18  said there were the three statutes.  I was actually almost

19  done.  6103 and 6104 can't be the statute because they -- first

20  of all, neither one has been violated here.  New Jersey and

21  Montana still get the information under 6103(d).  There is no

22  allegation that they are not getting information.  And then

23  6104, there was no agreement.  So the agreement can't be

24  violated.

25         In their reply, plaintiffs say that they don't need a

1  substantive statute, and then they can just sue under the APA.
2  For the reason outlined in our reply, we believe the contention
3  is without merit.  And then in their final reply, they say --
4  they don't address our argument or distinguish our cases.  They
5  merely state that we make our argument without authority, and
6  they're unaware of any cases that require them to allege
7  violations of a statute other than the APA.

8       To them and to the Court, I would point to pages 20
9  of our memorandum in support of our initial motion and 25 of
10 our reply and the numerous cases that we cite, Your Honor.

11      THE COURT:  Let me ask you about a couple of the
12 cases.

13      MR. SERGI:  Okay.

14      THE COURT:  The *Bay Sanctuary Covenant* case, Ninth
15 Circuit, 2018 case, are you familiar with that?

16      MR. SERGI:  Yes.

17      THE COURT:  So the zone of interest is not that of
18 the APA.  In fact, the zone of interest is to be protected and
19 regulated by the statute that the plaintiffs have been
20 violated.

21      MR. SERGI:  Right.  And, here, there was no statute
22 that was violated, Your Honor.

23      I think the point is that -- the point of these cases
24 is not -- the point of these cases is to say you can't just
25 rely on the APA alone.  You need a substantive statute.

1  Plaintiffs' position is that you don't need a substantive

2  statute, and a violation of the APA is alone -- a procedural

3  harm under the APA is enough.  All of the cases we cite, I

4  think, reiterate over and over and over again that you need a

5  substantive law that's violated.

6          Now, we haven't reached -- I guess that's beyond the

7  scope of this motion -- whether there is a violation under

8  6033.  But the point is, is that we're arguing in the zone of

9  interest at least, and the harm we're arguing is that it

10 doesn't affect either one.  In the zone of interest, we're

11 arguing that 6033 is not made to protect states.  It's made to

12 help the IRS determine tax exempt status.  So I guess states

13 would be protected the same way the world would be protected,

14 and you wouldn't have --

15         I mean, basically, at the end of the day, Your Honor,

16 Montana and New Jersey don't like what the IRS is doing, and

17 they don't like the way the IRS is administering their tax code

18 and their choices in administration.  And, Your Honor, if

19 that's enough to convey standing, we're going to be very busy

20 because there's a lot of people that don't like the way the IRS

21 administers the tax code that aren't affected.

22         THE COURT:  All right.  Anything else, sir?

23         MR. SERGI:  I'm sorry?

24         THE COURT:  Anything else?

25         MR. SERGI:  No, that's it.

1          THE COURT:  Thank you.  And I'll give you a brief

2     rebuttal once we hear from the states.

3          MR. SERGI:  And, just to be clear, we're only talking

4     about the standing?

5          THE COURT:  Only standing, yes.

6          MR. SERGI:  Thank you, Your Honor.

7          THE COURT:  We're not going to get to the

8     interpretative rule regulation issue till later.

9          All right, Mr. Gupta.

10          MR. GUPTA:  Good afternoon, Your Honor.  Deepak Gupta

11     for the plaintiffs Montana and New Jersey.  I will just be

12     addressing standing, and my colleague, Mr. Graybill, will

13     address the merits.

14          So for over 40 years, it has been the law that

15     nonprofit organizations, other than 501(c)(3)'s, must report

16     their substantial contributor information to the IRS.  And over

17     those 40 years, that rule has engendered substantial reliance

18     by state tax administration officials.  As Your Honor said,

19     states just don't have the same kind of resources when they are

20     administering the tax laws that the federal government has.

21          THE COURT:  So I suggested that states are drafting

22     along the federal government and taking advantage of the

23     information they have gathered.

24          MR. GUPTA:  Right.

25          THE COURT:  I understood opposing counsel's argument

1  to be they are not.  They weren't relying on this information.

2  There's no evidence, no allegation, that you specifically use

3  the information in the formal regulation to which you are now

4  seeking.  This is election information.  You are entitled to

5  information regarding tax exempt organizations and tax

6  exemptions.

7         MR. GUPTA:  That's right.  But this is important --

8  critically important information for the administration of the

9  states' tax laws, and they have been relying for decades on the

10  fact that the IRS collects this information and makes

11  determinations on the basis of this information.

12         THE COURT:  What kind of determinations?

13         MR. GUPTA:  Determinations about tax exemptions,

14  determinations about whether organizations are using the funds

15  for impermissible purposes.

16         THE COURT:  So what?  He said New Jersey passed a new

17  regulation, and they are right back in the same position.

18         MR. GUPTA:  No, it's not.  I mean, first of all, the

19  fact that New Jersey has had to pass that regulation and had to

20  incur the costs of doing so is itself a harm that flows from

21  this.

22         But the only way the IRS can collect this information

23  nationally with respect to all groups -- and Your Honor gave

24  the example of, you know, one organization that acts as a front

25  but then gives the money to a different organization that gives

1  it to a third organization.  And unless you have some
2  centralized repository of that information and the ability of
3  the states to get that information from the federal government
4  where it becomes necessary, states' ability to enforce their
5  own tax laws is going to be hindered.  And you don't have to
6  take my word for it.  You can take Congress's word for it.

7          THE COURT:  Mr. Gupta, let me interrupt you.  The
8  information to which you previously argued you were entitled.

9          MR. GUPTA:  Right.

10          THE COURT:  So it goes to a national repository of
11  the Internal Revenue Service.  Is that for any organization
12  anywhere in the country?  New Jersey can say, "Well, wait a
13  second.  This organization has done some business in
14  New Jersey.  We get this information."  Or is it only for
15  organizations that are headquartered or have offices in
16  New Jersey?

17          MR. GUPTA:  That's a good question.  So the IRS was,
18  until 2018, requiring this information with respect to all tax
19  exempt entities around the country.  You asked my colleague
20  about New Jersey's regulation, and Mr. Moramarco can correct me
21  if I'm wrong, but I asked him.  And I think the scope of that
22  New Jersey regulation that they have now promulgated is only
23  with respect to fund-raising in New Jersey.  They can't reach
24  across the country and assert jurisdiction over organizations
25  that are not doing anything in New Jersey.  So there's a value

to all 50 states in getting information that comes from a
centralized repository.  And Congress has recognized the value
of that.

So, in 1913, Congress passed a statute that has been
revised continually over the last 100 years that recognizes the
importance and indeed confers a right on state tax
administration officials to demand this information in writing
from the federal government.

THE COURT:  So let me point out that opposing counsel
argues that that's fine.  The IRS has been collecting this
information.  You haven't been using it in New Jersey or
Montana.  Why do you get to use it potentially in the future
about some harm that may happen down the road?

MR. GUPTA:  Right.  So a couple of points in
response.  First of all, it's not true that we haven't been
relying on and benefiting from the information.  And if you
look at the declarations submitted by the states, they explain
they have been relying the IRS's collection and use of this
information.

THE COURT:  To keep everyone honest.

MR. GUPTA:  Sorry?

THE COURT:  To keep everyone honest.

MR. GUPTA:  Exactly.  Yeah.

And as you mentioned, Your Honor, this information is
taking on increased importance with the flood of dark money

1  into politics.  And that is not just a job for the Federal

2  Election Commission.  It's also a job for state tax

3  administration officials because they have to ensure that when

4  they are making exemption determinations that the entities that

5  get those exemptions really deserve those exemptions under

6  state tax law.

7          So the statute that Congress first passed in 1913,

8  that still is on the books, is I think critical here.  When

9  Congress passed that, it recognized that it was important that

10 states had a continued right to access to federal tax

11 information, and it recognized two things that I think are

12 critical to why we have standing here.  One, that states have

13 limited resources, and so they're entitled to rely on the

14 federal government's collection of this information.  And,

15 secondly, that states need this information to enforce their

16 tax law.

17         And so there are a lot of -- you mentioned *FEC v*

18 *Akins*.  There are quite a lot of informational injury cases

19 that involve generalized rights to information that any citizen

20 has.  So if I want -- if I'm interested in some document that

21 the federal government has, I could make a FOIA request, and I

22 would have Article III standing to sue over that request.

23         But this isn't some generalized right that's

24 conferred on all citizens.  This is a very specific

25 informational right conferred on state tax administration

1  officials for the purpose of administering their tax laws, and
2  it confers --

3          THE COURT:   What is the basis of that authority?

4          MR. GUPTA:   The basis of that authority is -- it's
5  26 USC 6103(d).  And I'd like to talk about that in detail
6  because I think the government has made sort of a convoluted
7  argument about what that statute means, and I think it's an
8  argument that's appeared for the first time in their papers in
9  this case.  It's not a position that the IRS, to our knowledge,
10 has ever taken before, and it's really at odds with the plain
11 meaning of the statute.

12         So the threshold question for you, Your Honor, is do
13 the plaintiffs have a concrete interest to assert the
14 procedural right that they're asserting here?  And, remember,
15 the procedural right is the right to hold the agency to its
16 obligations to undertake notice-and-comment rulemaking.

17         And the reason that's important is that, as you know
18 from NEPA cases that come here often, when a plaintiff is
19 asserting a procedural right, some aspects of the standing
20 inquiry are relaxed.  So there's a relaxed inquiry into
21 redressability.  I don't have to prove that the outcome of the
22 process is going to be a certain way.  I merely have to prove
23 that I have a concrete interest in that process.  And the
24 states here unmistakably do because they have a right to
25 information that they are seeking, and the pool of that

1   information has been shrunk by the decision made by the IRS
2   without notice-and-comment rulemaking.

3       So I think maybe it would be helpful to take you
4   straight to the statute and look at the words of the statute so
5   you can see why I think that the government's characterization
6   is not correct.  So 6103(d) says, quote, "Returns and return
7   information with respect to taxes imposed by" -- and there's a
8   cross-reference to a whole bunch of provisions of the Internal
9   Revenue Code -- "shall be open to inspection by or disclosure
10  to any state agency, body, or commission charged under the laws
11  of such state with responsibility for the administration of
12  state tax laws."  And then if you go down a little bit further,
13  it says, "Upon written request by the state."

14      So the states have these agreements.  All 50 states,
15  including Montana and New Jersey, have agreements under
16  6103(d), but it's actually a written request from a state, much
17  like a FOIA request, that triggers the obligation on the part
18  of the IRS to provide the information.

19      The reason all of the states have these agreements is
20  just to kind of facilitate the constant flow of information
21  that's going on between the IRS and the states.

22          THE COURT:  And what about 6104?  Why are there only
23  three states with the agreements?

24          MR. GUPTA:  So 6104(c) is a later-enacted provision.
25  I think that's important because the IRS is asking you to

1  narrow the scope of 6103(d) on the basis of 6104(c).  But that

2  doesn't make a lot of sense when you consider that it was

3  enacted later.

4         And that statute is there to address a very different

5  purpose.  That statute is designed to allow people that are

6  state officials, other than state tax administration officials,

7  to get information that they may need for other law enforcement

8  purposes.  So the people who can make the request under 6104(c)

9  are, for example, state attorneys general, people that are

10  enforcing fraud laws, people that are bringing cases against

11  charities.  It's a broader scope.  And Congress didn't make

12  that provision mandatory.  It made it permissive.

13         And so you just have two different regimes that are

14  slightly overlapping.  One came first and is a more fundamental

15  one that Congress has recognized for over 100 years.

16         THE COURT:  And your claim arises from 6103?

17         MR. GUPTA:  Yeah.  Our claim arises under the APA.

18         THE COURT:  Right.  But --

19         MR. GUPTA:  But the informational injury --

20         THE COURT:  -- the basis is 6103 not 6104?

21         MR. GUPTA:  Correct.  The right to information that

22  is at stake here is the general right of information that all

23  state tax officials have to receive return and return

24  information.

25         And I think it's important, just briefly, to point

you to the definitions of return and return information because
I think they do a lot of work here.  The statute defines the
return information to which states are entitled as including
all data with respect to the determination of the existence or
possible existence of liability.

        So the IRS's position here is really -- it's a clever
textual argument that rests entirely on the word "imposed."
What they are saying is the only kind of information that
matters is one where a tax is actually imposed on someone.  And
this is why we point out that there are major corporations,
there are passthrough entities, there are all sorts of entities
that end up not paying taxes but are filing tax returns.  And I
think everyone agrees.  I heard the government say today they
agree with us that those entities would be covered under
6103(d).

        And I heard another thing today that I was interested
to hear which is that with respect to nonprofit organizations,
they have unrelated business income that they sometimes have to
pay taxes on.  And my colleague can correct me when he gets up,
but I think what I heard him say is that with respect to that
income, even the nonprofit organizations that are not
501(c)(3)'s would be covered by this statute.  So now they've
given up the idea that this is some sort of bright line that
rules out the entities in question.

        Now they are making this, I think, pretty convoluted

1  argument that in order to figure out whether the information is

2  relevant, you have to figure out whether they are tax exempt

3  entities that ended up not paying any taxes, and that might not

4  be clear on the face of the information.  Because, after all,

5  they're filing a return, and, you know, the taxing entities are

6  going to have to decide what the tax consequences are.

7          So I think the better way to analyze this is just to

8  look at the text of the statute.  It's a simple mandate for

9  this information, and the definition covers information with

10 respect to the determination of liability or possible

11 liability.

12         And the other thing I think to point out is that

13 there is a kind of dog that didn't bark here.  We have scoured

14 the IRS's regulations, the Internal Revenue Manual, all of the

15 materials that the agency has put out about 6103(d).  And

16 there's a whole lot of it, and it's very detailed, and it

17 explains what the limitations are on this regime.  We have not

18 seen any suggestion from the IRS until their briefing in this

19 case that 6103(d) doesn't cover the entities that are sort of

20 conveniently at issue in this case.

21         So once you get over that statutory interpretation

22 that they've offered here, this is a pretty straightforward

23 case of informational injury under, you know, *FEC v Akins*.  As

24 long as the plaintiff has a right to the information in

25 question --

1      THE COURT:  And in your view that right stems from

2  6103.

3      MR. GUPTA:  Correct.

4      THE COURT:  All right.

5      MR. GUPTA:  Correct.  And that's been recognized for

6  a very long time.

7      THE COURT:  For any purpose?

8      MR. GUPTA:  No, not for any purpose, and I think it's

9  important --

10      THE COURT:  So how do you distinguish counsel talking

11  about, well, this is about tax regulation not election

12  regulation?

13      MR. GUPTA:  Right.  So I mentioned this earlier, and

14  I just want to be clear about this.  Those are not two

15  hermetically sealed categories.  State tax officials are making

16  determinations about whether these entities deserve exemptions

17  under state tax law, and those determinations have important

18  consequences for money and politics.  Now, they are not the

19  FEC.  Right?  But they are making determinations about -- for

20  example, if you've got a dark money group and it is a front,

21  and it then gives money to another group which gives money to

22  another group --

23      THE COURT:  6103, though, I think the argument would

24  be, well, that requires us to gather this information for tax

25  purposes.

1           MR. GUPTA:  Correct.

2           THE COURT:  For regulation purposes.

3           MR. GUPTA:  Correct.  I agree with that.  And I think

4    if you --

5           THE COURT:  Not refereeing elections.

6           MR. GUPTA:  Yeah, that's right, Your Honor.  It's for

7    tax -- administration of the state tax laws.  It says that very

8    clearly.

9           And the history of this is that, you know, the

10   statute was revised in 1976.  There was an episode where the

11   country saw tax information being used for political purposes,

12   and Congress wanted to ensure that it was only used for

13   legitimate enforcement purposes.

14          But that's precisely what Montana and New Jersey want

15   to use it for.  They want to use it to ensure that they are

16   making the right determinations with respect to their tax

17   exemption.  They want to make sure there aren't any

18   discrepancies.  They want to make sure that they have the

19   availability of this information.  And, up until now, they have

20   been relying on the IRS's determinations that they've made with

21   this information.

22          And, again, the only thing this case is about is

23   not -- you know, can the IRS do this?  What's the ultimate

24   decision they're going to make?  The only decision is do the

25   states have some requisite concrete stake such that they should

1    be allowed to provide comments to the federal government before

2    the federal government makes this momentous decision on a

3    contested question of public importance that sort of

4    indisputably affects the states and their ability to administer

5    their own laws?

6            And so we think there are three independent reasons

7    why the states have the requisite concrete stake in the

8    controversy.  We have already talked a lot about informational

9    injury.  They have been denied access to a flow of information

10   that would have otherwise been available under their view of

11   the law, and that is a well-established injury.

12           THE COURT:  Mr. Gupta, counsel argued that -- you

13   know, what you are talking about is more analogous to a federal

14   agency has an obligation to gather information.  You as a

15   citizen can seek such information through a FOIA request, for

16   example, not through this taxing process, not through the

17   regulatory process.  How do you respond to that argument?

18           MR. GUPTA:  Well, I mean, I think the case for

19   standing here is considerably stronger than it is in a case

20   where every citizen has some generalized right to information.

21   Here, we have a much more specific right, and we're seeking it

22   for precisely the purpose that Congress had in mind.

23           THE COURT:  And that right stems from 6103?

24           MR. GUPTA:  It does, yeah.

25           THE COURT:  Any other source?

1              MR. GUPTA:  No, that is the source of the right.

2              I will just point out that you ask my colleague about

3    the PETA case, and the PETA case was actually one in which the

4    DC Circuit went further.  If you look at page 1103 of the PETA

5    case, the concurring judge explains that there was no

6    suggestion in that case that anything in the statute or

7    regulations gave PETA the legal right to the information.  So

8    they were not asserting a legal right to the information.  They

9    were simply saying, "We, as an organization, have relied on

10   this information that the federal government should be

11   collecting, and we're harmed by it."

12             Our argument, I think --

13             THE COURT:  By the failure to collect it.

14             MR. GUPTA:  Exactly, by the failure to collect it.

15             And that's settled law in the DC Circuit, and it

16   relies on an earlier case, *Action Alliance*, that was written by

17   Justice Ruth Bader Ginsburg when she was on the DC Circuit.

18             This case, I think, actually, we have a much stronger

19   case for standing because we do have a statutory right.  We are

20   relying on that right that Congress has created, and the IRS

21   hasn't pointed to any interpretation that suggests that the

22   statute doesn't apply here.  And you would think -- again, this

23   is the dog that didn't bark.  Given how long the statute has

24   been on the books, if the statute really didn't apply to any of

25   these exempt organizations, you would think they'd be able to

point you to something that says that, and they can't.

THE COURT:  Again, go back to counsel's argument.
There's no harm here.  New Jersey has set up its own regulatory
scheme now.  And Montana never uses this information.

MR. GUPTA:  Well, I think this goes straight to the
diversion of resources point.  Both states have had to already
expend resources to respond to the federal government's
decision.  In the case of New Jersey, they had to go to the
trouble of, you know, writing these new regulations and
figuring out how to administer them.  Montana has to --

THE COURT:  The new regulations you just discussed,
are those -- I'm not sure how New Jersey's state government is
set up, but do those relate to the Department of Revenue's
actions or to some elections board?

MR. GUPTA:  It is not election regulation, Your
Honor.  It's the same kind of regulation we're talking about
here.  It's New Jersey's core responsibility to ensure that
entities that are getting tax exemptions really should be
getting tax exemptions.

And up until now, Montana and New Jersey have been
able to rely on the federal government's work in this regard,
which is exactly what Congress had in mind; that you have
limited resources at the state level; so you can rely on the
federal government.  And they have already had to undertake
resources -- a shift in resources to respond, and they are

going to have to continue to do that.  And then you have
declarations from both states explaining how they have had to
shift their resources, and that is a classic Article III injury
as well.  And it doesn't require that they say it's going to
cost them millions of dollars.  Even a small amount of money
and diversion of resources, the use of state tax staff time is
an Article III injury under the law of this circuit.  So that
is an additional harm to the states.

        And it's also going to interfere in their ability to
enforce their state tax laws in the most effective way because
they are not capable of collecting this information nationally,
and they don't have the resources to do what the IRS has been
doing for 40 years.

        So all three of those, we think, are independent
grounds for Article III standing.  This is not, I think, a
close case when it comes to Article III standing.  You have
four cases that I would just recommend.  One of them we've
already discussed.  That's the *PETA v US Department of
Agriculture* case for the DC Circuit.  There's also the earlier
DC Circuit case, *Action Alliance*, as well as the *CREW case, and
the Public Citizen v Carlin* case.

        Those four cases we submit are indistinguishable.
Those are all situations in which plaintiffs are speaking to
assert procedural defects in a rule change by the federal
government that curtails the flow of information available to

1 those plaintiffs.

2       And, in fact, I would say the argument for Article
3 III standing here is considerably stronger because it doesn't
4 involve the kind of generalized interest or rights and
5 information at issue in those cases.  It involves a much more
6 specific informational right and for a specific purpose.

7       THE COURT:  Mr. Gupta, if you have standing in this
8 situation, it gets you the right to submit comments.

9       MR. GUPTA:  That's right.  And you might say, "Well,
10 big deal.  Who cares?"  But I think it's actually quite
11 important here, and my colleague Mr. Graybill will of course
12 talk about this when we get to the merits.  But the reason it
13 matters and the reason it harms our interests is because the
14 states have been denied the ability to participate in a process
15 on this very important contested question.  And it's true.  The
16 IRS could decide the same thing.  But if they did that, they
17 would be doing it on the basis of a record.  They would be
18 doing it on the basis of having heard from the states about the
19 harms that this would cause.  And then they would have to
20 explain themselves.  They would have to give reasons, and those
21 reasons might turn out to be arbitrary and capricious on the
22 basis of the record that's created.

23       So process matters.  It's the reason why -- you know,
24 this happens all of the time in environment cases.  We have big
25 disputes about whether somebody prepared the requisite

1  Environmental Impact Statement.  But those procedural

2  requirements are important, and they affect substantive

3  outcomes, and that's why we care about this.  Ultimately, we

4  care about the substantive outcome.

5          THE COURT:  All right.  Mr. Sergi argued the law here

6  gives discretion to the IRS to administer the tax code as it

7  applies to exempt organizations.

8          MR. GUPTA:  Right.

9          THE COURT:  And they ran into problems, apparently,

10  with regard to -- I think he mentioned the Tea Party

11  organizations, you know, the anti-tax groups, and the improper

12  disclosure of some of those donors to media organizations.  And

13  so in order to remedy that perceived problem, they've had to

14  step in.  Montana is not in the zone of interest as opposed to

15  these regulated entities.

16          MR. GUPTA:  Well, now, I don't think that's the right

17  way to think about the zone of interest inquiry, with respect,

18  Your Honor.  The way to think about zone of interest is first

19  you have to ask what is the interest that the plaintiff is

20  asserting that they say is protected?  Okay?  And we -- you

21  know, if you take nothing else away, I hope you agree with us

22  that we are at least asserting an informational interest.

23  Right?  An interest in this information.  And the reason you

24  know that we're -- and, remember, it's not an especially

25  demanding inquiry, the zone of interest inquiry.  You just

1   simply have to see is the interest that's being asserted so

2   marginally related that you shouldn't get into court?

3             Well, here, the interest at issue is one that

4   Congress has recognized.  Congress has recognized that the

5   states have an interest in this information and that they

6   needed to shore up limited resources, and because they need to

7   rely on it to administer their laws.  So I think this is an

8   easy case for the zone of interest inquiry.

9             The argument that you are hearing from my friend

10  about the zone of interest is I think just based on the

11  misunderstanding of how the inquiry works.  What they are

12  saying is we have to point to another statute, other than the

13  statute that we're suing on, the APA, and we have to be

14  alleging a violation of that statute.

15            THE COURT:  That's what I understood his argument was

16  with regard to how the government distinguishes the *PETA* case

17  and the *Akins* case.  There's a statute separate from the APA

18  that required the collection of information, and a citizen had

19  a right to challenge if they were to collect that information.

20            MR. GUPTA:  Yeah.  But that's not a distinction.

21  First of all, the PETA case, there wasn't even such a statute.

22  Right?  But in the other cases there is a statute that the

23  plaintiff say allows them to get the information.  But they're

24  also able to sue under the APA to allege a procedural defect in

25  the rule.  Well that's us.  We're alleging a procedural defect

1    in the rule that cuts off the flow of information that we say
2    that we have a right to.
3            So those cases really are on all fours.  And I think
4    it's -- you asked the government to distinguish one of those
5    cases, the PETA case.  We think there are four cases that are
6    good law that are really on all fours with this situation.  The
7    government hasn't been able to distinguish anything.
8            THE COURT:  Those are the four you mentioned
9    previously.
10           MR. GUPTA:  So the PETA case?
11           THE COURT:  The four you mentioned previously.
12           MR. GUPTA:  Yeah, exactly.
13           THE COURT:  Okay.
14           MR. GUPTA:  I think those cases -- and we've looked.
15   There aren't cases out there that have closer fact patterns
16   where the results have been different.  So it's not like we're
17   cherry-picking the cases.  These are the cases where you have
18   someone who is asserting exactly the same kind of theory that
19   we have here.  And those are, you know, mostly good government
20   groups.  You can accuse them of having much more generalized
21   abstract interests in enforcing the law.  We're states.  We
22   have special solicitude when it comes to Article III analysis,
23   and Congress gave us a very specific right to this information.
24           THE COURT:  Well, I know Congress is -- excuse me --
25   the Supreme Court has been more willing to recognize standing

for states in the procedural context, you know, the environment

cases, the *EPA v Massachusetts*.  Is this different?  We are not

dealing with procedural statutes here?

          MR. GUPTA:  We are.  We're suing under the APA.  The

only right that we're asserting in this case is a procedural

right.  It is the right to have the government make a decision

like this with notice and comment.

          And so you have sort of -- if you -- you know, even

if we were a good government nonprofit organization that didn't

have any of the advantage of these special standards, but there

are sort of two special rules that apply here.  One is the

special solicitude with respect to states, as you said, in

procedural matters.  And the second is the relaxed standard

that applies whenever anyone has asserted a procedural right,

relaxed standards for redressability and also for immediacy.

          And the reason for that is that, you know, if I am

complaining about a decision and I want the right to engage in

some process, I can't guarantee to the Court that at the end of

the day when that process is undertaken, that I'm going to be

satisfied with the result and it's going to -- you know, be

able to walk away happy.  Nobody can ever make that guarantee

in a procedural case.

          And so the Supreme Court has said -- and this is in

the *Lujan v Defenders of Wildlife*, it's footnote 7 in that

case.  The Supreme Court has long made clear that we're going

1    to relax those kinds of requirements when the asserted right is
2    a procedural right as it is here.  Thank you.
3              THE COURT:  Anything else?
4              MR. GUPTA:  No, that's it.  That's all on standing.
5              THE COURT:  Hold on.  Before you sit down, let me
6    make sure I have nothing else.
7              All right.  Thank you, Mr. Gupta.
8              MR. GUPTA:  Thank you.
9              THE COURT:  Mr. Sergi, I'll give you about 15 minutes
10   for rebuttal, and we'll take a break after that.
11             MR. SERGI:  I hope I don't need 15 minutes, Your
12   Honor.
13             THE COURT:  Well, I won't require it.
14             MR. SERGI:  Okay.  First, Your Honor, I'd like to --
15   I'm constantly being told I'm conceding things.  I want to just
16   clarify something.  I mentioned the 990T for a particular
17   purpose, and that is the form that if a tax exempt entity has
18   income, it has to file a Form 990T.  And a 990T is governed by
19   6103(d).  But you know what's not on the Form 990T is the
20   Schedule B that has donor information.  It's actually a tax
21   return, and I think that's important to start out with.
22             The other thing I think is also really important --
23   and I was debating which to mention first -- is you asked
24   opposing counsel, "Hey, is this a tax law?  Is this an election
25   law?"  And I believe he answered the second one but not the

first.  He said, "No, it's not an election law," and then he
constantly said New Jersey has a concern about its state laws.

The new rule that has been offered and the old rule
that required the Schedule B's are in the consumer protection
aspect.

THE COURT:  In New Jersey?

MR. SERGI:  In New Jersey.  It's in the consumer --
it's a completely separate -- in fact, the words "Department of
Treasury" do not appear anywhere in the rule.  It has to do
with --

THE COURT:  I would assume the state's argument would
be they want to make sure citizen recognize that if they are
donating to these groups, they know its purpose.

MR. SERGI:  And also they want to avoid people -- I
guess, consumer fraud saying, "Hey, this organization actually
exists."

But it's not for the purposes -- if you look at the
declarations in this case, there is a -- in a passing
reference, everybody says, "No, we need it for tax.  We need it
for tax.  We need it for tax."  But none of the reasons in any
of the declarations and none of the reasons in any of the
briefs suss out why for tax, other than the fact that, "Hey, we
already rely on the IRS."  But they can still already rely on
the IRS because the IRS is doing their job.

THE COURT:  Well, they need it for tax.  Wouldn't it

1    be for tax if they wanted to know whether the entity at issue

2    truly should qualify for tax exemption because their political

3    activities don't exceed a certain amount?

4              MR. SERGI:  And that's an interesting question, Your

5    Honor, that I don't think we discussed when I was up here last

6    time, which is it's unclear how a donor name or address answers

7    that question.  And I believe what my opposing counsel was

8    alluding to, because it's the elephant in the room, is the

9    501(c)(4)'s.  Okay.  So a 501(c)(4) can't be a 501(c)(4) if a

10   certain percentage -- some say 49, some say 50, some say 51 --

11   is political activity.  Well, a name of a donor and the amount

12   of a donation would never tell you whether or not an

13   organization is doing political activity.

14             THE COURT:  As I understand the state's argument, if

15   they have the donor information, they can track these entities

16   better and figure out where the money is going and if --

17             MR. SERGI:  But they know where the money is going,

18   Your Honor.

19             THE COURT:  If the organizations are set up in a way

20   to avoid the 50 percent, 49 percent threshold.

21             MR. SERGI:  But, Your Honor, they know where the

22   money is going because the 990s disclose the expenditures of

23   the organization, and that's still on there.  So that's how you

24   can tell the activity.  And so in some ways this is the dammed

25   if you do damned if you don't that this service had in the last

1  cases I had under the Tea Party, where organizations filed a
2  class action and --
3              THE COURT:  No one likes the IRS.
4              MR. SERGI:  I agree, Your Honor.
5              THE COURT:  So let's back up for a second.  The
6  complaint alleges a procedural injury.  That IRS modified this
7  regulation without going through the requisite
8  notice-and-comment period.  Courts generally have imposed a
9  relaxed standing requirement for an alleged procedural injury.
10 Why didn't that apply here?  Or does that same analysis apply
11 here?
12             MR. SERGI:  Because, Your Honor --
13             THE COURT:  Well, first, is this an alleged
14 procedural injury, do you think?
15             MR. SERGI:  Well, I don't know that it is because
16 you -- what Your Honor said was they take issue because the
17 service changed the regulation without notice and comment; and
18 therefore, they have a procedural violation because there was
19 no notice and comment.
20             Really what we have here is a statute that gives the
21 power to the treasurer who then delegated it to the
22 commissioner to decide what they need for taxation by forms
23 and/or regulations.  And so what we have here is it came out in
24 a regulation first.  And then when they decided they didn't
25 need the information, they did this revenue procedure, and then

1   changed the instructions to the form.

2         THE COURT:  Well, to be fair, the first regulation
3   was subject to notice and comment.

4         MR. SERGI:  Well, yes, Your Honor.  But that doesn't
5   mean that every single thing in there had to be subject to
6   notice and comment, which I guess is getting into the next
7   argument.

8         THE COURT:  But I want to understand, do you agree,
9   whether it's valid or not, plaintiffs allege what would be
10  classified as a procedural injury?

11        MR. SERGI:  I am not sure that it is a procedural
12  injury, Your Honor, because I don't think there's an injury at
13  all.  For example --

14        THE COURT:  Well, this is the allegation in the
15  complaint.

16        MR. SERGI:  Right.

17        THE COURT:  Am I analyzing this pursuant to
18  procedural injury standing, which is more relaxed, or am I
19  analyzing it pursuant to a different strand of the law which is
20  a higher standard?

21        MR. SERGI:  Your Honor, I don't think that it's a
22  procedural injury.

23        THE COURT:  Why?

24        MR. SERGI:  Because their complaint is not that they
25  didn't get notice and comment, although that's ultimately what

1  they are saying.  Their complaint is "We can no longer rely on
2  the IRS for state tax purposes because they are not collecting
3  this information."

4          THE COURT:  This is a motion to dismiss.  Aren't I
5  suppose to evaluate the complaint in the light most favorable
6  to the nonmoving party?

7          MR. SERGI:  And I am going to do that, Your Honor,
8  which is -- my opposing counsel said -- they are not saying
9  that -- well, they are putting words in our mouth again because
10 we are not saying that if they got notice and comment, it
11 wouldn't make a difference.  That's not what we're saying.
12 What we're saying is if they got notice and comment and the IRS
13 changed the rule so that they -- or continued the rule or you
14 were to order that the old rule is in place and the IRS still
15 has to collect the names and addresses of donors, what I'm
16 saying is it does not affect the states at all.  Because
17 our point isn't that, "Well, they're harmed."  You know, we're
18 saying that, "Well, even if they had commented, it wouldn't
19 have changed the rule."

20         What we're saying is even if the rule had changed, it
21 doesn't affect them one way or another, and that brings me to
22 the 6103(d) point.  My opposing counsel said they've scoured
23 the Internal Revenue Code and the Internal Revenue Manual and
24 all of these cases.  And the two places they didn't look was,
25 one, the statute, which clearly says -- and, again, in their

1   brief they say, "a swath."  And here he says, "a bunch."  But

2   990s aren't covered by any of those sections that are listed.

3           The second part that they didn't look at is they

4   didn't look at their own agreements because that section that

5   covers 990s is not in any of the 6103(d) agreements that are

6   between Montana and New Jersey and the IRS.  There's no

7   reference to 990s.  There's no reference to Schedule Bs.  So

8   even if it's a hypothetical that they could be included under a

9   6103(d) agreement, it is just that, and a hypothetical harm

10  isn't enough, Your Honor.

11          THE COURT:  Well, you mention in your -- go ahead.

12  Do you need to get any other notes?  Are you ready?

13          MR. SERGI:  Yes, I'm sorry.

14          THE COURT:  That's all right.  Take your time.

15          MR. SERGI:  I was grabbing a note which I now have

16  the answer to your other question.

17          THE COURT:  Okay.  There's another one there, I

18  think.  Get all of your answers.

19          MR. SERGI:  Thank you.

20          THE COURT:  It's a collective effort.

21          MR. SERGI:  It is.  I'd be lost with him.

22          THE COURT:  What are the answers there that you

23  didn't give before, before I ask my question.

24          MR. SERGI:  Okay.  So plaintiffs are alleging harm

25  under 6103 and 6104.  So you ask is that a procedural harm?

1  Really -- I'm sorry.  I misstated.  We thought they were
2  alleging initially 6103 or 6104, and our argument for 6104 is
3  they don't have agreements.  It appears now that they've put
4  all of their eggs into the 6103 basket.

5        6103 is not a procedural statute, Your Honor.  The
6  violation of 6103 would be a lack of getting the information to
7  the state.  As I said, it's the state gets what the IRS has.
8  It doesn't give them the ability to dictate to the IRS what
9  they collect.

10        THE COURT:  Right.  But their argument is they want a
11  voice in the rulemaking process, the regulatory processes; that
12  if you are going to change your rules, at least they get to
13  participate in the public comment.

14        MR. SERGI:  Right, Your Honor.  But I think that goes
15  more to the next argument.  But what I'm saying is even if they
16  had those rights, it doesn't affect them.

17        THE COURT:  So you argued in your opening that
18  New Jersey has passed this regulation, the consumer protection
19  law.  And I asked Mr. Gupta about it, and he said, "That only
20  allows us to get information from these entities that operate
21  in New Jersey.  We need to know more nationally what's going
22  on, and the IRS was a repository for this national information
23  to which the states have access under the statute."

24        MR. SERGI:  Your Honor, that's very easy to address
25  because New Jersey's prior rule was that they only -- they got

1    Schedule Bs from the same people who they are now getting the

2    information from.  So that's the first step.  Don't worry.

3    That's not my final answer.  So that's the first step.

4         So we know New Jersey before got the same exact

5    information they are getting now.  So then the question is what

6    else were they relying on?  And if you look at their

7    declarations, they are saying, "We're relying on the IRS to do

8    their job.  And now, because they are not asking for donor

9    names, they are not doing their job."

10        What we're saying is they don't really have standing

11   to say the IRS isn't doing their job and hide it behind saying

12   they didn't get comments on this procedure.  They don't like

13   the fact that the IRS is not collecting donor names.  There is

14   no connection.

15        The important thing is that the entities -- and I

16   don't even think, by the way, that that would create a harm if

17   the IRS relieved organizations of the obligations to maintain

18   the organization.  That applies more to the APA argument as to

19   whether it's a substantive change.

20        But they still have access to this information.  They

21   still -- what New Jersey did was they said, "Well this is where

22   we were.  We were at Point 0, Level 0.  Well, the IRS changed

23   that and put us at a negative because now we need to go to

24   everybody individually, and we need to ask for it, and it's

25   going to be ridiculous."

1          But then New Jersey changed its law and said, "Hey,
2    remember what you were supposed to give us?  We want the same
3    thing from exactly the same people."  And that's why they're
4    saying they filled the void.  And that's why in their press
5    release they're saying, "Well, now we fixed the harm.  When
6    we're harmed, we push back, and now we can enforce our state
7    laws."
8          "THE COURT:  I have to take the word of a political
9    press release?
10         MR. SERGI:  No, no.  I'm sorry, Your Honor.  I have a
11   copy.
12         THE COURT:  No, I'm just saying, so what?  It's in a
13   press release.  Politicians say all kinds of things.
14         MR. SERGI:  But it was the release of the regulation
15   by the same state that's in this court by the same people who
16   made the declarations in this case, Your Honor.
17         THE COURT:  Mr. Gupta talked about the PETA case, for
18   example.
19         MR. SERGI:  Yes.
20         THE COURT:  And he said there the Court determined
21   that PETA had standing that was much broader than the standing
22   asserted in this case.  I am not sure I have a -- your
23   argument, as I recall, was that PETA -- the statute required
24   the government to collect that information.
25         MR. SERGI:  Your Honor, I've had the benefit of

1  sitting at my table.

2          THE COURT:  All right.

3          MR. SERGI:  So now I can say --

4          THE COURT:  Maybe you had the wrong counsel arguing

5  here.

6          MR. SERGI:  I just -- there's a lot of cases we

7  cited, Your Honor.

8          In PETA, the Court found that PETA was harmed because

9  they were not providing info that was legally required to be

10 provided.  There is no legal requirement here.

11         THE COURT:  Hold on.  Legally required to be

12 provided, or legally required to be collected?

13         MR. SERGI:  I'm sorry.  Legally required to be

14 provided.  I think I may have misstated before.

15         THE COURT:  PETA had a legal right to that

16 information?

17         MR. SERGI:  The organization had a legal right to

18 provide the information.  I'm looking at my cocounsel.

19         THE COURT:  The regulated entity had a right -- or

20 had an obligation to provide that information; is that right?

21         MR. SERGI:  Right.  And there is no obligation here,

22 Your Honor, for --

23         THE COURT:  Well, I thought under 6103, there's an

24 obligation to provide this information to the IRS.

25         MR. SERGI:  I'm sorry.  To the IRS or -- under

1    6103(d), the IRS has an obligation to provide for inspection to

2    state officials information that is decides is necessary,

3    information it collects, with regard to taxable entities, not

4    tax exempt.  6104(c) has the right to share information

5    regarding tax exempt.  It doesn't give states in those

6    circumstances the right to say, "Well, this is what information

7    is collected."  So that would be the --

8         THE COURT:  But doesn't the state have the right to

9    the information collected by the IRS?

10        MR. SERGI:  And that right has not been violated

11   here, Your Honor.  The agreement -- neither New Jersey nor

12   Montana says that they are asking for this information.  And

13   that's what's so interesting because --

14        THE COURT:  But I thought the argument in these other

15   cases was that the federal government had an obligation to

16   collect the information, either in the *PETA*, the *Akins* case,

17   and the other cases cited.  Is that right?

18        MR. SERGI:  That the agency had an obligation to

19   collect the information?

20        THE COURT:  Right.

21        MR. SERGI:  Yes.

22        THE COURT:  Okay.  And then a group of citizens

23   wanted that information.

24        MR. SERGI:  Correct.

25        THE COURT:  And the question is whether they had

1   standing to bring a challenge to have access to that

2   information.  Is that right?

3          MR. SERGI:  That is correct.

4          THE COURT:  Okay.  So how does that differ here?  As

5   I understand it, the IRS collects this information from the

6   taxes of organizations.

7          MR. SERGI:  The IRS in the past determined it needed

8   this information and collected it.  Under the 6103(d)

9   agreements with both states, there is no obligation to provide

10  that information to either state.  Neither state has a 6104(c)

11  agreement to get that information.  So that's the first step.

12         The second step is going forward --

13         THE COURT:  But PETA doesn't have some agreement with

14  the federal government to get the information.  Their argument

15  was "You, federal government and the agriculture department,

16  have to collect this information.  We want access to it."

17         MR. SERGI:  Right.  But they don't -- the IRS does

18  not have an obligation to collect this information.  They can

19  by forms or instructions decide what they need.

20         THE COURT:  But they formally did.

21         MR. SERGI:  Right.  It's very different than what

22  PETA has which is where the government was required to collect

23  the information.  It was legally required to provide the

24  information.

25         Here, they're not legally required to provide the

1   information because there is no agreement between the states.

2   And my opposing counsel says they've been relying on this

3   information for decades, but in 40 years they've never asked

4   for it.  So I'm not sure how they are relying on it.  And it's

5   certainly not for tax administration because we know New Jersey

6   is getting it, but they are still getting it because there's

7   still the requirement that it be maintained.

8          And I know I keep going back to that point but I

9   think -- because that's the most important point is I can't --

10  how can you be harmed even -- because even if you -- one, it

11  wouldn't change your circumstance.  Like, even if this revenue

12  procedure were to go away and the service would be collecting

13  the names, it wouldn't change either state.  Maybe it would

14  give them more comfort that the IRS is doing their job.  But

15  what that's doing is it's second-guessing the administration.

16         Let me see.

17         And even if there were a procedural harm, Your Honor,

18  that still doesn't -- if you were to look at this as a

19  procedural harm, it still doesn't relieve Montana and

20  New Jersey from proving that there's Article III statutory

21  standing, and they have to prove their harm.

22         I've covered the 990.

23         And my point is -- again, I'll reiterate it before I

24  sit down -- that New Jersey and Montana, their argument for tax

25  administration is "Well, we have been relying on the IRS for

1  years and now we can't," because they don't like the way that
2  it's being administered.  But not liking the way that the IRS
3  is being administered doesn't create a harm for either one.
4  It's very speculative.  I mean, they's not in every meeting.
5  They're not -- you know, they're not governing it.

6          As to whether or not this is something completely
7  given to the commissioner's discretion, that's the APA
8  question, which we'll address now.  But even if this were to
9  change, there's no harm.  It doesn't affect them.

10          THE COURT:  All right.  Thank you, Mr. Sergi.

11          We're going to take a ten-minute recess and come back
12  and discuss the summary judgment issue.

13      (Proceedings in recess from 2:59 p.m. until 3:13 p.m.)

14          THE COURT:  Please be seated.

15          All right.  We'll now turn to argument on plaintiffs'
16  motion for summary judgment.

17          Mr. Graybill, are you going to argue?

18          MR. GRAYBILL:  Yes, Your Honor.

19          THE COURT:  Whenever you are ready.

20          MR. GRAYBILL:  Your Honor, the merits of this case
21  turn on a relatively simple distinction in administrative law.
22  When an agency amends the requirements contained in the
23  legislature rule, it may only do so using a legislative rule.
24  And it's elementary administrative law that legislative rules
25  require notice and comment.

1    For over 40 years, the IRS has unambiguously required

2 exempt organizations to report the names and addresses of their

3 substantial contributors.  And by a document called a revenue

4 procedure, last year they sought to undo that.  By its own

5 terms, modifying the reporting requirements to the IRS.

6    Tax reporting requirements are serious legal

7 obligations.  We know that because they come along with serious

8 legal penalties for failure to report.  And as the Supreme

9 Court wrote just earlier this week in a case we noticed in the

10 28(j) letter to the Court, quote, "Agencies have never been

11 able to avoid notice and comment by simply mislabeling their

12 substantive pronouncements.  On the contrary, courts have long

13 looked to the contents of the agency's action, not the agency's

14 self-serving label, when deciding whether statutory notice and

15 comment demands apply."

16    In this case, there is no question that the

17 underlying regulation that was repealed was legislative.  It's

18 been around for 40 years, and it says in 26 CFR 1.6033-2, which

19 I will call the repealed regulation, it says unambiguously that

20 tax exempt groups have to report the names of their substantial

21 contributors.

22    Now, by the revenue procedure in 2018, the IRS, by

23 its own terms, relieved organizations of that legal objection.

24 Now when courts are looking for whether or not something is a

25 legislative rule, an interpretive rule, a procedural rule, or

something else, they look to see whether a subsequent
regulatory action is inconsistent with, in its substantive
requirements, a prior legislative rule.

This was the very situation that the Ninth Circuit
faced in the *Hemp Industries* case.  In that case, through a
federal statute, Congress allowed agencies to articulate
certain regulations around hemp seeds and hemp oils.  Then the
DEA in that case passed a regulation that further articulated
and spoke as to the agency's considerations around hemp seeds
and hemp oils.  Fast-forward dozens of years later then the DEA
came back and said, "We're going to change our mind about what
those requirements are around hemp," the Court rejected the
argument that the IRS is making here, when the DEA said, "Well,
we're really just interpreting the underlying statute."

And the key to the *Hemp Industries* case in the Ninth
Circuit is the Ninth Circuit said, "No.  The fact that the
agency has already spoken on this question by articulating a
legislative rule carries the force of law.  When you undo those
requirements, no matter what you label it, that's also a
legislative rule, and it has to go through a notice and
comment."

Now, it bears mentioning in this case that notice and
comment are not foreign procedures to the IRS.  The IRS
routinely uses notice-and-comment procedures on revenue
procedures and other changes.  It simply failed to do so here.

1        If the Court puts itself in the position of a tax

2   exempt organization or imagines advising a tax exempt

3   organization related to the events at issue in this case,

4   there's no question that before the revenue procedure was

5   issued, it was a legal requirement with serious penalties if

6   you didn't report the names of your substantial contributors.

7        Now, either the revenue procedure carries the force

8   of law and, therefore, amends the legislative rule and is

9   itself legislative or it has no effect.  Now, I don't think the

10  IRS is arguing today or will argue that the revenue procedure

11  has no effect.  They instead have to pursue these less

12  intuitive alternative explanations that it might be an

13  interpretive rule or a procedural rule.

14       Neither of those explanations, both of which are

15  slightly inconsistent with one another, is less intuitive than

16  the obvious, which is, one, there was a requirement passed in

17  the 1970s that said you've got to report this kind of

18  information.  Two, last Year the IRS said you no longer have to

19  do it.

20       And the best evidence of what the IRS actually did is

21  contained in the revenue procedure itself.  We quoted this in

22  our briefs.  "The revenue procedure uses the language, like,

23  quote, 'modifying the information to be reported to the IRS,'

24  language, like, 'organizations relieved of the obligation to

25  report.'"  It's this very same language that courts around the

country use when they ask is this regulatory enactment
legislative or is it interpretive?

Now, let's go over briefly, as well, the main
response from the government, which is that this is -- there's
simply no law to apply and that this is something consigned to
agency discretion.  I think we saw -- the problem with this
argument came up a bit in the merits discussion as well.  There
is a significant difference between the substantive discretion
to make a decision, which undoubtedly belongs to the agent, the
A or B choice around the policy, and whether the procedural
safeguard in the APA apply to and govern that decision-making
process.

Now, the government would have you believe that
because there's this discretionary exception in the regulation,
Subsection G, and there's some discretion in the statute, that
they can reserve for themselves the right to forgo notice and
comment when amending the rule.  Now, I would dispute that
that's actually the function of the discretionary exception.
But it ignores well-established distinctions in case law.
Indeed, the very admitting purpose of the APA, which is
agencies get to make decisions, and those decisions can affect
our legal rights and obligations.  In exchange for that, as a
society, we've decided we get to govern the decision-making
process.  We get to put certain limitations, however expansive
or limited, on that.

1          Well, among the most basic of those limitations is
2    the right to notice and comment.  That simply didn't happen
3    here.  I think there's no serious question that in promulgating
4    the revenue procedure they took out -- if you look at the
5    regulation itself, the effect of the revenue procedure is to
6    take 16033-2 and run a black marker through a portion of the
7    regulation.  That is the gold standard for a legislative rule.
8    I think there's no serious question that notice and comment was
9    required.

10         Now, in arguing that this exception applies where
11   there's simply no law to apply, I have two particular responses
12   that I think are worth contemplating.  First, there is law to
13   apply.  This isn't a claim challenging the decision that the
14   IRS made.  This is a classic core APA claim challenging the way
15   that they made the decision.  And the law to apply is simple
16   and readily available to the Court.  It is did notice and
17   comment happened or not?  The answer here is "no."

18         We're not asking the Court to assess whether or not
19   it's a good idea to get rid of reporting requirements for this
20   information.  The agency gets to decide that.  But we get to
21   have notice and get to have comment in the process.  And the
22   APA is very clear that when the agency forgoes those
23   requirements, the regulation is set aside until it goes through
24   and do it the right way.

25         The second response on this point that's worth

considering is the cases they point to when this exception
applies where there's no law to apply look a lot different than
the case before the Court today, the *Webster* case, for example.
In the *Webster* case, the CIA director decided to fire a spy,
and that spy sought to use the APA to review his individual
termination decision.  And when the Supreme Court looked at the
structure, history, and text of the National Security Act, it
said, "The APA isn't a vehicle here for reviewing why this
particular person got fired.  That seems like the kind of thing
that Congress wanted the CIA director to be able to do without
the APA intervening."

        Now, in this case, you've got something that is
undoubtedly a legislative rule, that's been on the book for
decades, that articulates in very clear terms a requirement
that all tax exempt organizations have to follow, other than
(c)(3)'s who do it by statute.  And what the agency did in this
case is it created a new rule, a sweeping pronouncement that
applied to, again, every single tax exempt group, other than
(c)(3)'s, and changed their legal obligations.  That is the
hallmark of where we'd expect notice-and-comment rulemaking to
be in effect.

        And I think looking to the *Buschmann against
Schweiker* case, the Ninth Circuit tell us there that it is in
particularly in these sort of situations where agencies are
exercising their discretion that we want the APA to do some

1    work, and we want those procedural safeguards to operate.

2        Now, the *Schweiker* case was about whether an agency

3    had a sufficient good cause justification for not undergoing

4    notice and comment.  And, here, we think they've just

5    mislabeled what they've done.  But the same principles apply.

6    Here, where an agency, you know, truly does get to decide

7    whether or not this is a good idea, we get to come to court,

8    under the APA and under its standing, and evoke the Court's

9    powers to say, "When you make that decision, you've got to do

10   it the right way."

11       And I think it's worth passing -- it's worth looking

12   at some of the Ninth Circuit cases on how these different rules

13   get distinguished because in order for the IRS to be right, to

14   say that we can somehow take this black marker and run it

15   through the regulation without going through notice and

16   comment, they essentially are asking the Court to set aside or

17   ignore the *Erringer* case, the *Drakes Bay* case, the *Hemp* case.

18   Those cases are very clear.  You can only amend a legislative

19   rule by using other legislative rule.

20       And the *Drakes Bay* case is also worth spending time

21   with as well.  In this case, the question was do procedural

22   requirements govern the Secretary of the Interior's decision to

23   reissue or not issue a permit for an oyster farm.  In that

24   case, there was basically no question that it was the

25   secretary's decision to issue or not to issue this permit.  But

1   the Ninth Circuit said, nonetheless, certain procedural

2   safeguards apply to how that decision is made and govern the

3   manner in which that decision is made, and the same is true

4   here.

5          Now, I expect the IRS will get up and say, "Well,

6   we've got this discretionary exception in Subsection G of the

7   regulation."  Now, I don't think you can read that in any

8   serious way to say that something the IRS reserved for itself

9   in a notice-and-comment regulation allows it to forego any

10  future notice and comment as it freely rewrites a regulation.

11  That's simply not how the APA works.  So even on the IRS's

12  reading in their briefs of what the discretion exemption does,

13  the APA simply won't stand for it.  It won't let it carry that

14  weight.

15         So unless the Court has any question, I'm happy to

16  reserve the remainder of my time.

17         THE COURT:  No, not yet.  I'll give you a few minutes

18  for rebuttal.

19         MR. GRAYBILL:  Thank you.

20         THE COURT:  Thank you, Mr. Graybill.

21         Mr. Sergi.

22         MR. SERGI:  Thank you, Your Honor.

23         Your Honor, before I begin, I have one minor

24  correction, just because I had the benefit of an iPhone during

25  the break.  My number of four states having 6104 agreement was

```
 1   as of 2011.  I have been informed by the IRS that actually ten
 2   states and the District of Columbia have a 6104(c) agreement.
 3   I'm not sure if that matters, but I just didn't want to
 4   misstate the record.
 5            THE COURT:  Good to know.  Thank you.
 6            MR. SERGI:  Okay.  So, Your Honor, we're here about
 7   the APA.  I've heard my opposing counsel say, "Look at this.
 8   The IRS is giving themselves this authority.  How dare they
 9   give themselves authority.  You can't mislabel something.
10   There was a Supreme Court case this week that said you can't
11   mislabel something."
12            The IRS is not mislabeling this.  What that case
13   stands for in the Supreme Court is that you need to look at the
14   substance.  And, here, we have the substance, and the substance
15   here is there is a statute.  And we know that, as this Court's
16   aware, the APA provides a framework for determining when a
17   Court may review an agency decision, and it's precluded to the
18   extent agency action is committed to agency discretion by law.
19            So we need to -- you know, as we explain in our
20   brief, we believe Congress -- not itself, not through the
21   regulation, but going back to the original statute.  Congress
22   has explicitly committed decisions about information to collect
23   from exempt organizations to the treasury and then, through
24   delegation, to the IRS, and that would preclude APA review.
25            So if you look at the 6033, which is the statute that
```

1   gives rise to this and that is a statute that allows the IRS to

2   determine who is and who is not tax exempt.  It says that

3   (c)(3)'s must, and (c)(3)'s have to file specific information.

4           THE COURT:  Mr. Sergi, even if something is committed

5   to agency discretion, doesn't an agency have an obligation to

6   follow a notice-and-comment period?

7           MR. SERGI:  Not if it's -- Your Honor, I'm not

8   disagreeing, but I'm going to clarify that precluded from APA

9   review -- actually, let me go back to another Supreme Court

10  case.  The Supreme Court in *Perez* chastised the DC Circuit for

11  expanding the APA beyond its terms.  Well, that's kind of what

12  we're trying to avoid here because the APA says, "If an agency

13  action is committed to agency discretion by law, then it's

14  precluded from APA review."

15          So in answer to your question, do we need notice and

16  comment?  If the APA doesn't apply, then this case can't go

17  forward.  But if you are asking whether or not you need notice

18  and comment regardless of whether the APA applies and you're

19  referring to the *Vigil* case -- is that what you're referring

20  to, Your Honor?

21          THE COURT:  Yes.

22          MR. SERGI:  Then the government doesn't read *Vigil* as

23  broadly.  While it's true that the Supreme Court in *Vigil* ruled

24  separately that the agency decision in question was committed

25  to discretion and that notice and comment were not required,

1  the decision reviewed had the opposite effect in the lower

2  court.  So to overrule the circuit court's decision, it had to

3  address each of the arguments.  So in that court -- in that

4  context, the phrase that my opponents have latched on to and

5  that other district courts have found is the sentence that

6  says, "We next consider the court of appeals holding quite

7  apart from the matter of substantial reviewability, that before

8  terminating the program, the service was required to abide by

9  the familiar notice-and-comment rulemaking provisions of the

10  APA."

11          We read that sentence as the introduction to the

12  Court's discussion of whether notice and comment were required.

13  And in the context of that sentence, it appears that it was --

14  and this is their quote, "Quite apart from the matter of

15  substantive reviewability."  It meant merely to describe, we

16  think, Sixth Circuit Court's holding.

17          THE COURT:  Well, Mr. Sergi, I don't quite understand

18  your argument.  Why would any regulation or amendment or

19  adopted regulation not be committed to agency discretion of

20  review?  You said Congress has passed a statute and told the

21  agency they could come up with regulations.

22          MR. SERGI:  They did.

23          THE COURT:  Every agency in the federal government

24  has --

25          MR. SERGI:  They didn't do that, Your Honor.  They

1   said, "The commissioner made by revenue procedures" -- I'm

2   sorry -- "made by regulation or form implement these."

3             THE COURT:  How is that different from what the

4   Secretary of Agriculture can do regarding the timber sale, or

5   what the Secretary of Interior can do regarding the oil and gas

6   leases?

7             MR. SERGI:  Because, Your Honor, the treasury and the

8   commissioner has the right to change a form.  So if the form

9   can change -- you can't get any more procedural than "Oh, this

10  goes on line 3, then line 1."  So that is how --

11            THE COURT:  Wait a minute.  It's one thing to say,

12  "We're reorganizing the form."  It's another thing to say,

13  "We're excluding you from the requirement to have to fill out

14  the form."

15            MR. SERGI:  But now -- but they are giving that

16  ability, Your Honor.  It says it gives them the right to

17  relieve -- and it's interesting that my opposing counsel said,

18  "Yeah, they admitted it.  They used the word "relieve" in this

19  rev proc."  Well, Your Honor, the word --

20            THE COURT:  Hold on.  Let's avoid acronyms and --

21  what's a "rev proc"?

22            MR. SERGI:  You're right.  I apologize, Your Honor.

23  At least -- did I say "rev" too?  Revenue procedure.  Sorry.  I

24  live in this world, Your Honor.

25            THE COURT:  We don't.  Glad you do, but let's avoid

1  jargon and acronyms as much as possible.

2          MR. SERGI:  I will endeavorer to do that, Your Honor.

3          So the revenue procedure, my opposing counsel says,

4  it has the word "relieved" in it which obviously shows that

5  it's substantive.  Except for the fact that the statute gives

6  the commissioner -- I mean, the secretary, and then by

7  designation the commissioner -- the ability to relieve someone

8  from filing, and then the regulation says, "In whole or in

9  part."

10          THE COURT:  How does that differ from the authority

11  given to the Secretary of Interior to determine the issues to

12  be examined in an environmental impact analysis?

13          MR. SERGI:  Well, you would have to look at whether

14  or not there's objective meaningful standards which to review

15  that decision.  Here, the secretary and the commissioner have

16  the ability in the basis of tax administration.

17          THE COURT:  For whatever reason they want.

18          MR. SERGI:  It's not for whatever reason they want,

19  Your Honor.  It's for the basis of tax administration, but they

20  do --

21          THE COURT:  Well, if it's for the basis of tax

22  administration, why is that not reviewable under the APA?

23  Because the standard is, is it needed for tax administration?

24          MR. SERGI:  But, Your Honor, that's not a meaningful

25  standard.  It's the same standard that was applied when it said

1   that they should fire someone.  It's the same standard.

2          THE COURT:  Wait, wait, wait.  Whether the CIA

3   director can fire an individual spy is an example of the same

4   analysis of whether the IRS can adopt or modify or edit a

5   regulation?

6          MR. SERGI:  Your Honor, I think that's right because

7   they are both -- you would have to be substituting your

8   judgment for the person who did the firing versus your judgment

9   for what is --

10         THE COURT:  That's a stretch I have to say.  I am

11  asked all of the time to evaluate the actions of federal

12  agencies, and not to substitute my judgment for theirs but to

13  make sure they've gone through the appropriate process.  And

14  there's a legal threshold question of whether does that process

15  apply, and I know we have that here.  But all of the time we

16  have to -- well, was that arbitrary and capricious?  Was that

17  reasonable to make that determination?

18         MR. SERGI:  But, Your Honor, there really is no

19  standard other than in the best interest of tax administration,

20  which is a very broad standard that's been given.  And while I

21  see that there's a distinction between, you know, national

22  security and this, it's -- the differential language is broad

23  in both circumstances.  I mean, there is -- this isn't the same

24  as saying, "Well, if these economic factors apply."

25         THE COURT:  Can you point to another agency where

1    there's a less deferential standard?  So you think it would
2    show the IRS language is different, for example, than the
3    language regarding the Secretary of Education regulations there
4    or the Secretary of Interior with regard to oil and gas leases
5    or the Secretary of Agricultural regarding leases or timber
6    sales.
7              MR. SERGI:  Yes, Your Honor.  Give me second.  I did
8    have one.
9              THE COURT:  Take your time.
10             MR. SERGI:  I'm sorry, if I may confer?
11             THE COURT:  Sure.
12        (Off-the-record discussion between Mr. Sergi and
13        Mr. Yost.)
14             MR. SERGI:  Your Honor, the two cases I will point
15   you to is the *Friedman* case.
16             THE COURT:  *"Freeman"*?
17             MR. SERGI:  *Friedman*.
18             THE COURT:  F-R-I-E-D-M-A-N?
19             MR. SERGI:  F-R-I-E-D-M-A-N.
20             THE COURT:  What is the cite?
21             MR. SERGI:  It's Ninth Circuit.  It's 6 F.3d 1355.
22   And that found that another IRS action was committed to agency
23   discretion by law.  And in that case the Ninth Circuit found
24   that the statute in question provided that the IRS may
25   discharge property from liens if the IRS determined that the US

1  interest in the property had no value, and it committed the IRS

2  discretion, and thus was not subject to judicial review.

3         THE COURT:  Who was the challenging party in that

4  case?

5         MR. SERGI:  I'm looking, Your Honor.

6     (Off-the-record discussion between Mr. Sergi and

7     Mr. Yost.)

8         MR. SERGI:  Oh, it was a creditor who had an interest

9  in the property, Your Honor.

10         THE COURT:  Okay.

11         MR. SERGI:  And then the other case is the *Webster*

12  case.

13         THE COURT:  *"Webster"*?

14         MR. SERGI:  Yes, which I think we've heard about.

15         THE COURT:  What's the cite for that?

16         MR. SERGI:  That's 486 US 592.  That was the case we

17  have been discussing about the termination.

18         THE COURT:  Okay.  The CIA director.

19         MR. SERGI:  The CIA director.

20         So taking a step back to where we were, Your Honor,

21  we don't believe the text of the APA supports the position

22  that's in the *Vigil* Supreme Court case.  We think under the APA

23  the provisions for judicial review, which are clearly in review

24  of agency action alleged to have been taken without observance

25  of procedure by law don't apply when the agency action is

1  committed to agency discretion by law which is the terms of the

2  statute.

3           THE COURT:  So, Mr. Sergi, under your theory, if we

4  have a different director in the Internal Revenue Service in

5  2021, they could amend the regulation to say, "You have to

6  disclose the list of anyone donating in excess of $1,000"?

7           MR. SERGI:  Well, that's an interesting point, Your

8  Honor.  First, just to clarify, it would be the Revenue

9  Procedure not the regulations.

10          THE COURT:  I'm sorry.

11          MR. SERGI:  Again, it's my world.  I live in this

12  world.

13          THE COURT:  All right.

14          MR. SERGI:  At least I didn't call him a "reg."

15          That was one of the points that my opposing counsel

16  made and said, "For 40 years this has been on the book

17  unchanged."  Well, as we point out in our brief, it's been

18  changed quite a bit, and it's usually -- and it's changed by

19  revenue procedures where they exempt people from filing under

20  that -- the cart out there.

21          So in the past, previous commissioners have made that

22  determination of what is necessary and what isn't for the

23  purpose of this regulation because it is -- I mean, this is

24  where the rubber meets the road.

25          And it is also interesting that opposing counsel said

1  that I wouldn't argue that the underlying substance hasn't
2  changed as a result of this because it depends on what lens you
3  are looking through.  If you look at 6033 as saying, "Hey, the
4  IRS needs information as to determine what's tax exempt and
5  what isn't," the underlying determination of what makes an
6  organization tax exempt or not tax exempt hasn't changed.  It's
7  just the information the IRS gets to make that underlying
8  determination.  So in some ways maybe I am arguing that the
9  underlying law hasn't changed.

10          Related is that this doesn't increase any burdens on
11  any taxpayers, and in some cases relieves burdens.  But it's
12  minimal because they still have to keep and maintain the
13  information.  So it's not like the IRS is changing things about
14  how they do it.  But even if they did, there's an analogous
15  case where the IRS -- there's a statute that determines whether
16  or not you are fit to practice in front of the IRS.  And to do
17  that, the IRS decided they should issue a -- they should create
18  a test.  Well, nothing is more burdensome than a test, Your
19  Honor, especially if it has math on it.  And, here, that was
20  committed to agency discretion even though it increased the
21  burden because the service had the right to implement the test
22  to see -- you know, to enforce its law, and it was in their
23  discretion.

24          And the name of that case is -- I have it right here.
25          (Off-the-record discussion between Mr. Sergi and

1      Mr. Yost.)

2          MR. SERGI:   It's the American -- AICPA -- I

3   apologize, there were more acronyms -- versus the IRS.  And

4   that's the CPAs, basically, the tax preparers, paid tax

5   preparers.  And that was the DC Circuit, and the cite of that

6   is 2018 Westlaw 3893768.  And they found that a revenue

7   procedure establishing education and testing requirements for

8   certain preparers was an interpretive rule because it clarified

9   how a preparer may demonstrate his qualifications in

10  competency.  The same way here it's interpreted because it

11  clarifies the other information that may be collected by the

12  IRS to determine tax exempt status.

13          I want to make sure I didn't miss anything, Your

14  Honor.

15          I think the important thing here, Your Honor, is it

16  doesn't matter what the IRS's reasons were that we talked about

17  earlier.  It's important that it was their decision to make

18  under the statute and regulations.  And the broad grant of

19  power leaves no meaningful standard that a Court could apply in

20  judging the IRS's discretion.  And, therefore, we believe it's

21  not subject to APA review.

22          THE COURT:  All right.  Thank you, Mr. Sergi.

23          MR. SERGI:  Thank you.

24          THE COURT:  Mr. Graybill, rebuttal.

25          MR. GRAYBILL:  Thank you, Your Honor.

1    Plaintiffs don't dispute that this ultimately could
2    be the agency's decision to make.  Plaintiffs come before the
3    Court today with a very simple mundane core APA claim, which is
4    whether or not the agency makes a decision that plaintiffs
5    agree with, plaintiffs have nonetheless secured a right under
6    the APA that that decision-making process is lawful.

7         In this case, there's no question that in June 2018 a
8    tax exempt organization had to file -- when it filed, they had
9    to file the list of its substantial contributors, their names
10   and addresses.  There's no question that now, following
11   Regulation Number 2, the revenue procedure, they don't.  That
12   is the hallmark indicator of a legislature rule that requires
13   notice and comment.  This is an agency that is well-acquainted
14   with notice-and-comment procedures.  They weren't followed
15   here, and they should have been.

16        THE COURT:  Counsel argues that -- well, the
17   regulations are committed to IRS agency discretion to determine
18   what's needed for tax administration, and there's no meaningful
19   standard for me to apply to evaluate what's needed for tax
20   determination.

21        MR. GRAYBILL:  And, respectfully, that's not our
22   claim.  We're not asking the Court to say whether or not this
23   was a good idea.

24        THE COURT:  But even though something is committed to
25   agency discretion, you think they still have to go through the

1   notice-and-comment period.

2          MR. GRAYBILL:  Correct.  And I think that's the

3   lesson of the *Drakes Bay* case.  The *Drakes Bay* case said where

4   you have both substantive discretion to decide something and

5   that is consistent with procedural safeguards like NEPA or the

6   APA, courts have to give effect to both.  And I think the IRS

7   has basically put itself in a position here saying the APA

8   doesn't apply to our tax regulations, like their regulation at

9   issue here.

10          THE COURT:  Can you point to any language regarding

11  the IRS commissioner's authority that would compare to the same

12  authority to other federal agency heads and why we are similar

13  or dissimilar?

14          MR. GRAYBILL:  I think that the discretionary

15  language to issue regulations, like the underlying legislative

16  rule here, is similar to virtually any other agency.  HHS, for

17  example, implements the Affordable Care Act.  There, the

18  Secretary of HHS has given broad authority to promulgate

19  regulations that effectuate the various provisions and purposes

20  of that law.  I think it would offend the APA, however, if HHS

21  were to promulgate a rule that said, "We've got Rule Number 1

22  now, and we reserve to ourselves in Rule Number 1, pursuant to

23  our initial granted authority by Congress, the right to evade

24  notice and comment as we freely effectuate future changes."

25  That's essentially the IRS's argument here.  And I don't see

how the APA would apply any differently in this case under this
grant of authority than it would in that situation, which we
clearly wouldn't accept.

THE COURT:  Mr. Sergi also argued, well, the IRS has
made numerous revisions to this revenue procedure over the past
four years.  This isn't something that's been static since
1976.

MR. GRAYBILL:  And revenue procedures, again, this is
back to the Supreme Court case on Monday.  A revenue procedure
is just a label.  Revenue procedures do all sorts of different
things.  Ans so for the purpose of APA analysis, the Court
looks to what does it actually do?

Now, if the IRS wanted to move a comma or something
like that or exempt a discreet organization from something for
good cause, that would be very different than what the Court is
facing here, which is undoubtedly changing the legal rights and
obligations of every single tax exempt organization.  That's
the kind of thing that the APA says you have got to notice and
provide an opportunity for public comment.

THE COURT:  Mr. Graybill, the action at issue here,
the revision, is that published in the Code of Federal
Regulations, or is it published in some separate IRS revenue
provision?

MR. GRAYBILL:  I believe that the revenue
procedure --

1          THE COURT:  I'm sorry.  Procedure.  Excuse me.

2          MR. GRAYBILL:  I believe the revenue procedures are

3  typically published in the Internal Revenue Bulletin.

4          THE COURT:  All right.  So are we dealing with

5  something in the Internal Revenue Bulletin or the Code of

6  Federal Regulations?

7          MR. GRAYBILL:  Well, there's no question that the

8  initial regulation that's amended appears in the Code of

9  Federal Regulations.  That's the repealed regulation.

10          THE COURT:  So your argument is they've managed to

11  try to circumvent that normal process by sliding this into the

12  internal bulletin.

13          MR. GRAYBILL:  Correct.  And the Supreme Court's

14  repeatedly admonished us to say, "Don't look at how agencies

15  label their changes.  Look what the changes actually are."  And

16  I think that's language that's repeated in the case on Monday,

17  in the *Perez against Mortgage Bankers Association* case that

18  opposing counsel brought up.

19          And I think it's worth actually looking briefly at

20  the *Perez* case that opposing counsel discussed.  The *Perez* case

21  did say, "Courts don't create requirements in the APA that

22  aren't in the text of the statute."  But the *Perez* case dealt

23  with an interpretative rule modifying an interpretive rule.  It

24  makes sense where the initial rule doesn't have the force of

25  law.  When you amend the initial rule, that likewise doesn't

1  have the force of law.

2          This case is very different.  This case, plaintiffs
3  are merely asking the Court to enforce a very clear mundane
4  requirement of the APA.  That is, when you change legal
5  obligations, which undoubtedly happened here, you've got to go
6  through notice and comment regardless of what you call it.  And
7  were we to accept the other world in which an agency's choice
8  of where to publish something or how an agency labeled
9  something controlled, we create all kinds of perverse
10  incentives for agencies to effectively smuggle changes about
11  our rights and obligations through subregulatory documents.

12          The Supreme Court says, "No, we don't do that.  We
13  look at what the regulation actually does."  Again, the best
14  evidence of that here is what the revenue procedure says:
15  "Organizations relieved of the obligation to report."  It's
16  exactly that language that the courts use when they say, "We
17  found a legislative rule."

18          Now, opposing counsel also spoke a bit about the
19  underlying statute.  It makes this claim that, "Well, we're
20  really just implementing the discretion given to us in the
21  underlying statute."  And that would be a good argument but for
22  the fact that the agency's already spoken on this point.  This
23  goes back to the *Hemp* case.  If the agency hadn't promulgated a
24  regulation in the '70s that specified the kinds of information
25  they then repeal last year, that would be reading in the

1  statute.   That could plausibly be an interpretive rule.

2         But the Ninth Circuit, looking at precisely this

3  situation in the Hemp case said, "No.   The fact that you

4  already spoke on this statute and set forth certain affirmative

5  requirements, if you are going to change them later, no matter

6  what you call it" -- in that case I believe it was a memo.

7  Here, it's a revenue procedure -- "if the substantive

8  requirements are inconsistent with the prior regulation, that's

9  a legislative rule, and that requires notice and comment."

10        I want to briefly address a couple of the other cases

11  that were brought up.   The IACPA case, the CPA's case in the DC

12  Circuit, which was an unpublished decision last year, that's a

13  little bit more like the *Perez* case where there was an

14  interpretive rule changing a voluntary program.   It's not like

15  this case where for 40 years you've got a very clear

16  requirement that they run a black marker through.   That was a

17  voluntary program that dealt with an interpretive rule

18  modifying another interpretive rule.   Just like *Perez*, you can

19  do that.

20        But when you modify legislative rules, when you

21  change our rights and obligations -- again, here in the context

22  of tax where we have a special emphasis on reporting because we

23  are penalized if we do it wrong, if you make those kinds of

24  changes to rights and obligations, all you have to do is go

25  through notice and comment.   This agency is well-acquainted

1  with that, and it chose not to do it here.

2  And the limited scope of relief that plaintiffs speak
3  before the Court is making them go through a lawful
4  decision-making process.  We are not asking the Court to review
5  whether this was a good idea, whether or not this should be
6  part of the regulation, but merely to recognize what the agency
7  actually did, which is remove portions of a regulation.

8  THE COURT:  Mr. Graybill, what about the *Friedman*
9  decision?

10  MR. GRAYBILL:  I don't think that's -- I don't think
11  that's any different.  That's a decision where the IRS in a
12  particular enforcement situation made a decision as to an
13  organization.  I mean, I think that is a little closer to where
14  a -- you know, for example, if we came to the Court and said,
15  "We thought it was a bad idea that the IRS didn't require the
16  Great Falls Lunch Club to report its substantial contributors,"
17  and we sought to evoke the APA to challenge that decision, that
18  would be a lot different that what the Court is looking at
19  here, which is undoubtedly a change in the rights and
20  obligations that affect all exempt organizations.  Again,
21  that's the gold standard for when you'd expect notice and
22  comment would likely to occur.

23  So I don't think the Friedman case changes anything
24  about the facts before the Court now.  This is where we'd
25  expect the APA to operate.  If you are going to change our

1  rights and obligations, in exchange, you have to do so in a
2  lawful way.  Now, that's all plaintiffs are asking the Court to
3  do.

4           This is information that's important to states.  I
5  know elections have been discussed extensively.  But really all
6  states' tax agencies do with this information is figure out,
7  "Okay, what is it that this organization does?  Does it really
8  deserve to be tax exempt?"  We, in our brief, cited an example
9  about a plumber.  Right?  If a plumber applied to be tax exempt
10 and you get the donor information, you might see it appears
11 that all the donors to this tax exempt group, plumbing.org,
12 appear to be receiving plumbing services.  That looks like a
13 for-profit organization.  That's useful to administer the tax
14 laws.

15          Again, in this case, all we're seeking is the ability
16 to tell that to the IRS.  The law provides us under the APA an
17 opportunity to be noticed of this change and to provide
18 comments.  Because this is undoubtedly a change in the
19 legislative rule, the Court should set it aside and grant
20 summary judgment on Count 1.

21          I'd be happy to answer any questions.

22          THE COURT:  Well, let's talk about what you're asking
23 for.  In your relief, you say issue an order and judgment
24 setting aside the revenue procedure.

25          MR. GRAYBILL:  And we've only moved on Count 1.

1          THE COURT:  We have other counts.

2          MR. GRAYBILL:  They're all effectively APA counts.

3  Granting relief on Count 1 would moot the other two counts.

4          THE COURT:  Right.  So what would the effect -- I

5  would issue an order in this case setting aside that rule.

6          MR. GRAYBILL:  Yes.

7          THE COURT:  And that has effect in the District of

8  Montana.

9          MR. GRAYBILL:  Yes.

10          THE COURT:  Okay.  Anything else, Mr. Graybill?

11          MR. GRAYBILL:  No.  Thank you very much, Your Honor.

12          THE COURT:  Thank you for your time.

13          Let me just ask one follow-up question.  I just want

14  Mr. Sergi to clarify.  You don't have to go to the podium.

15          MR. SERGI:  Okay.

16          THE COURT:  So I have two issues to address.  First

17  one is the standing question.  Depending how I rule on that

18  case, if I ruled in the government's favor, that's the end of

19  the matter.  Correct?

20          MR. SERGI:  We believe so, Your Honor.

21          MR. GRAYBILL:  Correct.

22          THE COURT:  Mr. Graybill, you also agree?

23          MR. GRAYBILL:  Correct.

24          THE COURT:  Now, assuming that I found there was

25  standing by the plaintiffs, move on the summary judgment,

1  Mr. Graybill asserts there are no disputed issues of material

2  fact.

3          Do you agree, Mr. Sergi?

4          MR. SERGI:  Yes, Your Honor, with one minor caveat,

5  which is we've also moved to dismiss for failure to state a

6  claim on the APA, which is essentially we have opposite sides

7  of the same issue.  We move for two reasons:  precluded from

8  review and no notice and comment required.

9          THE COURT:  Right.  And that all relates to -- my

10  question is whether any further proceeding would be required in

11  front of me besides this issue and order.

12         MR. SERGI:  And that's where it gets complicated,

13  Your Honor.  It depends on how you rule.  If you rule that this

14  is precluded from APA review and then you grant them summary

15  judgment on the last count, I think it goes away.  If you deny

16  summary judgment but you find that it is subject to notice and

17  comment, then we might have to go through the administrative

18  record phase.

19         THE COURT:  Right.  Okay.  Is there such a record?

20  Is there an administrative record?

21         MR. SERGI:  There is an -- well, in APA cases in

22  general, there's always an administrative record that gets --

23         THE COURT:  I understand that.

24         MR. SERGI:  Does one exist?  Is that what you're

25  asking?

1        THE COURT:  Yes.  This is not a typical APA case.  I

2   want to make sure that such a record exists.

3        MR. SERGI:  We have been --

4        THE COURT:  I'm trying to make sure the IRS didn't

5   act entirely in the dark here.

6        MR. SERGI:  No, we've been endeavoring the IRS to

7   begin to gather a record.

8        THE COURT:  Okay.  So I will take this matter under

9   advisement.  I just want to be clear.  I understand there's one

10  scenario which would require the potential record review, and

11  that would be if I determine that plaintiffs had standing but

12  were not entitled to summary judgment on their

13  notice-and-comment argument.

14        MR. SERGI:  Correct, Your Honor.

15        THE COURT:  Okay.

16        MR. SERGI:  And you deny that it's subject to APA.

17        THE COURT:  Yes.

18        You agree, Mr. Graybill?

19        MR. GRAYBILL:  Your Honor, with one caveat.  I think,

20  given our arguments, we believe that if you found or you

21  determined that the plaintiffs have standing in this case, you

22  could on the record before you now grant summary judgment in

23  our favor because of the standards the --

24        THE COURT:  I understand that.  That's clear.  If I

25  do that, the case is done.  But if I denied summary judgment,

1  rejected the government's claim that you're not -- the APA
2  doesn't apply here, you don't validate the A claim, then I have
3  to go to a review of the administrative record.
4          MR. GRAYBILL:  Correct.
5          THE COURT:  Okay.  That's the only scenario in which
6  I would have to call you all back here.
7          MR. SERGI:  Yes, Your Honor.
8          THE COURT:  Are we clear?
9          MR. GRAYBILL:  Yes, Your Honor.
10         MR. SERGI:  I will say that we did not dispute any of
11 the material facts, but the material facts were, in essence,
12 the words of the --
13         THE COURT:  Sure, I understand.  Anything else to
14 address?
15         MR. SERGI:  No.
16         THE COURT:  Thank you, Counsel.
17         MR. GRAYBILL:  Thank you, Your Honor.
18         THE COURT:  Thank you, Ms. Conner for your
19 assistance.
20         Mr. Yost, I think I have seen your name on a number
21 of matters.  That's why I recognized -- what's your position?
22         MR. YOST:  Trial attorney in the western section,
23 which includes Montana, so...
24         THE COURT:  Where are you out of?
25         MR. YOST:  Washington, D.C.

1            THE COURT:  Okay.  I have seen your name on a few

2   briefs before.  That's why I recognize your name.

3            All right.  Thank you, Counsel.  We'll be in recess.

4        (The proceedings concluded at 3:55 p.m.)

5

6                            --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2    I, Yvette Heinze, a Registered Professional

3 Reporter and Certified Shorthand Reporter, certify that the

4 foregoing transcript is a true and correct record of the

5 proceedings given at the time and place hereinbefore mentioned;

6 that the proceedings were reported by me in machine shorthand

7 and thereafter reduced to typewriting using computer-assisted

8 transcription; that after being reduced to typewriting, a

9 certified copy of this transcript will be filed electronically

10 with the Court.

11    I further certify that I am not attorney for, nor employed

12 by, nor related to any of the parties or attorneys to this

13 action, nor financially interested in this action.

14    IN WITNESS WHEREOF, I have set my hand at Great Falls,

15 Montana, this 16th day of August, 2019.

16

17                    /S/ *Yvette Heinze*

18    _____
                   Yvette Heinze
19                 United States Court Reporter

20

21

22

23

24

25